**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE LUIS ACOSTA; ARMANDO GARCIA; MARIA SANCHEZ; and GLYNNDANA SHEVLIN, individually and on behalf of all similarly situated current and former participants of UNITE HERE Health Plan Units 178 and 278, | ) ) ) ) ) ) | Case No. 1:22-CV-01458 |
| Plaintiffs, | ) ) ) | Hon. Harry D. Leinenweber |
| v. | ) ) | |
| BOARD OF TRUSTEES OF UNITE HERE HEALTH; DOES 1 through 10, inclusive, | ) ) ) | |
| Defendants. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT FOR RESTITUTION AND

## INJUNCTIVE RELIEF

JOSE LUIS ACOSTA, ARMANDO GARCIA, MARIA SANCHEZ, GLYNNDANA

SHEVLIN, and MARIA BUENROSTRO  (collectively, "Named Plaintiffs") bring this action

against Defendants BOARD OF TRUSTEES ("Trustees") of UNITE HERE Health ("UHH")

and other as of yet unnamed Defendants, on the grounds that they violated their fiduciary

obligations under the Employee Retirement Income Security Act of 1974, as amended

("ERISA"), 29 U.S.C. § 1001 *et seq.*, by incurring excessive administrative expenses and by

unreasonably apportioning those administrative expenses so that the Named Plaintiffs receive

less valuable health benefits in order to subsidize significantly better benefits for other

participants. Named Plaintiffs bring this action individually and as a proposed class action on

behalf of similarly situated current and former participants in UHH who are or have been part of

the Los Angeles, California and Long Beach/Orange County, California Plan Units, respectively Plan Units 178 and 278. Named Plaintiffs seek restitution for the compensation they have lost as a result of this unlawful scheme.

## SUMMARY OF ACTION

1. UHH is a Taft-Hartley labor-management trust fund organized pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), and an employee welfare benefit plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1), with an equal number of trustees appointed by employers and by labor organizations. The Trustees are the "named fiduciary" of UHH under Section 402(a) of ERISA, 29 U.S.C. § 1102(a), and are subject to ERISA's fiduciary duties.

2. UHH was and is divided into approximately 16 distinct "Plan Units" covering approximately 110,000 participants. The different Plan Units offer different levels and forms of benefits and require different contribution rates from participating employers. The participating employers and participants are assigned to a Plan Unit by UHH, mostly based on geographic location but occasionally by industry; they are not permitted to opt into another Plan Unit to obtain better or different benefits. UHH unilaterally sets the contribution rates for each employer in each Plan Unit, and it has authority to terminate coverage for the employees of any employer that does not make contributions at this unilaterally-determined rate. The mandated contribution rates are not uniform, but rather UHH sets each employer's contribution rate individually.

3. Plan Unit 150, also known as the "Culinary Health Fund" and also as the "Las Vegas Plan Unit," is unique among all the other Plan Units. Participants in the Las Vegas Plan Unit receive more generous benefits, including access to an exclusive medical clinic where they

2

receive free medical care. By contrast, participants in all other Plan Units—including the Named Plaintiffs and the members of the proposed class—largely receive conventional health insurance benefits provided by third-party health insurers, such as Blue Cross and Kaiser Permanente. In other words, the Las Vegas Plan Unit's benefits are partially self-insured, while virtually all benefits provided by the other plan units are fully-insured.

4.      The administrative expenses that UHH imposes on Plan Units 178 and 278, and indeed all Plan Units other than the Las Vegas Plan Unit, are far higher than necessary to provide such fully-insured benefits, and bear no reasonable relationship to the benefits provided. As described in detail in the allegations below, the administrative expenses that UHH allocates to the other Plan Units, including Plan Units 178 and 278, are more than twice as high as the administrative expenses required by comparable fully-insured health plans. From at least 2016 through the present, UHH has spent millions of dollars more than is reasonable or necessary for a fully-insured health plan.

5.      For example, in Plan Year 2018, UHH allocated $1,058 per participant in administrative expenses to Plan Units 178 and 278, but only allocated $531 per participant in administrative expenses to Plan Unit 150. *See* Exhibit 11, 2018 Dashboard, PTF 00596-00619. And in Plan Year 2019, UHH allocated $1,064 per participant in administrative expenses to Plan Units 178 and 278, but only allocated $582 per participant in administrative expenses to Plan Unit 150. *See* Exhibit 12, 2019 Dashboard, PTF 00620-00641. Plaintiffs, and other similarly situated participants in Plan Units 178 and 278, are being assessed administrative expenses that are approximately twice as high as participants in the Las Vegas Plan Unit.

6.      ERISA imposes fiduciary duties on the Defendants. If the Defendants allow UHH to incur unreasonable administrative expenses compared to the level of benefits provided,

Defendants violate their fiduciary duties. Thus, by incurring administrative costs for Plan Units 178 and 278 that are more than twice what is necessary to obtain the benefits provided, the Trustees of UHH have violated their fiduciary duties under ERISA and are personally liable.

7.      ERISA's fiduciary duties also require trustees to allocate the costs of a plan among participants in a manner that is reasonably related to the benefits provided to those participants. Yet UHH's scheme in effect forces the participants in all the other Plan Units, including Plan Units 178 and 278, to subsidize the more valuable benefits of the Las Vegas Plan Unit. This is unfair to the participants and beneficiaries in all the other Plan Units, such as the Named Plaintiffs, as well as to the participating employers.

8.      Named Plaintiffs have also lost wages as a direct result of Defendants' conduct. Some of Named Plaintiffs' employers have agreed to "bucket allocation provisions" in the collective bargaining agreements that establish contributions to UHH. This refers to a system in which the employer agrees to raise employees' economic benefits by a fixed amount each year, dividing that amount among wages and other compensation and benefits on the one hand, and health plan contributions on the other. Some of Named Plaintiffs' employers do not have "bucket allocation provisions" but have similar language under which every penny that Defendants demand in increased contributions is deducted from employees' wages. Thus, for Named Plaintiffs, every extra penny of contributions imposed by Defendants directly results in one less penny of wages or other compensation. Even for employers that do not use the bucket allocation method, the give-and-take of collective bargaining requires employees to sacrifice wages and other compensation in order for their employer to make the excessive contributions demanded by Defendants. Thus, Defendants' unjust allocation of expenses directly reduced and reduces the Named Plaintiffs' compensation.

9.       Named Plaintiffs seek class-wide injunctive and monetary relief under ERISA for Defendants' breach of their fiduciary duties of loyalty and prudence. This action is brought under Sections 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3).

## JURISDICTION, VENUE, AND PARTIES

10.       This Court has subject matter jurisdiction pursuant to Section 502(f) of ERISA, 29 U.S.C. § 1132(f), which provides that federal courts have jurisdiction over all claims brought under Section 502 of ERISA, without respect to the amount in controversy or the citizenship of the parties. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.       Venue in this court is proper based upon Article 17, Paragraph 17.03, as amended by Resolution No. 9, of UHH's Agreement and Declaration of Trust, which provides:

> For any Participant, Beneficiary, or Employer of Plan Unit 150 or Plan Unit 152, any action, claim, controversy, or dispute relating to or arising under the Fund, Plan, Plan Unit, Plan Documents, and/or Trust Agreement shall be brought and resolved only in the United States District Court for Nevada and in any courts in which appeals from such court are heard. For all other Participants, Beneficiaries, Employers, persons, organizations, businesses, and entities, any action, claim, controversy or dispute relating to or arising under the Fund, Plan, Plan Unit, Plan Documents, and/or Trust Agreement shall be brought and resolved only in the United States District Court for the Northern District of Illinois and in any courts in which appeals from such court are heard.

Exhibit 1, Trust Agreement, Art. 17 ¶ 17.03, as amended by Resolution No. 9, PTF 00062.[1]

Named Plaintiffs are current and former participants in Plan Units 178 and 278.

---

[1] The Exhibits attached to this Complaint have been Bates stamped with the code "PTF" for ease of reference.

**The Parties**

12.     Named Plaintiff JOSE LUIS ACOSTA is a resident of Inglewood, California and currently works as a Bartender for the Manhattan Beach Westdrift Hotel, a position which he has held since approximately 1987. Mr. Acosta's position is covered by a collective bargaining agreement between UNITE HERE Local 11 ("Local 11") and the Manhattan Beach Westdrift Hotel. A copy of the currently effective collective bargaining agreement is attached as Exhibit 28, PTF 00879-00951. Mr. Acosta was a participant in UHH Plan Unit 178 from at least 2012 to approximately 2022.

13.     Named Plaintiff ARMANDO GARCIA is a resident of Los Angeles, California and currently works as a Senior Lead Steward for the Westin Bonaventure Hotel & Suites, where he has been employed since 1981. Mr. Garcia's position is covered by a collective bargaining agreement between UNITE HERE Local 11 and the Westin Bonaventure Hotel & Suites. A copy of the currently effective collective bargaining agreement is attached as Exhibit 30, PTF 01039-01118. Mr. Garcia was a participant in UHH Plan Unit 178 from at least 2012 to November 1, 2020. On November 1, 2020, Mr. Garcia stopped receiving health benefits from UHH and started receiving benefits from a different multiemployer health and welfare plan called the Santa Monica UNITE HERE Health Benefit Trust Fund. A copy of the memorandum of understanding between the Westin Bonaventure Hotel & Suites and UNITE HERE Local 11 transitioning the provision of health benefits from UHH to the Santa Monica UNITE HERE Health Benefit Fund is attached as Exhibit 31, PTF 01119-01120.

14.     Named Plaintiff MARIA SANCHEZ is a resident of Paramount, California and currently works as a Banquet Server for Aramark Sports, LLC at the Anaheim Convention Center, a position which she has held since 1986. Ms. Sanchez's position is covered by a

collective bargaining agreement between UNITE HERE Local 11 and Aramark Sports, LLC. A copy of the currently effective collective bargaining agreement is attached as Exhibit 40, PTF 01481-01513. Ms. Sanchez was a participant in UHH Plan Unit 278 from at least 2012 to approximately 2022.

15. Named Plaintiff GLYNNDANA SHEVLIN is a resident of La Mirada, California and currently works as a Food and Beverage Concierge for Walt Disney Parks and Resorts, U.S., Inc., where she has been employed since 1988. Ms. Shevlin's position is covered by a collective bargaining agreement between UNITE HERE Local 11 and Walt Disney Parks and Resorts, U.S., Inc. A copy of the currently effective collective bargaining agreement is attached as Exhibit 41, PTF 01514-01614. Ms. Shevlin was a participant in UHH Plan Unit 278 from at least 2012 through October 1, 2021. On October 1, 2021, Ms. Shevlin stopped receiving health benefits from UHH and started receiving benefits from a different multiemployer health and welfare plan called the Santa Monica UNITE HERE Health Benefit Trust Fund. A copy of the memorandum of understanding between Walt Disney Parks and Resorts U.S., Inc. and UNITE HERE Local 11 transitioning the provision of health benefits from UHH to the Santa Monica UNITE HERE Health Benefit Fund is attached as Exhibit 42, PTF 01615.

