### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOSE LUIS ACOSTA, ARMANDO GARCIA,** | ) | |
| **MARIA SANCHEZ, and GLYNNDANA** | ) | |
| **SHEVLIN, individually and on behalf of** | ) | |
| **all similarly situated current and former** | ) | |
| **participants of UNITE HERE Health Plan** | ) | |
| **Units 178 and 278,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | No.  22 C 1458 |
| | ) | |
| **v.** | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| **BOARD OF TRUSTEES OF UNITE HERE** | ) | |
| **HEALTH and DOES 1 through 10, inclusive,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs in this putative class action are participants in the Los Angeles, Orange County, and Long Beach "units" of the national multiemployer health plan UNITE HERE Health ("UHH" or "the Plan"). Plaintiffs have sued the Plan's trustees, alleging that they breached their fiduciary duties of loyalty and prudence under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Specifically, Plaintiffs contend that Defendants incurred unreasonably excessive administrative expenses and unfairly allocated those expenses among different plan units across the country. Several months ago, Judge Leinenweber of this court dismissed Plaintiffs' original complaint in part. In Count II of their First Amended Complaint ("FAC"), Plaintiffs have again alleged a claim that survived the earlier ruling: that Defendants breached their fiduciary duty by incurring excessive expenses. Defendants have moved to dismiss that claim but, as explained below, the motion is denied.

## BACKGROUND

The facts underlying Plaintiffs' lawsuit are set forth in Judge Leinenweber's earlier opinion.[1]

*See Acosta v. Bd. of Trs. of UNITE HERE Health*, No. 22 C 1458, 2023 WL 2744556, at *1–2 (N.D. Ill. Mar. 31, 2023) [31]. To recap, UHH is a national Taft-Hartley trust fund, or "multiemployer plan," that provides health benefits to approximately 110,000 UNITE HERE union members across the country. *Id.* at *1. UHH is comprised of approximately 16 to 19 "plan units," including—as relevant to this lawsuit—Plan Units 178 and 278, which cover employees in Los Angeles, Orange County, and Long Beach, and Plan Unit 150, which covers Las Vegas. *Id.* These plan units essentially operate as independent health plans with their own distinct benefit schedules and operating budgets. *Id.* UHH requires participating employers to contribute to the Plan at individually determined rates, and may terminate employers' participation in the multiemployer plan if they fail to make such contributions. *Id.* While different employers' collective-bargaining agreements use different methods for allocating the cost of these contributions, Plaintiffs allege that the end result of an increase in the rates that employers must pay to UHH is typically a pay cut (or some other reduction in benefits) for unionized workers. *Id.*

The Complaint draws a distinction between two basic types of health plans: fully-insured and self-insured plans. *Id.* at *2. Fully-insured plans use plan assets to fund the premiums that the plans pay to third-party insurance companies, which in turn pay out benefit claims to participants. *Id.* Self-insured plans, in contrast, pay benefit claims directly from plan assets. *Id.* Plaintiffs allege that fully-insured plans are typically cheaper to administer than self-insured plans that provide the same or

---

[1] The factual allegations in Plaintiffs' operative First Amended Complaint are identical to those in the original Complaint, cited in Judge Leinenweber's opinion. (*Compare* Compl. [1] ¶¶ 23–179, *with* FAC [46] ¶¶ 23–179.) Even though discovery in this case is ongoing, the court's analysis on a motion to dismiss remains limited to these pleadings, any materials attached to the complaint or referenced in depth therein, and information properly subject to judicial notice. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

similar services.[2]  *Id.*  Plan Unit 150 (the Las Vegas Plan Unit) is "partially self-insured," meaning that it pays some benefits directly and others through insurance contracts.  *Id.*  Its participants receive more generous benefits than those provided in other plan units, including free primary medical care from a private clinic that is funded entirely through plan assets.  *Id.*  By contrast, other UHH plan units—including Plan Units 178 and 278—pay virtually all benefits through conventional insurance plans (i.e., are fully insured).  *Id.*