16. Named Plaintiff MARIA BUENROSTRO is a resident of Los Angeles, California and currently works as a Banquet Server for Levy Premium Foodservice Limited Partnership at the Los Angeles Convention Center, where she has been employed since 2000. Ms. Buenrostro's position is covered by a collective bargaining agreement between UNITE HERE Local 11 and Levy Premium Foodservice Limited Partnership. A copy of the currently effective collective bargaining agreement is attached as Exhibit 45, PTF 02369-02419. A copy of an extension of that collective bargaining agreement is attached as Exhibit 46, PTF 02420. Ms. Buenrostro is,

7

and has been, a participant in UHH Plan Unit 178 from at least 2012 to the present.

17.    Named Plaintiffs bring this action individually and on behalf of the following class of individuals (the "putative class members") (collectively, "Plaintiffs"):

> All current and former participants in UNITE HERE Health Plan Unit 178 or Plan Unit 278, who are or were participants in such Plan Units at any point from March 21, 2016 through the date of judgment in this action.

18.    UHH is an "employee welfare benefit plan" as that term is defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1), and is a "multiemployer plan" as that term is defined in Section 3(37) of ERISA, 29 U.S.C. § 1002(37).

19.    UHH was created and is maintained pursuant to an Agreement and Declaration of Trust ("Trust Agreement") executed and maintained pursuant to collective bargaining agreements between various employers located across the United States and various local unions of UNITE HERE, pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). A copy of the Trust Agreement is attached to this Complaint as Exhibit 1, PTF 00001-00066.

20.    UHH maintains headquarters in DuPage County, Illinois at 711 N. Commons Drive, Aurora, Illinois 60504.

21.    Defendant Trustees are the named fiduciary of UHH as defined in ERISA section 402(a)(1), 29 U.S.C. § 1102(a)(1). *See* Exhibit 1, Trust Agreement, Art. Twelve § 12.01 at p. 40, PTF 00040 ("such Board of Trustees being the "Named Fiduciary" of the Fund within the meaning of ERISA"). Each Defendant Trustee is a "Plan Fiduciary" of UHH as defined in ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A).

22.    Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names.

Plaintiffs will amend this Complaint to allege Doe Defendants' true names and capacities when ascertained.

## FACTUAL BACKGROUND

### UHH's Structure

23.     UHH is divided into approximately 16 Plan Units.

24.     Each Plan Unit is a "benefit program[] adopted by the Trustees for [a] specific region[] of the country or [a] specific group[] of Employers or Participants." *See* Exhibit 1, Trust Agreement §1.08 at p. 6, PTF 00006. In other words, each Plan Unit is effectively an independent health plan.

25.     Each Plan Unit provides health care benefits exclusively to participants who are assigned to that Plan Unit.

26.     Each Plan Unit's "operating budget" is "set[], approv[ed], and monitor[ed]" separately by the Executive Committee of the Board of Trustees. *See* Exhibit 1, Trust Agreement §6.14(1)(a)(iii) at p. 22, PTF 00022.

27.     Each Plan Unit is governed by its own set of governing documents. *See* Exhibit 1, Trust Agreement § 4.02(14) at p. 10, PTF 00010 (noting that the Plan Administrator's duties include adjudicating disputes "as specifically set forth in the governing plan documents of a particular Plan Unit").

28.     The Trustees monitor "the viability of certain plan units" and "have the authority to terminate any individual Plan Unit … and to terminate the participation in that Plan Unit of any Employer and its Employees (and their beneficiaries)" if the Trustees find, among other things, that "continuing to maintain the relevant Plan Unit … has resulted or is expected to result

9

in (a) financial or administrative hardship for the overall plan." *See* Exhibit 1, Trust Agreement §16.05 as amended by Resolution No. 11 at pp. 64-65, PTF 00064-00065.

29. Each participant is assigned to a Plan Unit based on the identity of their employer and the location of the facility at which they work. For example, the Summary Plan Description for Plan Unit 178 refers to it as "The Los Angeles Plan" because employees in Los Angeles, California are assigned to it. The Summary Plan Description for Plan Unit 278 refers to it as "The Long Beach/Orange County Plan" because employees in Long Beach, California and Orange County, California are assigned to it. A true and correct copy of the Summary Plan Description for Plan Unit 178 is attached to this Complaint as Exhibit 3 ("Plan Unit 178 SPD"), PTF 00080-00221. A true and correct copy of the Summary Plan Description for Plan Unit 278 is attached to this Complaint as Exhibit 7 ("Plan Unit 278 SPD"), PTF 00378-00543.

30. Participants may not opt into a different Plan Unit.

31. The Plan Units are administered separately by the Trustees of UHH.

32. There are four committees of the Board of Trustees which administer the various plan units: the "Gaming Plan Units Committee," the "Food Service Plan Units Committee," the "Hospitality Plan Unit Committee" and the "Aurora Plan Units Committee." *See* Exhibit 1, Trust Agreement § 6.14 at p. 21, PTF 00021 as amended by Resolutions 1, 4, 6, and 7 at pp. 50, 56, 57-59, 60, PTF 00050, 00056, 00057-00059, 00060.

33. The Gaming Plan Units Committee administers "Las Vegas Plan Units 150, 150A and 152; Atlantic City Plan Unit 102; and Atlantic City Plan Unit 202." *See* Exhibit 1, Trust Agreement § 6.14(2) as amended by Resolution 7 at p. 60, PTF 00060.

34. The Food Service Plan Units Committee administers "Food Service Plan 176, Delaware North Companies Plan 174 and New York Plan 100." *See* Exhibit 1, Trust Agreement

10

§ 6.14(9) as amended by Resolution 1 at p. 50, PTF 00050.

35.     The Hospitality Plan Unit Committee administers the "Hospitality Plan Unit." *See* Exhibit 1, Trust Agreement § 6.14(11) which was added by Resolution 6 at p. 58, PTF 00058.

36.     The Aurora Plan Units Committee is a catch-all committee that administers "all Plan Units not listed under the Gaming Plan Units Committee, Food Service Plan Unit Committee and Hospitality Plan Unit Committee." Exhibit 1, Trust Agreement § 6.14(3) as amended by Resolution 6 at p. 57, PTF 00057.

37.     Each of these four committees – the Gaming Plan Units Committee, the Food Service Plan Units Committee, the Hospitality Plan Unit Committee, and the Aurora Plan Units Committee – is responsible for "health care delivery", "Benefits and participant services", and "Plan Unit Finances" of the Plan Units they administer. *See* Exhibit 1, Trust Agreement §§ 6.14(2)(a) at p. 23, PTF 00023 [the Gaming Plan Units Committee], 6.14(3)(a) at pp. 24-25, PTF 00024-00025 [the Aurora Plan Units Committee], 6.14(9)(a) at p. 27, PTF 00027 [the Food Service Plan Units Committee], and 6.14(11)(a) added by Resolution 6 at p. 58, PTF 00058 [the Hospitality Plan Unit Committee].

38.     Each of these four committees' responsibility for health care delivery includes "responsibility for developing strategies for healthcare delivery and approving initiatives within the budget; considering and implementing new healthcare delivery initiatives and innovations; and monitoring and making decisions on healthcare delivery models for [the committee's plan units], including expense, income and healthcare delivery system trends impacting the [committee's plan units]." *See* Exhibit 1, Trust Agreement §§ 6.14(2)(a) at p. 23, PTF 00023 [the Gaming Plan Units Committee], 6.14(3)(a) at pp. 24-25, PTF 00024-00025 [the Aurora Plan Units Committee], 6.14(9)(a) at p. 27, PTF 00027 [the Food Service Plan Units Committee], and

11

6.14(11)(a) added by Resolution 6 at p. 58, PTF 00058 [the Hospitality Plan Unit Committee].

39.     Each of these four committees' responsibility for benefits and participant services includes "responsibility for approving regional and national service providers; establishing and approving the plans of benefits (including benefit levels and eligibility) for the [committee's plan units]; and setting the direction for participant service, communications and benefit education." *See* Exhibit 1, Trust Agreement §§ 6.14(2)(a) at p. 23, PTF 00023 [the Gaming Plan Units Committee], 6.14(3)(a) at pp. 24-25, PTF 00024-00025 [the Aurora Plan Units Committee], 6.14(9)(a) at p. 27, PTF 00027 [the Food Service Plan Units Committee], and 6.14(11)(a) added by Resolution 6 at p. 58, PTF 00058 [the Hospitality Plan Unit Committee].

40.     Each of these four committees' responsibility for plan unit finances includes "responsibility for establishing and approving funding requirements for the [committee's plan units]; reviewing and monitoring finances and operating budgets for [the committee's plan units]; and monitoring and making decisions on income and expenses for [the committee's plan units]." *See* Exhibit 1, Trust Agreement §§ 6.14(2)(a) at p. 23, PTF 00023 [the Gaming Plan Units Committee], 6.14(3)(a) at pp. 24-25, PTF 00024-00025 [the Aurora Plan Units Committee], 6.14(9)(a) at p. 27, PTF 00027 [the Food Service Plan Units Committee], and 6.14(11)(a) added by Resolution 6 at p. 58, PTF 00058 [the Hospitality Plan Unit Committee].

41.     Each of these four committees has "full authority to act without ratification by the Board of Trustees …." *See* Exhibit 1, Trust Agreement § 6.14 at p. 22, PTF 00022.

42.     The Las Vegas Plan Unit receives special prominence in the administrative structure of the Gaming Plan Units Committee: there is an appeals subcommittee dedicated solely to considering appeals from the Las Vegas Plan Unit. *See* Exhibit 1, Trust Agreement § 6.14(2)(c) at p. 24, amended by Resolution 7 at p. 60, PTF 00060.

12

43. Most of the Plan Units within UHH—including Plan Units 178 and 278—are administered by the Aurora Plan Units Committee. The Aurora Plan Units Committee has jurisdiction over "all Plan Units not listed under the Gaming Plan Units Committee, Food Service Plan Unit Committee and Hospitality Plan Unit Committee." *See* Exhibit 1, Trust Agreement §6.14(3) as amended by Resolution 6 at p. 57, PTF 00057.

44. Each Plan Unit's benefits are independent of every other Plan Unit's benefits.

45. Each of the Plan Units has its own insurance contracts.

46. There are two basic types of health care plans, which are distinguished based on how they pay out claims for benefits. A self-insured plan is a plan in which benefit claims are paid directly from plan assets. A fully-insured plan is a plan in which plan assets are used to pay insurance premiums to an insurer such as Blue Cross or Kaiser Permanente, and that insurer pays benefit claims.