Plaintiffs are participants in Plan Units 178 and 278 who filed this lawsuit in March 2022 on behalf of themselves and other current and former members of these plan units, charging that UHH's policies unfairly favor the Las Vegas Plan Unit at their (and other) plan units' expense.  *Id.*  They claimed that their fully-insured plan units should be cheaper to operate than the partially self-insured Las Vegas plan, but UHH regularly allocates twice the amount of annual administrative expenses per participant to their plans as it does to Las Vegas.  *Id.*  These expenses, Plaintiffs further alleged, bear no reasonable relationship to the level of benefits they receive in return.  Based on publicly-available Form 5500 data,[3] the Complaint listed 29 other multiemployer health plans deemed comparable to UHH in that they had more than 20,000 participants and provided "similar types of benefits." (Compl. [1] ¶¶ 142–43, 151; *see* FAC ¶¶ 142–43, 151.)  Using these peer plans as a benchmark, Plaintiffs alleged that their plan units' expenses—as well as the Plan's overall expenses across plan units—are

---

[2]        Plaintiffs' stated rationale for their assertion that fully-insured plans are cheaper to operate is that they are better able to benefit from economies of scale. (Pls.' Opp. to Mot. to Dismiss Count II of FAC [51] at 5 (citing Gail A. Jensen, Kevin D. Cotter & Michael A. Morrisey, *State Insurance Regulation and Employers' Decisions to Self-Insure*, 62 J. Risk & Ins. 185, 200 (1995)).)  As they contend, self-insured plans must handle all administrative functions (such as claims handling) in-house, while fully-insured plans merely pay premiums to major insurance companies that are able to distribute these costs over a larger pool of participants.  (*Id.*)

[3]        ERISA requires all covered plans to file annual reports with the Department of Labor and Internal Revenue Service disclosing information about their financial condition, administration, and benefits, which are made available for public inspection. (Compl. ¶¶ 137, 140–41 (citing 29 U.S.C. §§ 1021–24, 1026(a)).)  Plans with over 100 participants file these reports on the Form 5500, published jointly by the DOL, IRS, and Pension Benefit Guaranty Corporation.  (*Id.* ¶ 137 (citing 29 C.F.R. § 2520.103–1).)

substantially higher than the typical cost of providing fully-insured benefits. (Compl. ¶¶ 145–49, 152–56; *see* FAC ¶¶ 142–43, 151.) Their Complaint asserted four claims under ERISA: breach of fiduciary duties for unfair allocation of administrative expenses (Count I); breach of fiduciary duties for incurring excessive administrative expenses (Count II); "prohibited transactions" in violation of 29 U.S.C. § 1106 (Count III); and violation of the statute's "exclusive purpose" rule, 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A).

Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) in June 2022, arguing that Plaintiffs lacked standing to pursue all four counts and that their third and fourth counts failed to state claims for relief [20]. While Defendants' motion was pending before the court, the Seventh Circuit issued two relevant decisions addressing the pleading standard for ERISA breach-of-fiduciary-duty claims: *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022), *reh'g denied,* No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022), and *Hughes v. Northwestern University* ("*Hughes II*"), 63 F.4th 615 (7th Cir. 2023). The court granted the parties' motions to supplement their briefs with these additional authorities [31].

In March 2023, the late Judge Harry Leinenweber granted Defendants' motion to dismiss in part and denied it in part, rejecting Defendants' standing defense but dismissing Counts III and IV for failure to state a claim. *Acosta*, 2023 WL 2744556, at *3–5. Judge Leinenweber also held, however, that Counts I and II stated legally sufficient claims for relief. *Id.* at *4. Plaintiffs have since amended their Complaint to add an additional named Plaintiff and excise the two dismissed counts, but made no other substantive changes. (*See* FAC [46] ¶ 16.) In October 2023, Defendants filed another Rule 12 motion [49], this time seeking to dismiss Count II only—the excessive-fee claim—under Rule 12(b)(6). This case was subsequently reassigned to the undersigned judge [95].

4

## DISCUSSION

### I. Waiver and Law of the Case

Defendants argue in this motion that Count II must be dismissed because Plaintiffs do not meet the standards set forth in *Albert*, *Hughes,* and related cases to plead a breach of ERISA's fiduciary duty of prudence. The court notes, initially, that Defendants did not raise these arguments in their initial motion to dismiss; they challenged Plaintiffs' standing to assert the breach of fiduciary duty claim for excessive administrative expenses, but did not argue that Count II should be dismissed for failure to state a claim. And in ruling on this prior motion, Judge Leinenweber affirmatively held— albeit without prompting from the parties—that Count II *did* state a claim for breach of fiduciary duty. *See Acosta*, 2023 WL 2744556, at *4. This raises concerns on both waiver and law-of-the-case grounds: they already had the chance to challenge Plaintiffs' excessive-fee claim under Rule 12(b)(6), and their belated attempt to do so now requires second-guessing the court's earlier determination.