47. Self-insured plans are more expensive to administer than fully-insured plans that provide the same level of benefits. *See, e.g.,* Gail A. Jensen et al., *State Insurance Regulation and Employers' Decisions to Self-Insure*, 62 J. Risk & Ins. 185, 200 (1995) ("research suggests that employers' benefit and administrative costs for self-insured plans are actually higher than those of purchased plans containing the same coverage").

48. Some plans are "partially insured," which is a hybrid of self-insured and fully-insured. It means that some benefits are paid directly from plan assets, while other benefits are provided by an insurer whose premiums are paid with plan assets.

49. Most UHH Plan Units, including Plan Units 178 and 278, provide fully-insured medical benefits, while the Las Vegas Plan Unit provides a mix of fully-insured and self-insured medical benefits.

50.     Each of the Plan Units has its own appeals process. Plan Unit 178 PPO members must submit a benefit claim to UNITE HERE Health, P.O. Box 6020, Aurora, IL, 60598-0020. *See* Exhibit 3, Plan Unit 178 SPD, p. G-3, PTF 00186. If that benefit claim is denied, a Plan Unit 178 PPO member only has one level of appeals. *Id.* at G-9, PTF 00192. Plan Unit 178 HMO participants must submit a claim to Kaiser Permanente Claims Administration - SCAL P.O. Box 7004 Downey, CA 90242-7004. *See* Exhibit 5, Kaiser Permanente's Template Evidence of Coverage, p. 67, PTF 00346; *See also* Exhibit 4, Plan Unit 178 Kaiser Disclosure Form, pp. 33, 40, PTF 00254, 00261 ("For details about the terms and conditions of coverage, please refer to the *Evidence of Coverage ("EOC")*" and "Please refer to the *EOC* for additional instructions, coverage information, exclusions, limitations, and dispute resolution for denied claims."). If that claim is denied the Plan Unit 178 HMO member has only one level of appeal. *See* Exhibit 5, Kaiser Permanente's Template Evidence of Coverage, pp. 68, 73-74, PTF 00347, 00352-00353.

51.     By contrast, Plan Unit 278 EPO members must submit claims to EHS Medical Group, ATTN: Claims Department, 1600 Corporate Center Drive, Monterey Park, CA 91754. *See* Exhibit 7, Plan Unit 278 SPD, p. G-2, PTF 00505. If that claim is denied, the Plan Unit 278 EPO member has two levels of appeal in which they can attempt to reverse the denial. *Id.* at p. G-9, PTF 00512.

52.     Each employer's contribution rate is independent of every other employer's contribution rate. *See, e.g.,* Exhibit 13, PTF 00642-00643 ("Plan Units 178 and 278 Published Rates for 2021 and 2022") (this UHH-prepared document shows distinct rates for different participating employers).

53.     The Trustees of UHH track the expenses of each Plan Unit separately. For each 12-month Plan Year (from April through the following March), UHH staff produces a

"dashboard" for presentation to the Trustees, which tracks how each Plan Unit performed during the preceding 12 months. The Dashboard for the Plan Year ending in March 2019 ("2018 Dashboard") is attached as Exhibit 11. The Dashboard for the Plan Year ending in March 2020 ("2019 Dashboard") is attached as Exhibit 12.

54. Each Plan Year is numbered by the year in which it commenced. Thus, the Plan Year ending in March 2019 is referred to as "Plan Year 2018," and the Plan Year ending in March 2020 is referred to as "Plan Year 2019."

### The "Minimum Standards"

55. UHH sets a minimum contribution rate for each employer in each Plan Unit.

56. UHH's "Amended and Restated Notice of Minimum Standards for Acceptance of Collective Bargaining Agreements" (hereinafter, "Minimum Standards") set the required terms and conditions that must be included in any employer's collective bargaining agreement in order to participate in UHH. A copy of the Notice of Minimum Standards is attached as Exhibit 2, PTF 00067-00079.

57. The Notice of Minimum Standards contains contribution requirements, that the Trustees have issued at their discretion: "A number of these requirements are restatements of existing Fund rules; others are new." *See* Exhibit 2, Notice of Minimum Standards, p. 1, PTF 00069.

58. The Trustees have discretion to change the Minimum Standards at any time: "the Trustees retain the right to modify these [Minimum Standards] rules at any time, at their sole discretion." *See* Exhibit 2, Notice of Minimum Standards, p. 1, PTF 00069.

59. The Trust Agreement requires each participating employer to make "those

15

[contributions] required by the Minimum Standards as established under the authority of the Trust Agreement." *See* Exhibit 1, Trust Agreement § 9.01 at p. 30, PTF 00030.

60.     The minimum contribution rates for each Plan Unit and for each employer within each Plan Unit are independent from one another.

61.     UHH can change the minimum contribution rates of any participating employer at its discretion. *See* Exhibit 2, Notice of Minimum Standards § II.C.2 at p. 5, PTF 00073 ("in order to determine the required rate, Fund Staff must be consulted prior to the negotiation of a new agreement."); *See also id.* at § I.I, p. 3, PTF 00071 ("Any prospective modification of contribution rates or other terms affecting the Employer's contribution obligation, whether or not under a reopener clause, shall be treated as a new contract; accordingly, the Trustees shall have the right to reject contributions and terminate participation if the modification fails to conform with Minimum Standards.").

62.     Each employer that wishes to participate in UHH must sign a collective bargaining agreement with a local union, or a participation agreement, that obligates the employer to make contributions to UHH that are not less than the current minimum contribution rate that UHH set for the employer. *See* Exhibit 2, Notice of Minimum Standards at p. 1, PTF 00069 ("the Collective Bargaining Agreement, generally, is the document that entitles the Fund to accept Employer contributions and pay benefits to Fund Participants and Beneficiaries. Occasionally, a Participation Agreement will serve this purpose."); *Id.* ("If any agreement is inconsistent with these [Minimum Standards], the Fund will not be able to accept contributions or pay benefits.")

63.     Each employer that wishes to participate in UHH must sign a collective bargaining agreement with a local union or participation agreement that obligates the employer

16

to allow UHH to increase the contribution rate at least once every three years. *See* Exhibit 2, Notice of Minimum Standards §§ II.C.2.e-f at p. 6, PTF 00074.

64.     An employer that signs a collective bargaining agreement or participation agreement which does not allow UHH to set the contribution rates at least once every three years must allow UHH to set a new contribution rate every three years notwithstanding the lack of any such language in the agreement, or will have its participation terminated. *See* Exhibit 2, Notice of Minimum Standards § II.C.2.f at p. 6, PTF 00074.

65.     Each employer that participates in UHH must sign a collective bargaining agreement or participation agreement that "incorporate[s] the Trust Agreement and Minimum Standards governing the Fund." Exhibit 1, Trust Agreement § 9.04(5) at p. 35, PTF 00035.

66.     Each employer that participates in UHH must sign a collective bargaining agreement or participation agreement in which they "agree … to be bound by the Trust Agreement as may, from time to time, be amended." Exhibit 1, Trust Agreement § 9.04(5) at p. 35, PTF 00035; *See also* Exhibit 2, Notice of Minimum Standards §I.F at p. 2, PTF 00070.

67.     Each employer that participates in UHH must sign a collective bargaining agreement or participation agreement in which they "agree … to be bound and abide by all actions taken and rules and procedures established by the Trustees pursuant to the Trust Agreement." Exhibit 1, Trust Agreement § 9.04(5) at p. 35, PTF 00035; *See also* Exhibit 2, Notice of Minimum Standards § I.F at p. 2, PTF 00070.

68.     Each employer that participates in UHH must sign a collective bargaining agreement or participation agreement in which they "agree … [to] ratify without the necessity of notice all acts taken or to be taken by the Trustees to effectuate the purposes of the Fund and its proper administration." Exhibit 1, Trust Agreement § 9.04(5) at p. 35, PTF 00035.

69.     Employers are required to submit their collective bargaining agreements to UHH for approval: "Upon execution of each new or successive collective bargaining agreement or participation agreement … each Employer contributing to the Fund shall promptly submit (to the Fund Office) … a complete copy of the contract." Exhibit 1, Trust Agreement § 9.04(3) at p. 34, PTF 00034.

70.     Every employer's collective bargaining agreement must be "submitted to the Fund Office within five (5) days of final execution." *See* Exhibit 2, Notice of Minimum Standards §I.B at p. 1, PTF 00069.

71.     The Minimum Standards document also reiterates the requirement that UHH has the right to review all collective bargaining agreements and participation agreements from participating employers: "[T]he Fund, in order to accept contributions and pay benefits, must be provided with a copy of the most complete and current written agreement regarding the Employer's contribution obligation to the Fund and must receive a copy of the complete, currently-effective written agreement as soon as it is executed by all parties. Also, in order to enable the Fund to administer the Plan effectively, it is necessary that each Collective Bargaining Agreement and Participation Agreement conform to certain requirements described below. If any agreement is inconsistent with these requirements, the Fund will not be able to accept contributions or pay benefits." *See* Exhibit 2, Notice of Minimum Standards, p. 1, PTF 00069.

72.     Further, the Trustees have total discretion to reject an employer's collective bargaining agreement: "the Trustees may reject any agreement that they determine, at their sole discretion, to be detrimental to the interests of the Fund's Participants and Beneficiaries." *See* Exhibit 2, Notice of Minimum Standards, p. 1, PTF 00069.

73.     The Trust Agreement also grants the Trustees the power to terminate the

participation of any employer whose collective bargaining agreement does not meet UHH's unilateral requirements: "The Trustees reserve the right to reject contributions from and terminate the participation of any Employer whose collective bargaining agreement, participation agreement, or other agreement or understanding fails to satisfy … the requirements for participation in the Fund as set forth in the provisions of the Trust Agreement and Minimum Standards." Exhibit 1, Trust Agreement § 9.04(3) at p. 34, PTF 00034.

74.     Although each participating employer must sign a collective bargaining agreement with a local union, each such employer's "obligation to make timely contributions to the Fund … in accordance with the Minimum Standards shall continue after expiration of the collective bargaining agreement … The obligation to contribute following the expiration of such agreement shall include the obligation to pay the contribution rate established by the Trustees during the post-expiration period." *See* Exhibit 1, Trust Agreement § 9.02(2) at p. 33, PTF 00033.

75.     The Trust Agreement also requires all participating unions and employers to conform their collective bargaining agreements to the Minimum Standards, providing that:

> The term "Minimum Standards" means the minimum requirements for an Employer's participation in the Fund adopted by the Trustees, as they currently exist, and as they may be amended from time to time*, to which each collective bargaining agreement and participation agreement must conform* in order for the Trustees to accept contributions and pay benefits on behalf of Employees covered under the Plan.