Turning first to waiver, Plaintiffs do not contest Defendants' contention that they may raise new arguments in a successive Rule 12(b)(6) motion under the law of this circuit. *See Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) (reading the text of Rules 12(g) and 12(h) to conclude that "a litigant need not consolidate all failure-to-state-a-claim arguments in a single dismissal motion."). While *Ennenga*'s holding may not map perfectly onto circumstances like those presented here,[4] this court

---

[4]     *Ennenga* involved a situation in which—after an initial Rule 12(b)(6) motion was granted—the plaintiff filed an amended complaint raising the same claims under different theories of liability, prompting a second motion to dismiss. *Plumtree v. City of Naperville*, No. 22 C 6635, 2024 WL 3177890, at *3 (N.D. Ill. June 26, 2024) (citing *Ennenga*, 677 F.3d at 771). That scenario does not implicate the concerns about "piecemeal litigation" that Rules 12(g) and 12(h) were designed to prevent, since the defendant could not have responded to the "new issues implicated by the plaintiff's amended complaint" any sooner. *Id.* at *3–4 (citing *Kramer v. Am. Bank & Tr. Co., N.A.*, No. 11 C 8758, 2014 WL 3638852, at *2 (N.D. Ill. July 23, 2014)). It is less clear that a defendant should be allowed to raise new arguments in multiple successive Rule 12(b)(6) motions without any substantive change in the underlying pleadings or other extenuating circumstances. *See Williams v. State Farm Mut. Auto. Ins. Co.*, No. 22 C 1422, 2023 WL 8827946, at *3 (N.D. Ill. Dec. 21, 2023) (rejecting successive motion to dismiss after finding that "[defendant] could have raised its present failure-to-state-a-claim arguments in its previous motion," and that its failure to do so "has delayed this litigation by months").

does have discretion to consider Defendants' failure-to-state-a-claim argument on the merits if "the interests of judicial economy and efficiency would be served by doing so." *About U.S. Real Est., Inc. v. Burnley*, No. 14 C 04471, 2015 WL 3397025, at *6 (N.D. Ill. May 26, 2015) (noting that courts have discretion to construe successive Rule 12(b)(6) motions as Rule 12(c) motions for purposes of Rule 12(h)(2)'s waiver exception).

The law-of-the case doctrine presents more of a challenge. That doctrine "bars . . . an argument for reconsideration that is based not on intervening authority, new (and heretofore undiscoverable) evidence, or other changed circumstances" that justify reopening an issue. *Vidimos, Inc. v. Wysong Laser Co.*, 179 F.3d 1063, 1065 (7th Cir. 1999). The doctrine's application is discretionary and "does not prohibit a court from revisiting an issue when there is a legitimate reason to do so," *Boyer v. BNSF Ry. Co.*, 824 F.3d 694, 710–11 (7th Cir.), *opinion modified on reh'g*, 832 F.3d 699 (7th Cir. 2016). Defendants contend that because they did not level a Rule 12(b)(6) challenge to this claim earlier, the court's ruling on that count should be considered "dicta." *See Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993) (law-of-the-case doctrine does not extend to dicta). But this is an overstatement. Judge Leinenweber made an "explicit ruling" on the legal sufficiency of Count II, *id.*, and it can hardly be argued that such a ruling is "unnecessary to the outcome" of the case as a whole, *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988). One of the reasons for treating passages as dicta, moreover, is that the issues they address "may not have received the full and careful consideration of the court" without having first been actively litigated by the parties. *Id.* True, Defendants' initial motion to dismiss preceded the Seventh Circuit's rulings in *Albert* and *Hughes II*, but the court explicitly considered both in its March 2023 opinion based on the parties' respective notices of supplemental authority. (*See* Mem. Op. & Order [31] (granting [26] and [29]).) And in seeking to bring *Albert* to the court's attention, Defendants expressly argued that the case "casts doubt on Plaintiffs' claim that Defendants breached their fiduciary duty by incurring

excessive administrative fees." (*See* Mot. for Leave to Submit Suppl. Auth. [26] at 3.) The court therefore does not agree that issues presented in this new motion were not before the court earlier.