Exhibit 1, Trust Agreement, § 1.13 at p. 7, PTF 00007 (emphasis added).

76.     Any employer and local union that wish to modify their contract must submit the proposed modifications to UHH for approval *before* the employer and union execute the modification agreement:

19

> Contract modifications, by and between the Employer and the Union, may be accepted only prospectively, after review and approval by the Fund's Contracts Department, which shall review the modification for compliance with the Fund established Minimum Standards. <u>Any prospective modification of contribution rates or other terms affecting the Employer's contribution obligation, whether or not under a reopener clause, shall be treated as a new contract; accordingly, the Trustees shall have the right to reject contributions and terminate participation if the modification fails to conform with Minimum Standards.</u>

Exhibit 2, Notice of Minimum Standards § I.I at p. 3, PTF 00071 (emphasis in original).

77.     Any employer that agrees to a contribution rate which is lower than UHH's minimum contribution rate for that employer's Plan Unit can be terminated from participation in UHH. *See* Exhibit 2, Notice of Minimum Standards § II.C.2.d at p. 6, PTF 00074 ("If an increased rate is required, but is not included in a new, renewal, or extended agreement, the account will be terminated and further contributions will not be accepted and no eligibility will be granted.")

78.     In October 2021, UHH notified Local 11 of its 2021 and 2022 contribution rates for some employers in Plan Units 178 and 278. A copy of this UHH-prepared record is attached as Exhibit 13, Plan Units 178 and 278 Published Rates for 2021 and 2022, PTF 00642-00643.

**UHH's Control Over Collective Bargaining to Enforce Minimum Contributions**

79.     UHH compels local unions and employers to bargain to include the minimum standards in their collective bargaining agreements; UHH can terminate the health benefits of all employees working under a collective bargaining agreement that does not bind the employer to the minimum contribution rate set by UHH. As noted above, the Minimum Standards provide that "[i]f any agreement is inconsistent with these requirements, the Fund will not be able to accept contributions or pay benefits." Exhibit 2, Notice of Minimum Standards, p. 1, PTF 00069.

80.     Any local union that negotiates a collective bargaining agreement which provides for a contribution rate that is less than the UHH-imposed minimum can have its members' benefits terminated by UHH. *See* Exhibit 2, Notice of Minimum Standards § II.C.2.d at p. 6, PTF 00074.

81.     UHH requires local unions to obtain UHH's approval for their negotiated contribution rates *before* executing a collective bargaining agreement: "in order to determine the required rate, Fund Staff must be consulted prior to the negotiation of a new agreement." Exhibit 2, Notice of Minimum Standards § II.C.2.A at p. 5, PTF 00073 (emphasis in original).

82.     In some cases, where UHH has not yet calculated its minimum contribution rates for future years, UHH has required participating local unions and employers to sign collective bargaining agreements allowing UHH discretion to set future contribution rates, but without expressly requiring the increased contributions to come out of employee compensation. For example:

> a.  By letter dated November 8, 2019, UHH informed Local 11 and Plan Unit 178 participating employer Levy Premium Foodservice ("Levy Foodservice")— the food concessionaire at Dodger Stadium—that because UHH had not calculated contribution rates past 2020, the parties would need to agree to contract language allowing UHH discretion to set a contribution rate effective on February 1, 2021. Specifically, UHH explained that it "has not projected the welfare contribution rates to be effective in 2021. Because the Fund's Minimum Standards require that all agreements contain welfare rates obligations for all years of the contract, the Fund requests the parties to include the following language in the renewal agreement if the rates for the

21

years listed above are not available by the time the renewal agreement is signed by the parties…. "*Effective February 1, 2021 through the expiration of this Agreement, the Employer agrees to contribute the contribution rates necessary, as determined by UNITE HERE HEALTH ("Fund"), to sustain benefits. The parties agree and understand that, if the appropriate contribution rates are not paid, the Trustees of the Fund may eliminate benefits to otherwise eligible participants and terminate the employer's participation pursuant to the Fund's Minimum Standards.*" (emphasis in original). A true and correct copy of this letter is attached as Exhibit 14 (*See* PTF 00645).

b. By letter dated February 5, 2020, UHH again notified Local 11 and Levy Foodservice that because "the Fund has not projected the welfare contribution rates to be effective in 2021" the parties needed to agree to contract language under which "the Employer agrees to contribute the contribution rates necessary, as determined by [UHH]…." This letter extended the period for which UHH had discretion to set contribution rates out to 2023. A true and correct copy of this letter is attached as Exhibit 15 (*See* PTF 00651).

c. By letter dated July 31, 2019, UHH notified Local 11 and participating employer Aramark Sports regarding a bargaining unit at the Anaheim Convention Center that because "the Fund has not projected the welfare contribution rates to be effective in 2021" the parties needed to agree to contract language under which "the Employer agrees to contribute the contribution rates necessary, as determined by [UHH]…." A true and correct

copy of this letter is attached as Exhibit 16 (*See* PTF 00653).

d.  By letter dated March 5, 2017, UHH notified Local 11 and Levy Foodservice—this time regarding a bargaining unit at what was then called the StubHub Center—that "the Fund has not projected the welfare contribution rates to be effective in 2017" and consequently requiring the parties to agree to contract language that "the Employer agrees to contribute the contribution rates necessary, as determined by the Fund, to sustain benefits." A true and correct copy of this letter is attached as Exhibit 17 (*See* PTF 00656).

e.  By letter dated November 8, 2016, UHH notified Local 11 and Walt Disney Parks and Resorts, U.S., Inc., a participating employer with bargaining unit employees at Disneyland Resort, that "the Fund has not projected the welfare contribution rates to be effective in 2018" and consequently requiring the parties to agree to contract language that "the Employer agrees to contribute the contribution rates necessary, as determined by [UHH], to sustain benefits." A true and correct copy of this letter is attached as Exhibit 18 (*See* PTF 00658).

f.  By letter dated September 26, 2016, UHH notified Local 11 and Levy Foodservice—this time regarding a bargaining unit at what was then called the Staples Center, that "the Fund has not projected the welfare contribution rates to be effective in 2017" and consequently requiring the parties to agree to contract language that "the Employer agrees to contribute the contribution rates necessary, as determined by the Fund, to sustain benefits." A true and

23

correct copy of this letter is attached as Exhibit 19 (*See* PTF 00663).

g. By letter dated June 14, 2016, UHH notified Local 11 and Legends Hospitality, a participating employer with bargaining unit employees at the Los Angeles Memorial Coliseum and Sports Arena, that "the Fund has not projected the welfare contribution rates to be effective in 2017" and consequently requiring the parties to agree to contract language that "the Employer agrees to contribute the contribution rates necessary, as determined by [UHH], to sustain benefits." A true and correct copy of this letter is attached as Exhibit 20 (*See* PTF 00665-00666).

h. By letter dated July 23, 2014, UHH notified Local 11 and participating employer the California Club that "the Fund has not projected the welfare contribution rates to be effective in 2016" and consequently requiring the parties to agree to contract language that "the Employer agrees to contribute the contribution rates necessary, as determined by the Fund, to sustain benefits." A true and correct copy of this letter is attached as Exhibit 21 (*See* PTF 00669, 00671).

i. By letter dated June 5, 2019, UHH notified Local 11 and Compass Group, a Plan Unit 176E participating employer with bargaining unit employees at the University of La Verne, that "the Fund has not projected the welfare contribution rates to be effective in 2020" and consequently requiring the parties to agree to contract language that "the Employer agrees to contribute the contribution rates necessary, as determined by [UHH], to sustain benefits." A true and correct copy of this letter is attached as Exhibit 22 (*See* PTF

00680).

j.  By letter dated June 5, 2019, UHH notified Local 11 and Compass Group, a Plan Unit 176E participating employer with bargaining unit employees at Whittier College, that "the Fund has not projected the welfare contribution rates to be effective in 2020" and consequently requiring the parties to agree to contract language that "the Employer agrees to contribute the contribution rates necessary, as determined by [UHH], to sustain benefits." A true and correct copy of this letter is attached as Exhibit 23 (*See* PTF 00688).

k.  By letter dated April 18, 2019, UHH notified Local 11 and Pomona College, a Plan Unit 176E participating employer, that "the Fund has not projected the welfare contribution rates to be effective in 2020" and consequently requiring the parties to agree to contract language that "the Employer agrees to contribute the contribution rates necessary, as determined by [UHH], to sustain benefits." A true and correct copy of this letter is attached as Exhibit 24 (*See* PTF 00693).

83.  UHH encourages local unions to negotiate collective bargaining agreements that include a "bucket allocation" provision. The "bucket allocation" is also referred to as an "Allocated Contribution Rate" by UHH.

84.  A bucket allocation provision is one providing that "in one (1) or more years during the term, or during any extension or renewal of the agreement, the Employer will pay a cents-per-hour increase that is to be allocated by the Union between wages and contributions to one or more employer benefit trust funds, including the Fund." *See* Exhibit 2, Notice of Minimum Standards § II.C.2.h, Ex. 2 at p. 7, PTF 00075.

25

85.     In other words, under the bucket allocation method, a union and employer agree that employees will receive a fixed increase in their total hourly compensation at definite points in the future, but UHH is entitled to take some or all of those increases, at its discretion.

86.     Under any bucket allocation contract, for each penny per hour that UHH demands in increased contributions, each covered employee receives one penny less per hour in wages or other benefits than they otherwise would.

87.     Collective bargaining agreements that use the bucket allocation method include, but are not limited to, the following:

    a.  The 2018-2023 Collective Bargaining Agreement between the Hilton Los Angeles North/Glendale and Local 11. Exhibit 25, Hilton Los Angeles North CBA 2018-2023, Side Letter on Trust Fund Economic Increases at p. 36, PTF 00735;

    b.  The 2018-2023 Collective Bargaining Agreement between the Beverly Wilshire Hotel and Local 11. Exhibit 26, Beverly Wilshire CBA 2018-2023 § 8.A at p. 16, PTF 00759;

    c.  The 2018-2023 Collective Bargaining Agreement between Sydell Hotels d/b/a The Line Hotel and Local 11. Exhibit 27, Line Hotel CBA 2018-2023 § 21.04 at p. 40, PTF 00859;

    d.  The 2018-2023 Collective Bargaining Agreement between the Manhattan Beach Westdrift Hotel and Local 11. *See* Exhibit 28, Westdrift Hotel CBA 2018-2023 § 39.h at pp. 36-38, PTF 00915-00917;

    e.  The 2013-2018 Collective Bargaining Agreement between the Beverly Hilton Hotel and Local 11. Exhibit 29, Beverly Hilton Hotel CBA 2013-2018, 2013-

2018 Side Letter on Economic Increases at p. 83, PTF 01037;

f.  The 2013-2018 Collective Bargaining Agreement between the Westin Bonaventure Hotel & Suites and Local 11. Exhibit 30, Westin Bonaventure CBA 2013-2018, Memorandum of Agreement Concerning Economic Increases at pp. 74-76, PTF 01115-01117;

g.  The 2018-2023 Collective Bargaining Agreement between the Courtyard Management Corporation d/b/a Courtyard and Residence Inn L.A. Live and Local 11. *See* Exhibit 32, Feb 27, 2020 UHH Acceptance Letter, pp. 1-3, PTF 01123-01125 (noting that each year the Union must ensure that a sufficient portion of the "total economic package" is dedicated to UHH's rate increases); and

h.  The 2018-2023 Collective Bargaining Agreement between JW Marriott Hotel and Ritz-Carlton at LA Live and Local 11. *See* Exhibit 33, Feb 27, 2020 UHH Acceptance Letter, pp. 1-3, PTF 01131-01133.