That said, regardless of whether Defendants are entitled to fresh consideration of the issues, the court will briefly revisit its prior conclusion on Count II in light of the substantial shifts in this circuit's ERISA caselaw during the pendency of the prior motion. As explained here, the court ultimately stands by the prior merits analysis.

## II.    Failure to State a Claim (Count II)

### A.    Legal Standard

In general, a complaint survives a motion to dismiss under Rule 12(b)(6) if it "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this determination, the court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2018).

Count II of Plaintiffs' FAC alleges that Defendants breached their fiduciary duty of prudence[5] by incurring excessive administrative expenses. Under ERISA, a plan fiduciary must act with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Courts evaluate motions to dismiss claims for breach of this duty of prudence under the *Twombly / Iqbal* plausibility standard. *Hughes v. Nw. Univ.* ("*Hughes I*"), 595 U.S. 170, 177 (2022). Specifically, "[t]o plead a breach of the duty of prudence under

---

[5]      While Count II's header styles the claim as one for "violation of [the] fiduciary duties of loyalty *and* prudence," the body of the count only cites caselaw discussing the latter duty, and Plaintiffs do not mention the former in their opposition to Defendants' motion to dismiss. (FAC at 50–51 (emphasis added).)

ERISA, a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Hughes II*, 63 F.4th at 630. This requires a "context specific" analysis based on "the circumstances prevailing at the time the fiduciary acts." *Id.* (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)) (cleaned up). Still, the plaintiff need only "provide enough facts to show that a prudent alternative action was plausibly available, rather than actually available." *Id.*

The duty of prudence "includes a continuing duty to monitor [plan] expenses to make sure they are not excessive with respect to the services received." *Id.* at 625 (citing *Tibble v Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016)). To plausibly allege that a fiduciary breached this duty, a plaintiff must offer more than the bare statement that expenses were "too high" in general. Rather, their complaint "must provide a sound basis for comparison—a meaningful benchmark." *Albert*, 47 F.4th at 581 (citation omitted). Defendants contend that Plaintiffs' excessive-fee claim is implausible for two reasons: (1) the plans listed in the Complaint are too small to serve as meaningful comparators to UHH, and (2) the Complaint does not show that they provided a substantially similar level of services. The court assesses each argument in turn.

### B.    Selection of Comparators

In its prior opinion, the court found that Plaintiffs plausibly stated a claim for excessive costs by "show[ing] that similarly situated funds accrued significantly lower administrative costs" by at least "ten percent across the board." *Acosta*, 2023 WL 2744556, at *4. Specifically, the FAC alleges that Plan Units 178 and 278 incurred $1,058 in costs per participant in 2018 and $1,064 in 2019, while UHH incurred overall plan-wide expenses of $853 per participant in 2018 and $899 in 2019.[6] (FAC ¶¶ 114, 116, 131–32, 149, 156.) The comparator plans listed in Plaintiffs' complaint, meanwhile, paid significantly less: those that were "partially insured" (i.e., "provide[d] at least 30% of benefits through insurance contracts") paid an average of $393 per participant in 2018 and $442 in 2019, while those

---

[6]    Plaintiffs cite statistics from these years only, but allege upon information and belief that administrative expenses were similar in other years. (FAC ¶¶ 100, 117, 133, 157–58.)

that were self-insured paid an average of $719 in 2018 and $765 in 2019. (*Id.* ¶¶ 145–48, 152–55.) This discrepancy, the court held in the earlier ruling, "demonstrate[d] not only consistency but some likelihood that the fiduciary failed to conduct regular reviews of its investment." *Acosta*, 2023 WL 2744556, at *4 (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015)).

Defendants now question whether Plaintiffs' purported comparators are, in fact, "similarly situated" to UHH. *Id.* Specifically, they point out that most of the other multiemployer plans in Plaintiffs' sample are smaller than UHH, which has slightly over 110,000 participants across all of its plan units. (FAC ¶¶ 144(d), 151(d).) As they point out, 22 of the 29 plans that comprise Plaintiffs' sample have less than half this number of participants, and 18 of the 29 have less than one-third.[7] (*Id.* ¶¶ 144(i)–(dd), 151(i)–(dd).) In their view, this improperly skews Plaintiffs' benchmark for industry-average expenses downward, since smaller plans "might offer fewer services and tools to plan participants." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022); *see also Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022) (finding average fees for "smaller plans . . . with less than half the number of participants and under a quarter of the total assets" to be a "less-than-helpful benchmark"); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1155–58 (10th Cir. 2023) (finding that average 401(k) recordkeeping fees for "smaller plans" with "under $200 million in assets" could not serve as "meaningful benchmark" for defendants' $500 million plan).