88.  Other collective bargaining agreements that UHH has approved provide that increased minimum contributions can be taken from employee wage increases "if required, to maintain benefits." Like the bucket allocation agreements, these agreements provide that increases in contributions demanded by UHH come directly from employee wages. Examples of collective bargaining agreements with this arrangement include but are not limited to the following:

a.  The 2018-2023 Collective Bargaining Agreement between the Millennium Biltmore Hotel and Local 11. Exhibit 34, Millennium Biltmore CBA 2018-2023 §8.A.12 at p. 25, PTF 01161. ("At the Union's option, the wage

27

increases specified in this Agreement may be reduced, and the amount of such reduction contributed by the Employer to [UHH], if required, to maintain benefits.");

b.  The 2017-2023 Collective Bargaining Agreement between Levy Premium Foodservice at Dignity Health Sports Park and Local 11. Exhibit 35, Dignity Health Park CBA 2017-2023 § 20.1.4 at p. 30, PTF 01268 ("…the wage increases specified in this Agreement may be reduced, and the amount of the reduction contributed by the Employer to [UHH], if required, to maintain benefits.");

c.  The 2017-2020 Collective Bargaining Agreement between Levy Premium Foodservice at Dodger Stadium and Local 11. Exhibit 36, Dodgers Concessions CBA 2017-2020, Art. 10 § 4 at p. 12, PTF 01298;

d.  The 2017-2020 Collective Bargaining Agreement between Levy Premium Foodservice covering Premium Service at Dodger Stadium and Local 11. Exhibit 37, Dodgers Premium CBA 2017-2020 § 20.3 at p. 30, PTF 01362;

e.  The 2017-2019 Collective Bargaining Agreement between Levy Premium Foodservice at the LA Cathedral and Local 11. Exhibit 38, LA Cathedral CBA 2017-2020 § 20.1(d) at p. 28, PTF 01405;

f.  The 2017-2019 Collective Bargaining Agreement between Levy Premium Foodservice at the Staples Center & Microsoft Theater and Local 11. Exhibit 39, Staples Center CBA 2017-2019 § 20.A.4 at p. 38, PTF 01455; and

g.  The 2016-2019 Collective Bargaining Agreement between Aramark Sports, LLC at the Anaheim Convention Center and Local 11. Exhibit 40, Aramark

28

Sports CBA 2016-2019 Art. 23 § 1(a) at p. 17, PTF 01498 ("Should the cost of the Health Plan exceed the required Employer contribution in any year of the Agreement, the additional amount necessary to fund the Health Plan shall be paid by employees by means of payroll deduction… .").

**The Las Vegas Plan Unit**

89.     Plan Unit 150, also known as the "Culinary Health Fund" and the "Las Vegas Plan Unit," has significantly better benefits than any other Plan Unit.

90.     Plan Unit 150 is, and at all relevant times has been, a partially-insured plan.

91.     Plan Unit 150 maintains a self-insured, private, exclusive medical clinic called the Culinary Health Center.

92.     All participants in Plan Unit 150 are entitled to obtain free primary medical care at the Culinary Health Center.

93.     All participants in Plan Unit 150 are also entitled to obtain free pediatric care, dental care, and vision care at the Culinary Health Center.

94.     There is no copay for participants who visit the Culinary Health Center. A copy of the "Copay Book" for the Las Vegas Plan Unit is attached as Exhibit 10, PTF 00580-00595.

95.     The Culinary Health Center does not provide service to the general public or to participants in other UHH Plan Units.

96.     The "Participant Guide" for the Las Vegas Plan Unit explains that "[t]he Culinary Health Center is exclusively for Culinary [i.e. Las Vegas Plan Unit] participants and their dependents. … It's fast, easy and convenient. No lines, no waiting to see a doctor." A copy of the Participant Guide is attached as Exhibit 9 (*See* p. 10, PTF 00557).

29

97.     On information and belief, all costs of operating the Culinary Health Center are paid from UHH's plan assets.

98.     In Plan Year 2018, there were 54,911 participants in the Las Vegas Plan Unit. Exhibit 11, 2018 Dashboard, p. 6, PTF 00601. In Plan year 2018, UHH allocated $29,160,434 of administrative expenses to the Las Vegas Plan Unit. *Id*. Thus, in Plan Year 2018, UHH imposed on the Las Vegas Plan Unit administrative expenses of only $531 per participant.

99.     In Plan Year 2019, there were 55,875 participants in the Las Vegas Plan Unit. Exhibit 12, 2019 Dashboard, p. 6, PTF 00625. In Plan Year 2019, UHH allocated $32,536,017 of administrative expenses to the Las Vegas Plan Unit. *Id*. Thus, in Plan Year 2019, UHH imposed on the Las Vegas Plan Unit administrative expenses of only $582 per participant.

100.     On information and belief, the administrative expenses that UHH allocated to the Las Vegas Plan Unit in other plan years relevant to this lawsuit are similar to the amounts allocated to the Las Vegas Plan Unit in Plan Years 2018 and 2019.

101.     In Plan Year 2018, there were six calendar months for which the Las Vegas Plan Unit operated at a deficit. Exhibit 11, 2018 Dashboard, p. 6, PTF 00601.

102.     In Plan Year 2019, there were seven calendar months for which the Las Vegas Plan Unit operated at a deficit. Exhibit 12, 2019 Dashboard, p. 6, PTF 00625.

103.     On information and belief, the Las Vegas Plan Unit had a budget deficit for a number of months in other Plan Years relevant to this lawsuit similar as the numbers of months that it had a deficit in Plan Years 2018 and 2019.

104.     In Plan Year 2018, administrative expenses allocated by UHH to the Las Vegas Plan Unit were equal to 6.0% of the contributions made to the Plan Unit. Exhibit 11, 2018 Dashboard, p. 6, PTF 00601.

30

105.     In Plan Year 2019, the administrative expenses allocated by UHH to the Las Vegas Plan Unit were equal to 6.2% of the contributions made to the Plan Unit. Exhibit 12, 2019 Dashboard, p. 6, PTF 00625.

106.     On information and belief, the ratios of the Las Vegas Plan Unit's administrative expenses to its overall contributions during the other Plan Years relevant to this lawsuit were similar to the ratios in Plan Years 2018 and 2019.

107.     On information and belief, there are more than 200 full-time staff employed by UHH or UHH-contracted service providers solely to process benefit claims for participants in the Las Vegas Plan Unit.

108.     On information and belief, claims handling expenses for medical services provided by the Culinary Health Center are handled directly by UHH staff or contractors, and not by an insurance company.

### The Los Angeles Plan Unit: Plan Unit 178

109.     Plan Unit 178 covers employers in Los Angeles, California.

110.     Plan Unit 178 is, and at all relevant times has been, a fully-insured plan with respect to medical, vision, and life insurance benefits. Until June 1, 2021, dental benefits were self-insured and provided through the UHH-operated Los Angeles Dental Center. Since June 1, 2021, dental benefits have also been fully-insured.

111.     Plan Unit 178 provides participants with a Kaiser Permanente HMO plan. Participants who enrolled prior to March 1, 2018 may be able to obtain benefits from Blue Cross Blue Shield of Illinois instead, but this PPO plan is closed to new participants. A copy of the October 1, 2018 Summary Plan Description for Plan Unit 178 is attached as Exhibit 3, PTF

00080-00221.

112.    The Kaiser HMO benefits provided under Plan Unit 178 include significant cost sharing by the participant: the participant chooses between paying a monthly out-of-pocket cost-sharing premium, or paying the first $1,000 of incurred medical expenses out of pocket (i.e., a $1,000 deductible). A copy of a November 2019 "Benefits at a Glance" document summarizing the various cost structures available to Plan Unit 178 participants through Kaiser is attached as Exhibit 6 (*See* PTF 00374).

113.    The Blue Cross PPO option provided under Plan Unit 178 also includes cost sharing by the participant: there is a $300 deductible as well as coinsurance ranging from 10 percent to 50 percent of the cost of benefits, depending on the type of service obtained. *See* Exhibit 3, Plan Unit 178 SPD at p. C-2, PTF 00115.

114.    In Plan Year 2018, there were 7,373 participants in Plan Units 178 and 278. Exhibit 11, 2018 Dashboard, p. 18, PTF 00613. In Plan Year 2018, UHH imposed $7,797,105 in administrative expenses on Plan Units 178 and 278. *Id.* Thus, in Plan Year 2018, UHH imposed on Plan Unit 178 administrative expenses of $1,058 per participant. This is nearly twice the administrative expenses imposed on participants in the Las Vegas Plan Unit.

115.    The 2018 and 2019 Dashboards report the financial status of Plan Units 178 and 278 as a single entity and thus it is not possible from the Dashboards alone to disaggregate the expenses attributed to each of these two Plan Units. *See* Exhibit 11, 2018 Dashboard, p. 18, PTF 00613; Exhibit 12, 2019 Dashboard, p. 17, PTF 00636.

116.    In Plan Year 2019, there were 7,513 participants in Plan Units 178 and 278. Exhibit 12, 2019 Dashboard, p. 17, PTF 00636. In Plan Year 2019, UHH imposed $7,997,369 in administrative expenses on Plan Units 178 and 278. *Id.* Thus, in Plan Year 2019, UHH imposed

32

on Plan Unit 178 administrative expenses of $1,064 per participant. This is nearly twice the administrative expenses imposed on participants in the Las Vegas Plan Unit.

117. On information and belief, the administrative expenses that UHH imposed on Plan Unit 178 in other plan years within the relevant period are similar to the amounts imposed on Plan Unit 178 in Plan Years 2018 and 2019.

118. In Plan Year 2018, the combined Plan Units 178 and 278 operated with a surplus in every month but one. Exhibit 11, 2018 Dashboard, p. 18, PTF 00613.