*Smith*, *Matousek*, and *Matney* provide guidance but are distinguishable. All involved recordkeeping expenses in single-employer defined-contribution retirement plans, and all took issue with the use of comparator data from the same source, the "401(k) Averages Book." *See Smith v. CommonSpirit Health*, No. CV 20-95-DLB-EBA, 2021 WL 4097052, at *11 (E.D. Ky. Sept. 8, 2021), *aff'd*, 37 F.4th 1160 (6th Cir. 2022); *Matousek*, 51 F.4th at 280; *Matney*, 80 F.4th at 1156–57. This case, in contrast, involves the administrative expenses of a multiemployer health plan, which is governed

---

[7] The Complaint lists each comparator plan by total number of participants, and does not specify how many separate plan units each is divided into (if any).

by several entirely different sections of ERISA.  *See* 29 U.S.C. §§ 1002(1), (37)(A), 1161–91d.  It is not a foregone conclusion that smaller plans would be cheaper to operate in this context: while a smaller 401(k) plan might indeed offer a more limited range of financial services, that does not necessarily hold true for medical, dental, and vision benefits.  Indeed, as Plaintiffs point out, it would be just as reasonable to suspect that *larger* plans are less expensive per participant since they are better able to realize economies of scale.[8]  *See Hughes II*, 63 F.4th at 629 ("Where alternative inferences are in equipoise—that is, where they are all reasonable based on the facts—the plaintiff is to prevail on a motion to dismiss.").

In the end, even if the logic underlying *Smith*, *Matousek*, and *Matney* does apply outside the 401(k) context, Defendants have not explained why it requires dismissal of Plaintiffs' excessive-fee claim as a matter of law.  The court thus declines to dismiss Count II based on Plaintiffs' use of smaller comparators.

### C.    Description of Services Rendered

Next, Defendants argue that the Complaint does not include enough detail to show that UHH's administrative expenses were excessive "relative to the services rendered."  *Albert*, 47 F.4th at 580 (quoting *Smith*, 37 F.4th at 1169).  For support, they lean heavily on the Seventh Circuit's decision in *Albert*, which affirmed dismissal of an ERISA duty-of-prudence claim based in part on allegedly excessive 401(k) recordkeeping fees.  The plaintiff had identified nine comparator plans with "similar numbers of participants . . . and total assets" as the defendants' plan; these comparators paid between $32 to $45 per participant in annual recordkeeping fees from 2014 to 2018, while the defendants paid $87 per participant over the same time period.  *Albert*, 47 F.4th at 579.  But the complaint was "devoid

---

[8]    Plaintiffs attempt to drive this point home by noting that Plan Units 178 and 278 each have around 7,500 participants, but still incur higher per-participant administrative costs than other, larger non-UHH peer plans.  (*See* FAC Exs. 11, 12.)  This is less compelling: Plaintiffs offer no explanation for why it is permissible to compare the costs of an individual plan *unit* (or two units) to those of an entire multiemployer *plan*.  Indeed, this line of argument seems at odds with Plaintiffs' other theory of fiduciary liability in Count I, which attributes Plan Units 178 and 278's high costs in key part to UHH's unfair allocation of administrative expenses among different plan units.

of allegations as to the quality or type of recordkeeping services" that these comparators purchased, which the Seventh Circuit found fatal to plausibility given that "the cheapest investment option is not necessarily the one a prudent fiduciary would select." *Id.* (quoting *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011)). The *Albert* court emphasized, though, that "recordkeeping claims in a future case could survive the 'context-sensitive scrutiny of a complaint's allegations' courts perform on a motion to dismiss." *Id.* at 580 (quoting *Dudenhoeffer*, 573 U.S. at 425).