119. In Plan Year 2019, the combined Plan Units 178 and 278 operated with a surplus in all months but three. Exhibit 12, 2019 Dashboard, p. 17, PTF 00636.

120. Plan Units 178 and 278 operated with a surplus in a similar number of months of the other Plan Years relevant to this lawsuit as the months in which they operated at a surplus in Plan Years 2018 and 2019.

121. In Plan Year 2019, two of the three months in which Plan Units 178 and 278 operated at a deficit were February 2020 and March 2020. These months correspond to the onset of the COVID-19 pandemic in the United States.

122. In Plan Year 2018, administrative expenses allocated to Plan Units 178 and 278 were equal to 7.6% of the contributions made to the Plan Units. Exhibit 11, 2018 Dashboard, p. 18, PTF 00613.

123. In Plan Year 2019, Plan Units 178 and 278's administrative expenses were equal to 7.3% of the contributions made to the Plan Units. Exhibit 12, 2019 Dashboard, p. 17, PTF 00636.

124. On information and belief, the ratios of Plan Units 178 and 278's administrative expenses to their overall contributions during the other Plan Years relevant to this lawsuit were

similar to the ratios in Plan Years 2018 and 2019.

125. Claims for benefits under Plan Unit 178 for participants in the Kaiser plan are handled by Kaiser and not by UHH. *See* Exhibit 3, Plan Unit 178 SPD at p. A-6, PTF 00089. These expenses are included in the cost of benefits, not in the administrative expenses allocated to Plan Unit 178.

**Orange County and Long Beach Plan Unit: Plan Unit 278**

126. Plan Unit 278 covers employers in Orange County, California and Long Beach, California.

127. Plan Unit 278 is, and at all relevant times has been, a fully-insured plan with respect to medical, vision, and life insurance benefits. Until June 1, 2021, participants in Plan Unit 278 could elect a fully-insured dental plan or the self-insured dental benefits provided through the UHH-operated Los Angeles Dental Center. Since June 1, 2021, all dental benefits have been fully-insured.

128. Plan Unit 278 provides participants with either a Kaiser Permanente HMO plan or an EPO option provided through Employee Health Solutions. A copy of the Summary Plan Description for Plan Unit 278 is attached as Exhibit 7. A copy of the "Benefits at a Glance" document for Plan Unit 278, which details the cost sharing involved in the Kaiser HMO option, is attached as Exhibit 8, PTF 00544-00547.

129. The Plan Unit 278 "EPO" option stands for "exclusive provider option." This means that "benefits are only paid if [the participant] use[s] a network provider." *See* Exhibit 7, Plan Unit 278 SPD, p. C-2, PTF 00405.

130. Under both the HMO and EPO options for Plan Unit 278, there is significant cost

sharing for the individual participant: up to $3,000 per year for a family. *See* Exhibit 7, Plan Unit 278 SPD, p. B-2, PTF 00397 (EPO cost sharing); Exhibit 8, Plan Unit 278 Benefits at a Glance, PTF 00544 (HMO cost sharing).

131.    In Plan Year 2018, there were 7,373 participants in Plan Units 178 and 278. Exhibit 11, 2018 Dashboard, p. 18, PTF 00613. In Plan Year 2018, UHH imposed $7,797,105 in administrative expenses on Plan Units 178 and 278. *Id*. Thus, in Plan Year 2018, UHH imposed on Plan Unit 278 administrative expenses of $1,058 per participant. This is nearly twice the administrative expenses imposed on participants in the Las Vegas Plan Unit.

132.    In Plan Year 2019, there were 7,513 participants in Plan Units 178 and 278. Exhibit 12, 2019 Dashboard, p. 17, PTF 00636. In Plan Year 2019, UHH imposed $7,997,369 in administrative expenses on Plan Units 178 and 278. *Id*. Thus, in Plan Year 2019, UHH imposed on Plan Unit 278 administrative expenses of $1,064 per participant. This is nearly twice the administrative expenses imposed on participants in the Las Vegas Plan Unit.

133.    On information and belief, the administrative expenses that UHH imposed on Plan Unit 278 in other plan years within the relevant period are similar to the amounts imposed on Plan Unit 278 in Plan Years 2018 and 2019.

134.    As alleged above in paragraphs 118 through 121, Plan Units 178 and 278 together operated at a surplus in all but one month of Plan Year 2018, and in all but three months of Plan Year 2019. Two of those three months correspond to the onset of the COVID-19 pandemic in the United States. On information and belief, Plan Units 178 and 278 operated at a surplus for a similar number of months in the other Plan Years relevant to this lawsuit.

135.    As alleged above in paragraphs 122 through 124, Plan Units 178 and 278 together were allocated administrative expenses that were approximately within the range of 7.3% to

7.6% of the total contributions to those Plan Units during Plan Years relevant to this lawsuit.

136. Claims for benefits under Plan Unit 278 are handled by insurance companies, and not by UHH. *See* Exhibit 7, Plan Unit 278 SPD at p. A-6, PTF 00387. These expenses are therefore included in the cost of benefits, not in the administrative expenses allocated to Plan Unit 278.

**Administrative Expenses of Comparable Health Plans**

137. Every ERISA-covered pension and health and welfare plan is required to file an annual report with the Department of Labor and Internal Revenue Service. ERISA §§ 101-104, 29 U.S.C. §§ 1021-1024. For plans with more than 100 participants, the annual report must be filed on the Form 5500, published by the DOL, IRS, and Pension Benefit Guaranty Corporation. *See* 29 C.F.R. § 2520.103–1.

138. The accuracy of the information in every Form 5500 that is submitted to the federal agencies must be certified by the plan administrator, who signs a declaration stating that "[u]nder penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete." *See* Form 5500.

139. The Form 5500 requires the plan administrator to report substantial amounts of information about the state of the plan, including but not limited to:

      a. Whether it is a multiemployer plan (Part I, Line A);

      b. Whether it is a collectively-bargained plan (Part I, Line C);

      c. The total number of participants at the beginning of the plan year (Line 5);

d. The total number of active participants at the beginning of the plan year (Line 6a(1));

e. The total number of active participants at the end of the plan year (Line 6a(2));

f. The total number of retired or separated participants receiving benefits (Line 6b);

g. The total number of employers obligated to contribute to the plan, if the plan is a multiemployer plan (Line 7);

h. The types of benefits provided by the plan, e.g. health, life insurance, supplemental unemployment, dental, vision, temporary disability, or death benefits (Line 8b);

i. Whether the plan is fully insured, or partially or fully self-insured (Lines 9a and 9b);

j. Details about each insurance contract held by the plan, including premiums paid to the insurers (Schedule A); and

k. The plan's total administrative expenses (Schedule H, Line 2i(5)).

140. Every annual report filed with the Department of Labor is "public information and the Secretary shall make any such information and data available for inspection." 29 U.S.C. § 1026(a).

141. The Department of Labor maintains a web site where these publicly available Form 5500s are made searchable. Individual Form 5500s may be searched and downloaded from the url, https://www.efast.dol.gov/portal/app/disseminate?execution=e2s1, and complete data sets of the Form 5500s for each year from 1999 through the present are available at this url:

https://www.dol.gov/agencies/ebsa/key-topics/reporting-and-filing/form-5500.

142. Using the forms and data sets available on the Department of Labor's web site, it is possible to compare the administrative expenses of UHH to other, comparable multiemployer health plans, i.e., those with more than 20,000 total participants, and which provide similar types of benefits.

143. The Department of Labor's forms and data set for 2019 plan years show that there were 30 multiemployer health plans comparable to UHH and that submitted Form 5500s for 2019. These 30 plans (including UHH) each reported over 20,000 total participants, did not primarily provide benefits to retirees, did not primarily provide benefits through Health Reimbursement Arrangements, and reported that they provided comparable types of medical benefits to UHH.

144. The 30 comparable multiemployer health plans are:

a. Central States, SE & SW Areas H&W Active Plan, which reported 223,410 participants;

b. 1199 SEIU National Benefit Fund for H&HS Employees, which reported 154,597 participants;

c. Building Service 32BJ Health Fund, which reported 117,218 participants;

d. UNITE HERE Health, which reported 110,746 participants;

e. Motion Picture Industry Health Plan, which reported 70,321 participants;

f. United Welfare Fund-Welfare Division, which reported 67,338 participants;

g. Steelworkers Health and Welfare Fund, which reported 60,419 participants;

h. UF&CW Unions & Food Employers Benefit Fund, which reported 59,309 participants;

38

i.   Line Construction Benefit Fund, which reported 52,644 participants;

j.   SAG-AFTRA Health Plan, which reported 41,699 participants;

k.   Amalgamated National Health Fund, which reported 39,170 participants;

l.   National Elevator Industry Health Benefit Plan, which reported 37,554 participants;

m.  Sound Health & Wellness Trust, which reported 36,254 participants;

n.   Heartland Health and Wellness Fund, which reported 35,846 participants;

o.   NECA/IBEW Family Medical Care Trust Fund, which reported 35,299 participants;

p.   Mila National Health Plan, which reported 32,845 participants;

q.   Southwest Carpenters Health and Welfare Trust Fund, which reported 32,598 participants;

r.   I.A.T.S.E. National Health & Welfare Fund, which reported 32,269 participants;

s.   NY Hotel Trades & Hotel Assoc. of NYC Health Benefits Fund, which reported 31,012 participants;

t.   UFCW & Employers Benefit Trust, which reported 29,227 participants;

u.   Pension, Hospital & Benefit Plan of the Elec Ind Welfare Acct, which reported 28,938 participants;

v.   Carpenters Health and Welfare Trust Fund for California, which reported 28,539 participants;

w.   1199 SEIU National Benefit Fund for Home Care Employees, which reported 28,297 participants;

39

    x.   Western Growers Assurance Trust, which reported 26,090 participants;

    y.   Laborers H&W Trust Fund for Northern California, which reported 25,642 participants;

    z.   SEIU Healthcare NW Health Benefits Trust Plan, which reported 23,000 participants;

    aa.  1199 SEIU Greater New York Benefit Fund, which reported 22,398 participants;

    bb.  New York City District Council of Carpenters Welfare Fund, which reported 21,122 participants;

    cc.  Chicago Regional Council of Carpenters Welfare Fund, which reported 20,620 participants; and

    dd.  ILWU-PMA Welfare Plan, which reported 20,486 participants;

145.    In 2019, the administrative expenses of the average comparable multiemployer health plan that provides at least 30% of benefits through insurance contracts (i.e., is partially-insured) were $442 per participant.

146.    In 2019, the administrative expenses of the median comparable multiemployer health plan that provides at least 30% of benefits through insurance contracts were $485 per participant.