*Hughes II* proved to be such a case. On remand from the Supreme Court's decision vacating a prior ruling in the defendants' favor, the Seventh Circuit held that the plaintiffs had plausibly alleged that the administrators of Northwestern University's 403(b) retirement plan had breached their fiduciary duties by incurring excessive recordkeeping fees. *Hughes II*, 63 F.4th at 633. The *Hughes* plaintiffs, the Seventh Circuit found, succeeded where the *Albert* plaintiffs had failed: their complaint alleged that recordkeeping services for defined-contribution retirement plans "are fungible and the market for them is highly competitive," and that "[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of services to large defined contribution plans like [the defendants']." *Id.* at 632 (emphasis in original). They also provided comparator data for "several other university I.R.C. § 403(b) plans that successfully reduced competitive bids, consolidating to a single recordkeeper, and negotiating rebates." *Id.* This additional context, the court found, made it plausible that Northwestern's recordkeeping fees were too high "relative to the recordkeeping services rendered." *Id.* at 632. Post-*Hughes* courts in this circuit have largely looked to whether the plaintiffs' complaints recited the same or similar statements in determining whether to allow ERISA claims for excessive 401(k) recordkeeping fees to proceed.[9]

---

[9]     *Compare, e.g., Remied v. NorthShore Univ. HealthSystem*, No. 22 C 2578, 2024 WL 3251331, at *10 (N.D. Ill. July 1, 2024) ("At this early stage, [plaintiff] has plausibly alleged that the level of service provided by national recordkeepers is comparable across service providers."), *and Tolomeo v. R.R. Donnelley & Sons*, No. 20 C 7158, 2023 WL 3455301, at *4 (N.D. Ill. May 15, 2023) ("Plaintiffs here like the *Hughes II* plaintiffs 'maintain that the market is competitive with equally capable recordkeepers who can provide comparable services for less.'" (quoting *Hughes II*, 63 F.4th at

The task here is not as simple because, as noted, this is a health-plan case, not a retirement-plan case. *See Hughes II*, 63 F.4th at 633–34 ("[T]he inquiry into the duty of prudence is in all cases 'context specific.'" (quoting *Hughes I*, 595 U.S. at 177)). The basic principles that *Albert* and *Hughes* articulated are not limited on their face to the 401(k) context: regardless of the type of plan at issue, an ERISA plaintiff alleging excessive costs must give enough "comparative context" to permit the reasonable inference that the fiduciary is spending too much for what they are getting in return. *Coyer v. Univar Sols. USA Inc.*, No. 22 C 362, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) (citing *Albert*, 47 F.4th at 580). But neither party has provided any caselaw specifically addressing what this analysis looks like in the health-plan context, let alone the *multiemployer* health-plan context. Health plans are different creatures from retirement plans, and the same imperatives underlying the ERISA 401(k) excessive-fee caselaw do not automatically apply here. Without any such direct guidance, the court must reason by analogy to determine whether Plaintiffs' Complaint falls on the *Albert* or the *Hughes* side of the plausibility line.

In Defendants' view, the Complaint's bare allegations that the 29 comparator plans offer "similar" or "comparable" types of benefits to UHH's fall on the *Albert* side of this line. (FAC ¶¶ 142–43, 151.) Defendants point out that UHH is a nationwide plan split into multiple units operating across different industries and geographies, each of which offers a distinct suite of benefits to participants. Without more facts about how the other plans are structured and what types of benefits they provide, Defendants urge, the Complaint "fails to provide the kind of context necessary under *Albert*" to support an apples-to-apples comparison of their operating costs. *Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 832 (N.D. Ill. 2023) (cleaned up).

---

633)), *with Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 831 (N.D. Ill. 2023) ("Although [plaintiff] asserts that the services are similar, his complaint does not allege any facts regarding 'the quality or type of recordkeeping services' provided . . . ." (quoting *Albert*, 47 F.4th at 579–80)), *and Baumeister v. Exelon Corp.*, No. 21 C 6505, 2023 WL 6388064, at *8 (N.D. Ill. Sept. 29, 2023) ("Plaintiffs have failed to allege that their proposed comparators offered the same services as [defendant's] Plan at a lower price per participant.").