147.    In 2019, the administrative expenses of the average comparable self-insured multiemployer health plan were $765 per participant.

148.    In 2019, the administrative expenses of the median comparable self-insured multiemployer health plan were $718 per participant.

149.    In Plan Year 2019, UHH incurred overall administrative expenses of $899 per

40

participant, according to its Form 5500. *See* Exhibit 44 to Plaintiffs' Opposition to Motion to Dismiss (Dkt. #24-2), 2019 Form 5500, PTF 01996-02368. This is higher than comparable plans, even if only the more expensive-to-administer self-insured plans are considered. And UHH is not fully self-insured.

150. The same method may be used to compare the expenses incurred by comparable multiemployer health plans in 2018 plan years, using the 2018 Form 5500 forms and data set.

151. In 2018, there were 30 multiemployer health plans with over 20,000 active participants, that did not primarily provide benefits to retirees, did not primarily provide benefits through Health Reimbursement Accounts, and that reported that they provide benefit types comparable to UHH. The 30 plans (including UHH) were:

a. Central States, SE & SW Areas H&W Active Plan, which reported 207,200 participants;

b. 1199 SEIU National Benefit Fund for H&HS Employees, which reported 152,409 participants;

c. Building Service 32BJ Health Fund, which reported 114,742 participants;

d. UNITE HERE Health, which reported 106,638 participants;

e. United Welfare Fund-Welfare Division, which reported 67,171 participants;

f. Motion Picture Industry Health Plan, which reported 66,785 participants;

g. UFCW Unions & Food Employers Benefit Fund, which reported 59,737 participants;

h. Steelworkers Health and Welfare Fund, which reported 57,881 participants;

i. Line Construction Benefit Fund, which reported 46,401 participants;

j. Amalgamated National Health Fund, which reported 42,450 participants;

41

k. Sound Health & Wellness Trust, which reported 37,202 participants;

l. National Elevator Industry Health Benefit Plan, which reported 36,383 participants;

m. NECA/IBEW Family Medical Care Trust Fund, which reported 35,893 participants;

n. SAG-AFTRA Health Plan, which reported 35,818 participants;

o. Mila National Health Plan, which reported 35,269 participants;

p. New York Hotel Trades & Hotel Assoc. of NYC Health Benefits Fund, which reported 31,266 participants;

q. UFCW & Employers Benefit Trust, which reported 30,438 participants;

r. Heartland Health and Wellness Fund, which reported 29,990 participants;

s. I.A.T.S.E. National Health & Welfare Fund, which reported 29,892 participants;

t. Pension, Hospital & Benefit Plan of the Electric Industry Welfare Account, which reported 29,736 participants;

u. Carpenters Health and Welfare Trust Fund for California, which reported 29,683 participants;

v. Southwest Carpenters Health and Welfare Trust Fund, which reported 29,213 participants;

w. Western Growers Assurance Trust, which reported 28,974 participants;

x. 1199 SEIU National Benefit Fund for Home Care Employees, which reported 28,788 participants;

y. Laborers Health and Welfare Trust Fund for Northern California, which

42

reported 28,738 participants;

z.   1199 SEIU Greater New York Benefit Fund, which reported 22,503 participants;

aa.  New York City District Council of Carpenters Welfare Fund, which reported 21,537 participants;

bb.  SEIU Healthcare NW Health Benefits Trust Plan, which reported 21,474 participants;

cc.  ILWU-PMA Welfare Plan, which reported 20,442 participants;

dd.  Chicago Regional Council of Carpenters Welfare Fund, which reported 20,269 participants.

152.    In 2018, the administrative expenses of the average comparable multiemployer health plan that provides at least 30% of benefits through insurance contracts (i.e. is partially-insured) were $393 per participant.

153.    In 2018, the administrative expenses of the median comparable multiemployer health plan that provides at least 30% of benefits through insurance contracts were $497 per participant.

154.    In 2018, the administrative expenses of the average comparable self-insured multiemployer health plan were $719 per participant.

155.    In 2018, the administrative expenses of the median comparable self-insured multiemployer health plan were $663 per participant.

156.    In Plan Year 2018, UHH incurred overall administrative expenses of $853 per participant, according to its Form 5500. *See* Exhibit 43 to Plaintiffs' Opposition to Motion to Dismiss (Dkt. #24-1), 2018 Form 5500, PTF 01616-01995. This is higher than comparable plans,

43

even if only the more expensive-to-administer self-insured plans are considered. And UHH is not fully self-insured.

157. On information and belief, the administrative expenses associated with comparable health plans were similar in other years within the relevant period to their expenses in 2018 and 2019.

158. On information and belief, UHH's overall administrative expenses were comparable in other years within the relevant period to the expenses incurred in Plan Years 2018 and 2019.

159. If UHH's administrative expenses in the 2016 and 2017 Plan Years were the same as in the 2018 Plan Year and if its administrative expenses in the 2020 and 2021 Plan Years were the same as in the 2019 Plan Year, then UHH spent approximately $186,568,617 more on administrative expenses from the 2016 Plan Year through the 2021 Plan Year than the average, comparable, partially-insured health plan.

160. If UHH's administrative expenses in the 2016 and 2017 Plan Years were the same as in the 2018 Plan Year and if its administrative expenses in the 2020 and 2021 Plan Years were the same as in the 2019 Plan Year, then UHH spent approximately $27,611,504 more on administrative expenses from the 2016 Plan Year through the 2021 Plan Year than the average, comparable, self-insured health plan.

**The Effect of UHH's Plan Unit Structure on Plaintiffs' Plan Units**

161. In the give-and-take of collective bargaining, unions must often sacrifice one economic goal to achieve another.

162. In order to obtain UHH's high minimum contribution rates in their collective

44

bargaining agreements, required by UHH on pain of termination of coverage, local unions must often sacrifice other economic objectives such as higher wages and retirement contributions.

163. Local 11, the local union that represents employees within the geographic areas covered by Plan Units 178 and 278, has at times been forced to sacrifice other objectives in collective bargaining to obtain employers' agreements to meet UHH's minimum standards.

164. In cases where the local union and employer agree to a "bucket allocation" provision, UHH's contribution rates directly reduce employee wages.

165. In cases where the local union and employer agree to provisions allowing increased UHH contributions to be taken from employee wages even without a "bucket allocation" provision, UHH's contribution rates directly reduce employee wages.

166. If UHH had not assessed such high minimum contribution rates on Plan Units 178 and 278, Local 11 would have negotiated higher wages, retirement contributions, and/or other economic benefits.

167. In the collective bargaining agreements identified in paragraphs 87 and 88, among others, increased UHH contribution rates directly reduced employee wages.

168. Between 2021 and 2022, UHH increased contribution rates for many employers in Plan Units 178 and 278 by 50 cents per hour or 60 cents per hour. *See* Exhibit 13, Plan Units 178 and 278 Published Rates for 2021 and 2022, PTF 00642-00643. If not for these increases, participants working under bucket allocation contracts or similar contracts would have earned 50 or 60 cents more per hour.

169. There were similar yearly increases in UHH's contribution rates for many employers in the years from 2016 through 2021.

## CLASS ACTION ALLEGATIONS

170. Named Plaintiffs seek, on their own behalf and on behalf of the putative class members, restitution for the wages and other economic benefits lost due to Defendants' excessive and unfair allocation of administrative expenses. Named Plaintiffs also seek injunctive relief in the form of an order requiring UHH to allocate administrative costs among the employers in the different Plan Units in a manner reasonably related to the benefits UHH provides to participants in each Plan Unit. This action is appropriate for class treatment pursuant to Fed. R. Civ. Proc. 23.

171. The proposed class which Named Plaintiffs seek to represent is composed of all current and former participants in UHH Plan Unit 178 and Plan Unit 278 who were participants at any point between March 21, 2016 and the date of judgment in this action.

172. The proposed class is estimated to include well over 7,500 individuals. This proposed class is so numerous that joinder of all such persons is impracticable and the disposition of their claims as a class will benefit the parties and the Court.

173. There is a well-defined commonality of interest in the questions of fact and law involving and affecting the putative class members to be represented by Named Plaintiffs, in that all of these participants have been harmed by UHH's excessive administrative costs and unfair allocation of those costs to Plan Units 178 and 278.

174. Common questions of fact and law involved in this action include the following:

   a. Whether the Defendants violated their fiduciary duties by imposing excessive administrative expenses on Plan Units 178 and 278;

   b. Whether the Defendants violated their fiduciary duties by allocating administrative expenses among Plan Units such that the participants and

46

employers in Plan Units 178 and 278 were effectively subsidizing the excellent health care benefits provided to participants in the Las Vegas Plan Unit; and

c. What are the appropriate equitable remedies for the Defendants' breaches of fiduciary duties.

175. The claims alleged by Named Plaintiffs herein encompass the challenged practices and common courses of conduct of Defendants and are typical of those claims which could be alleged by any member of the proposed class. Named Plaintiffs' claims arise out of the alleged courses of conduct by Defendants and are based on the same legal theories as the claims of the putative class members. The legal issues as to how ERISA was violated by such conduct apply equally to Named Plaintiffs and the putative class members. Further, the relief sought by Named Plaintiffs is typical of the relief which would be sought by each member of the proposed class if they were to file separate actions.

176. Named Plaintiffs are proper representatives of the proposed class because they will fairly and adequately represent and protect the interests of all putative class members and because there are no known conflicts of interest between Named Plaintiffs and any putative class members. Other current and former participants in UHH Plan Units 178 and 278 are available to serve as class representatives if the Named Plaintiffs are found to be inadequate.

177. The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendants, and resulting in the impairment of putative class members' rights and the disposition of their interests through actions to which they are not parties. This action is manageable as a class action

47

because, compared with other methods such as intervention or the consolidation of individual actions, a class action is fairer and more efficient.

178. Common issues predominate in that all of Plaintiffs' claims arise out of Defendants' decisions to impose excessive administrative expenses on all members of the proposed class, and to allocate expenses in a way that unfairly prejudiced and harmed all class members similarly. Within each affected Plan Unit (i.e., Plan Units 178 and 278), each member of the proposed class was harmed equally by the excessive and unfairly allocated administrative costs and each such member was provided with the same health and welfare benefit options. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the putative class members have little or no interest in individually controlling the prosecution of separate actions and individualized litigation would increase the delay and expense to all parties and the court system. Furthermore, it is desirable to concentrate the litigation of the claims in this Court because the applicable Trust Agreement requires all litigation regarding the administration of UHH to be brought in this Court.

179. Finally, Named Plaintiffs have retained attorneys who are competent and experienced in class action and ERISA litigation and they intend to prosecute this action vigorously. Therefore, the interests of putative class members will be fairly and adequately protected by Named Plaintiffs and their counsel.