But Plaintiffs have, in fact, provided at least one metric for assessing health plans' expected costs—the distinction between "fully-insured" and "self-insured" plans. Recall that the Complaint alleges that the former are, all else equal, generally cheaper to operate than the latter. (FAC ¶ 47.) The Complaint splits up the average and median administrative expenses for its sample of comparators based on whether a plan is "partially insured" (meaning, by Plaintiffs' definition, that it "provides at least 30% of benefits through insurance contracts") or entirely self-insured (meaning that it pays all benefits directly from plan assets). (*Id.* ¶¶ 145–49, 152–56.) The partially-insured plans in Plaintiffs' sample incurred approximately $400 in average expenses per participant from 2018 to 2019, while the self-insured plans incurred around $700. (*Id.*) By contrast, Plan Units 178 and 278—which are both fully insured—paid more than $1,000 per participant during this same time period. (*Id.* ¶¶ 114, 116, 131–32.) And UHH's overall plan-wide expenses exceeded $800 per participant, even though "virtually all" benefits provided by its plan units outside Las Vegas are fully insured. (*Id.* ¶¶ 3, 149, 156).[10]

That level of detail is sufficient, at the pleading stage, to render Plaintiffs' excessive-fee claim plausible. Nothing in either *Albert* or *Hughes* suggests that Plaintiffs must identify every possible service provided by peer plans, or describe their administrative structure in exhaustive detail, to allow for a meaningful comparison. It would be unduly burdensome to require the Complaint to itemize the full range of medical, dental, vision, and other benefits provided across not only UHH's various plan units, but those of 29 other comparator plans. *See Coyer*, 2022 WL 4534791, at *5 (plaintiffs "do not need to provide examples of similar plans receiving the <u>same</u> services in the <u>same</u> year"). Rather, the Complaint need only identify a *reason* why this comparison is possible—why a peer plan's costs are

---

[10]    Defendants also fault Plaintiffs for failing to explain which of the 29 plans in their sample are fully insured and which are "partially insured," or why they selected a 30% cutoff for "partially insured" plans. While these details would have been helpful, they go to the merits of Plaintiffs' excessive-fee claim rather than its legal sufficiency. *Cf. Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 190 (3d Cir. 2024) ("[Any] calculation problems are not fatal here because even taking those problems into account, there are enough comparators, and the comparators are sufficiently similar to the Plan, to state a claim.").

likely to fall within a sufficiently predictable range to be used as a benchmark. In *Hughes II*, that reason was the allegedly fungible and commoditized nature of 401(k) recordkeeping services, making it unlikely that any given plan would legitimately pay more for higher-quality or more extensive services. *Hughes II*, 63 F.4th at 632. Here, it is the allegation—accepted as true for purposes of the motion to dismiss—that one of the major drivers (if not the *only* driver) of a health plan's operating costs is whether it is fully or self-insured. And if the story Plaintiffs tell is true, the costs they incur for fully insured benefits exceed not only those of other fully-insured plans, but even the supposedly more expensive self-insured plans.[11]

Discovery in this case is ongoing, and this analysis may change as more information comes to light. Perhaps the other multiemployer plans listed in the complaint will turn out to offer varying portfolios of health-care benefits at vastly divergent price points, overwhelming any common ground created by their fully insured versus self-insured status. If that is the case, then any comparison between their expenses and UHH's may indeed end up being apples-to-oranges. Or maybe UHH's size and structure means that it must legitimately pay more per participant to administer its various benefit programs across the country than other, less complex plans. But all of this detail would require factual development and is inappropriate to require at the motion-to-dismiss stage. Plaintiffs have collected data on some two dozen comparators to use as a benchmark for UHH's costs, have given a plausible reason why these costs should fall within a certain range, and have shown how UHH falls short under that framework. That is more than enough to sustain the court's earlier ruling on Count II. *See Remied v. NorthShore Univ. HealthSystem*, No. 22 C 2578, 2024 WL 3251331, at *10–11 (N.D. Ill. July 1, 2024) ("Plaintiff has offered enough factual content to allege a plausible claim. Maybe the

---

[11]    Plaintiffs also argue that Plan Unit 150 can serve as a "benchmark" to evaluate Plan Units 178 and 278, since it is partially self-insured but still pays lower annual fees per participant. Again, however, this argument is in tension with Count I, which contends that the very reason Plan Unit 150's costs are so low is that it is being subsidized by UHH's other plan units.

claim will fall apart someday, but at this early stage, the complaint . . . adequately alleges that the Plan is paying too many bucks for the bang.").

## <u>CONCLUSION</u>

Defendants' Motion to Dismiss Count II of Plaintiffs' First Amended Complaint [49] is denied.

ENTER:

Dated:  August 21, 2024

_____
REBECCA R. PALLMEYER
United States District Judge