**COUNT I**
**UNFAIR ALLOCATION OF ADMINISTRATIVE EXPENSES IN VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND PRUDENCE**
**(ERISA §§ 502(a)(2), 502(a)(3), and 409; 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109)**
**(By All Named Plaintiffs and the Putative Class Members Against All Defendants)**

180. Named Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 179 above as if repeated here in full.

48

181.    ERISA imposes on all plan fiduciaries duties of loyalty and prudence. ERISA §§ 404(a)(1)(A) and 404(a)(1)(B), 29 U.S.C. §§ 1104(a)(1)(A) and 1104(a)(1)(B). The duty of loyalty requires each fiduciary to act for the "exclusive benefit" of the plan's beneficiaries. The duty of prudence requires each fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." These duties are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *George v. Kraft Foods Glob., Inc.*, 814 F.Supp.2d 832, 852 (N.D. Ill. 2011).

182.    The Defendants' fiduciary duties include the duty to ensure that plan expenses are allocated among participants in a manner reasonably related to the services furnished to individual participants. The Department of Labor has cautioned that "if a method of allocation has no reasonable relationship to the services furnished or available to an individual account, a case might be made that the fiduciary breached his fiduciary duties to act prudently and 'solely in the interest of participants' in selecting the allocation method." Department of Labor Field Assistance Bulletin 2003-03.

183.    The Defendants have allocated plan expenses to the Las Vegas Plan Unit amounting to only $531 per participant in Plan Year 2018, and $582 per participant in Plan Year 2019. Meanwhile, the Defendants have allocated plan expenses to Plan Units 178 and 278 amounting to approximately $1,058 per participant in Plan Year 2018, and $1,064 per participant in Plan Year 2019—nearly twice as much as the Las Vegas Plan Unit. In other plan years relevant to this lawsuit, the discrepancy in administrative costs between these Plan Units was similar.

184. The Defendants have allocated plan expenses to the Las Vegas Plan Unit amounting to 6.0% of total contributions received by the Plan Unit in Plan Year 2018 and 6.2% of total contributions received by the Plan Unit in Plan Year 2019. Meanwhile, the Defendants have allocated plan expenses to Plan Units 178 and 278 amounting to 7.6% of total contributions received by the Plan Units in Plan year 2018 and 7.3% of total contributions received by the Plan Units in Plan Year 2019. In other years relevant to this lawsuit, the discrepancy in administrative costs between these Plan Units was similar.

185. Yet the participants in the Las Vegas Plan Unit receive better—and more expensive to administer—medical benefits, including the ability to be seen for free at an exclusive clinic. Participants in Plan Units 178 and 278 are supporting higher administrative expenses to receive worse benefits. There is no reasonable relationship between the allocation of expenses to Plan Units 178 and 278 and the benefits provided.

186. The Defendants violated their fiduciary duties by allocating the plan expenses among Plan Units in a way that bears no reasonable relationship to the benefits provided to participants in those Plan Units.

**COUNT II**
**EXCESSIVE ADMINISTRATIVE EXPENSES IN VIOLATION OF ERISA'S FIDUCIARY DUTIES OF LOYALTY AND PRUDENCE**
**(ERISA §§ 502(a)(2), 502(a)(3), and 409; 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109)**
**(By All Named Plaintiffs and the Putative Class Members Against All Defendants)**

187. Named Plaintiffs reallege and incorporate by reference paragraphs 1 through 186, above, as though fully set forth herein.

188. ERISA's fiduciary duty of prudence requires that plan fiduciaries hold plan assets "for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying *reasonable expenses* of administering the plan." ERISA §

404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) (emphasis added).

189. Fiduciaries of an ERISA plan violate their fiduciary duty of prudence if they pay substantially more than other similar plans to obtain the same services. *See Sweda v. University of Pennsylvania*, 923 F.3d 320, 330 (3rd Cir. 2019); *see also Hughes v. Northwestern*, 595 U.S. ____, 142 S.Ct. 737 (2022).

190. Fiduciaries of an ERISA plan violate their fiduciary duty of prudence if they fail to "determine whether [a provider's] pricing [is] competitive" before contracting with the provider." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). If the plan's contracts provide for administrative expenses that are at or below the market norm, it implies that the fiduciaries acted prudently; conversely, if the fiduciaries agree to pay service providers fees that are unreasonably large, it implies that they violated their duty of prudence. *See Brock v. Robbins*, 830 F.2d 640, 644 (7th Cir. 1987).

191. UHH provides fully-insured healthcare benefits to participants of Plan Units 178 and 278 at a cost for administrative expenses of $1,058 per participant in Plan Year 2018, $1,064 per participant in Plan Year 2019, and similar amounts for other plan years within the relevant period. At the same time, the average administrative expenses for a comparable fully-insured health plan were $393 per participant in 2018, $442 per participant in 2019, and similar in other years within the relevant period. UHH pays substantially more than similar plans to provide fully-insured benefits.

192. If the UHH plan is considered as a whole, its fees are still unreasonably high. Even if the UHH Plan Units are all considered at once, the administrative expenses are $853 per participant for Plan Year 2018, $899 per participant for Plan Year 2019, and similar amounts in other years within the relevant period.

51

193.     The Defendants violated their fiduciary duties by incurring unreasonable administrative expenses.

## COUNT III
## RESTITUTION AND DISGORGEMENT
**(ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3))**
**(By All Named Plaintiffs and the Putative Class Members Against All Defendants)**

194.     Named Plaintiffs reallege and incorporate by reference paragraphs 1 through **Error! Reference source not found.**, above, as though fully set forth herein.

195.     "A person who obtains a benefit (a) in breach of a fiduciary duty, (b) in breach of an equivalent duty imposed by a relation of trust and confidence, or (c) in consequence of another's breach of such a duty, is liable in restitution to the person to whom the duty is owed." Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011). Despite the phrasing of the foregoing rule, "liability in restitution by the rule of this section does not depend on proof either that the claimant has sustained quantifiable economic injury or that the defendant has earned a net profit from the transaction." *Id.*, cmt. b. Restitution is also required when the fiduciary who breached his or her duties made "a wrongful disposition to third parties." *Id.*, cmt. c.

196.     The Defendants breached their fiduciary duties of prudence and loyalty by imposing unreasonably excessive administrative expenses on the participants in Plan Units 178 and 278, and by inequitably allocating expenses so that the participants in Plan Units 178 and 278 effectively subsidized the benefits of participants in the Las Vegas Plan Unit.

197.     By setting unreasonably high minimum contribution rates for employers in Plan Units 178 and 278, the Defendants reduced the wages and other compensation of Named Plaintiffs and all other participants in Plan Units 178 and 278.

198. By setting unreasonably high minimum contribution rates for employers in Plan Units 178 and 278, the Defendants forced Named Plaintiffs and all other participants in Plan Units 178 and 278 to subsidize the benefits to the participants in the Las Vegas Plan Unit.

199. The Defendants' scheme for having Named Plaintiffs in Plan Units 178 and 278 subsidize the benefits of the Las Vegas Plan Unit constitutes a wrongful disposition to third parties.

200. The Defendants must make restitution for the wrongful disposition of the wages of Named Plaintiffs and all other participants in Plan Units 178 and 278.

## Prayer For Relief

Plaintiffs pray for relief as follows:

1. For an order certifying all Claims for Relief as a class action;

2. For an order designating Named Plaintiffs as class representatives;

3. For an order designating Named Plaintiffs' counsel of record as class counsel;

4. For an award of restitution to the Named Plaintiffs and the members of the class for the lost income and other compensation caused by the Defendants' breaches of their fiduciary duties;

5. For preliminary and permanent injunctive relief prohibiting Defendants from accruing further excessive fees;

6. For preliminary and permanent injunctive relief prohibiting Defendants from allocating higher administrative fees per participant to Plan Units 178 and 278 than they allocate to the Las Vegas Plan Unit;

7.      For preliminary and permanent injunctive relief prohibiting Defendants from forcing participants in Plan Units 178 and 278 to subsidize the benefits of participants in the Las Vegas Plan Unit;

8.      For an order to transfer plan assets attributable to contributions on behalf of Named Plaintiffs and Class Members to a health plan that currently provides their benefits;

9.      For an award of disgorgement of profits and all other appropriate equitable relief;

10.     For declaratory relief;

11.     For prejudgment and postjudgment interest on all sums awarded;

12.     For an award of attorneys' fees and costs incurred in the filing and prosecution of this action, as provided by ERISA section 523(g), 29 U.S.C. § 1132(g);

13.     For costs of suit; and

14.     For such other and further relief as the Court may deem proper and just.


Robert E. Bloch (ARDC: 6187400)                    Respectfully submitted,
Stephen A. Yokich (ARDC: 6181707)                  /s/ Robert E. Bloch
George A. Luscombe III (ARDC: 6290097)             Robert E. Bloch
Elizabeth L. Rowe (ARDC: 6316967)                  An Attorney for the Plaintiffs
DOWD, BLOCH, BENNETT, CERVONE,
AUERBACH & YOKICH LLP
8 South Michigan Ave. - 19th Floor
Chicago, IL 60603
312-372-1361

Michael D. Weiner (*pro hac vice*)
Benjamin M. O'Donnell (*pro hac vice*)
Nicole Grinstein (*pro hac vice*)
GILBERT & SACKMAN
A LAW CORPORATION
3699 Wilshire Boulevard - Suite 1200
Los Angeles, CA 90010
323-938-3000

**DEMAND FOR JURY TRIAL**

Named Plaintiffs JOSE LUIS ACOSTA, ARMANDO GARCIA, MARIA SANCHEZ, GLYNNDANA SHEVLIN, and MARIA BUENROSTRO individually and on behalf of all similarly situated current and former participants in Plan Units 178 and 278, hereby request a jury trial on all claims so triable.

Robert E. Bloch (ARDC: 6187400)
Stephen A. Yokich (ARDC: 6181707)
George A. Luscombe III (ARDC: 6290097)
Elizabeth L. Rowe (ARDC: 6316967)
DOWD, BLOCH, BENNETT, CERVONE, AUERBACH & YOKICH LLP
8 South Michigan Ave. - 19th Floor
Chicago, IL 60603
312-372-1361

Michael D. Weiner (*pro hac vice*)
Benjamin M. O'Donnell (*pro hac vice*)
Nicole Grinstein (*pro hac vice*)
GILBERT & SACKMAN
A LAW CORPORATION
3699 Wilshire Boulevard - Suite 1200
Los Angeles, CA 90010
323-938-3000

Respectfully submitted,
/s/ Robert E. Bloch
Robert E. Bloch
An Attorney for the Plaintiffs

55

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2023, I caused a copy of the foregoing to be served on all parties that have not been held in default through the Court's CM/ECF system.

/s/Michael D. Weiner
Michael D. Weiner