**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSE LUIS ACOSTA, MARIA BUENROSTRO,** ) | | |
| **ARMANDO GARCIA, MARIA SANCHEZ,** ) | | |
| **and GLYNNDANA SHEVLIN,** ) | | |
| ) | | |
| **Plaintiffs,** ) | **No.** | **22 C 01458** |
| ) | | |
| **v.** ) | **Judge Rebecca R. Pallmeyer** | |
| ) | | |
| **BOARD OF TRUSTEES OF UNITE HERE** ) | | |
| **HEALTH and DOES 1 through 10, inclusive,** ) | | |
| ) | | |
| **Defendants.** ) | | |

**MEMORANDUM OPINION AND ORDER**

Jose Luis Acosta, Armando Garcia, Maria Sanchez, Glynndana Shevlin, and Maria Buenrostro ("Named Plaintiffs") move to certify a class of current and former plan participants of UNITE HERE Health ("UHH"), an ERISA-covered healthcare plan. The Named Plaintiffs allege that the Board of Trustees of UHH ("Defendant") breached its fiduciary duties by taking on exorbitant administrative costs and distributing costs disproportionately among "Plan Units." They seek relief under ERISA §§ 409, 502(a)(2), 502(a)(3), codified at 29 U.S.C. §§ 1109, 1132(a)(2), and 1132(a)(3), respectively. The proposed class includes "at least" 7,513 individuals who were members of two allegedly overcharged Units between March 2016 and present. For the reasons stated below, Plaintiffs motion for certification is granted in part.

**BACKGROUND**

**I.      Factual Background**

The facts underlying this action are set out in two prior opinions ruling on Defendant's motions to dismiss. *See Acosta v. Bd. of Trs. of UNITE HERE Health*, No. 22 C 1458, 2023 WL 2744556, at *1–2 (N.D. Ill. Mar. 31, 2023) (Leinenweber, J.); *Acosta v. Bd. of Trs. of UNITE HERE Health*, No. 22 C 1458, 2024 WL 3888862, at *1–2 (N.D. Ill. Aug. 21, 2024). The court, nonetheless, summarizes the facts relevant to the parties' arguments for and against certification.

### A.      UHH's Structure and Cost Allocation

UHH is a Taft-Hartley multiemployer trust fund providing healthcare coverage to approximately 110,000 employees working for hundreds of employers nationwide.  (Am. Compl. [46] ¶¶ 1–2.)  Given the discrepancies in cost and coverage needs across geography and industries, UHH divides its coverage into "Plan Units," which function as independent, self-sustaining benefit programs with different benefit options and independent operating budgets. (Simon Decl. [84-3] ¶ 4.)  The Plan Units are divided in different ways, some by geography (e.g. Boston Plan, Detroit Plan), some by industry (e.g. Food Service Plan, Chicago Hotels/Casinos Plan).  (*See generally* UHH 2022-23 Dashboard [78-18] at UHH040200.)  The health plans offered in each Plan Unit fall into three categories: fully-insured plans, self-insured plans, and partially-insured plans.  (Am. Compl. ¶¶ 46–49); *see also Acosta*, 2023 WL 2744556, at *2.  In fully-insured plans, benefits claims are paid through third-party insurance, and UHH funds are used to pay the insurance premiums.  (*Id.*)  In self-insured plans, UHH funds are used to directly pay for the cost of benefits, without the use of third-party insurance.  (*Id.*)  Partially-insured plans are hybrid plans in which some benefits are fully-insured and others are self-insured by UHH.  (*Id.*)

Three Plan Units are relevant to the claims in this case: Unit 178, Unit 278, and Unit 150. Plan Unit 178 covers employers in Los Angeles County, California.  (*Id.* ¶ 109.)  Plan Unit 278 covers employers in Orange County and Long Beach, California.  (*Id.* ¶ 126.)  Both Unit 178 and Unit 278, for all relevant times, have been fully-insured plans with respect to medical, vision, and life insurance benefits.  (*Id.* ¶¶ 110, 127.)  Until June 1, 2021, participants of Units 178 and 278 could obtain self-insured dental care through the UHH-operated Los Angeles Dental Center.  (*Id.*) Since June 1, 2021, dental benefits have been fully-insured as well for both plans.  (*Id.*)  Unit 150, also known as the "Las Vegas Plan" or the "Culinary Health Plan," covers employers in Las Vegas, Nevada.  (*Id.* ¶ 89.)  Unit 150 is a partially insured plan—UHH operates a medical clinic called the

"Culinary Health Center," where Unit 150 participants can exclusively obtain primary, pediatric, dental, and vision care free of charge. (Id. ¶ 90–94.) In addition to contributing funds to UHH for the payment of benefits to plan-members, each Plan Unit must also contribute funds for the payment of UHH's administrative expenses. The amount that each Unit must pay towards administrative expenses is calculated at two stages: first, the allocation of *projected* administrative expenses when UHH generates minimum contribution rates employers must contribute to the fund, and, second, when UHH *actually* allocates expenses by using contributions to pay off administrative expenses at the end of the fiscal year.

### 1. Projection of Administrative Expenses

UHH is funded almost exclusively by the periodic contributions paid into it by participant employers and employees. (*See* Pls. Mem. [78-1] at 3, O'Donnell Decl. [78-2] ¶ 53.) Employers contribute to the fund at rates set by collective bargaining with the employee unions. (*See* Minimum Standards [78-6] at UHH0406694–96.) But while the precise contributions made by employers to UHH are set by collective bargaining, there is a floor: UHH sets a minimum threshold (also known as a "target contribution rate" or "published rate") that each employer must contribute to cover the cost of benefits, maintain a surplus, and account for administrative expenses. (*See id*. at UHH0406696; *see also* Simon Dep. Tr. [78-37] at 56:15–57:2.) In bargaining with the union, an employer may agree to contribute more than the minimum threshold set by UHH but may not contribute less than the target rate without UHH's permission. (*See* Simon Decl. [84-3] ¶ 17, Minimum Standards at UHH056696.) Alternatively, some employers come to "bucket allocation" agreements through collective bargaining. In bucket allocations, in contrast to the previously described "published-rate" agreements, an employer does not agree to pay a specific rate in contributions to UHH, but instead agrees to provide a pool of funds to the union and leaves it to the union's discretion to divide the available funds for payment of healthcare costs (i.e. contributions to UHH), wages, pension funds, and other benefits. (Simon Decl. ¶ 16.) In the bucket-allocation scenario, UHH does not create a minimum requirement, but provides a target

rate as a recommendation to the union to maintain the self-sufficiency of the fund; the union has the final say on how much to contribute. Simon Dep. Tr. at 191:24–192:5.)

In calculating target employer contribution rates, Units 178 and 278 are treated differently than other Plan Units; they are subdivided further into "employer categories," for which UHH's underwriters develop different target contribution rates as if each category were a Plan Unit itself. (*See* Simon Decl. ¶ 10.)[1] For each employer category, UHH's chief underwriter Robert Simon explains, UHH underwriters determine the target employer contribution rate using a six-step process: (1) UHH projects the medical cost per employee per month ("PEPM medical cost") at the employer-category level; (2) UHH projects other costs (including life, dental, and vision insurance benefits) at the employer-category level, combining with the PEPM medical cost to project an aggregate "PEPM benefits cost"; (3) administrative expenses and necessary reserve maintenance[2] are then estimated as a percentage of benefits cost, and the PEPM benefits cost is multiplied by these administrative expense and necessary reserve "factors," to determine a "composite target PEPM rate"; (4) UHH then multiplies the composite target PEPM rate by the projected number of eligible employees (on annual basis), generating a "target annual dollar amount" for each category; (5) UHH then subtracts any amounts the union has agreed to contribute ("employee contributions") and investment income and divides the resulting number by the total annual expected work hours, producing a targeted hourly employer contribution rate for

---

[1]     This subdivision (unique to Units 178 and 278) predates the Units' participation in UHH. Unit 178 was previously the free-standing Los Angeles Hotel-Restaurant Employer Union Welfare Fund, and Unit 278 was the former UNITE HERE Long Beach and Orange County Health Benefit Fund; both merged into UHH in 2012. (Simon Decl. ¶ 5.) Prior to the merger, the funds were divided into employer categories because of "varying eligibility rules" across different kinds of employers. (*Id.* ¶ 10.) Since 2016, Unit 178 has been divided into three employer categories (LA hotels, LA cafeterias, LA event centers) and Unit 278 has been divided into four categories (OC hotels, OC cafeterias, OC event centers, and OC restaurants). (*Id.*)

[2]     "Necessary reserve maintenance" refers to the charge incorporated into the target employer contribution rate intended to maintain the fund's "reserve"—a surplus of funds set aside to cover, in the event of an emergency, six months of UHH's liabilities and payment obligations. (*See* Simons Dep. Tr. at 189:3–23; 2020 Reserve Policy [78-36] at UHH051965.)

each employer category.  (*Id*. ¶ 12.)  UHH's process for developing target rates yields a different target contribution rate for each employer, dependent on the employer's category within Units 178 and 278.

As described above, administrative expenses enter UHH's calculation of target contribution rates at step three; administrative expenses are estimated as a "factor" or percentage of total benefit costs.  The calculation of the factor itself is standardized.  The administrative expense factor (i.e. the specific percentage), unlike the PEPM benefit costs, is not calculated at the employer-category level, but is consistent across all employer-categories within Units 178 and 278; indeed, UHH uses the same factor for Unit 178 and Unit 278 plans.  (*See* Simon Dep. Tr. at 50:18–51:4.)  Importantly, the administrative expense factor covers not only Unit-specific costs but also administrative expenses for the fund as a whole.  (*See id*. at 51:5–14.)  UHH has decreased the factor for Units 178 and 278 in recent years from 7.5% to 6.5% as administrative expenses have become a smaller percentage of the fund's overall costs.  (*Id*.)  Additionally, UHH ascribes a discounted administrative expense factor to Units 178 and 278 (relative to other Units) because they are fully-insured plans—meaning that UHH has fewer administrative costs in providing benefits than UHH has in providing benefits to other, partially-insured Units.  (*Id*. at 51:20–52:12.)  *See also Acosta*, 2024 WL 28888862, at *2 (explaining how fully-insured plans have fewer administrative costs than partially-insured plans).

### 2. Actual Allocation of Administrative Expenses

The projection of administrative expenses performed by UHH's underwriters is unrelated to the method used by UHH's finance department for allocating actual administrative expenses among Plan Units at the end of the fiscal year.  (*See* Simon Dep. Tr. at 49:10–50:1.)  At this stage, UHH has a pool of funds from each Plan Unit that the Unit has contributed during the year, and UHH must determine how much to take from each Unit's pool to pay for shared administrative expenses.  UHH does so pursuant to a written administrative expense allocation policy adopted by the Board of Trustees on September 28, 1988.  (*See* Stipulations [78-4] ¶¶ 27.1, 28; *see also*

5

Allocation Policy [78-19].)  The Allocation Policy document establishes that the "common denominator on which to base the allocation of expenses is total contributions handled in any given time period." (Allocation Policy at UHH063820.)  In other words, the proportion that a Unit's contributions make of the total contributions to UHH in a given year is the proportion of administrative expenses that their funds will be used to pay for—if Unit A's contributions make up 10 % of the total contributions to UHH,  UHH will draw from Unit A's pool of contributions to pay for 10 % of the administrative expenses; or, in UHH's terms, UHH will "allocate" 10 % of the administrative expenses to Unit A.  (*Id.; see, e.g.,* March 31, 2000 Expense Allocation Presentation [78-22] at UHH045836.)  According to this scheme, each Plan Unit's contributions will be used to pay for an amount of administrative costs roughly proportional to the Unit's size (in terms of contributions) in the fund.

But there is a caveat to this "proportional" distribution of administrative expenses: UHH's Allocation Policy also gives discounts to specific Units in allocating expenses, including a 33.3% weighting[3] to contributions from Unit 150 (then called "APBA") for administrative expenses relating to Executive and Accounting Staff because "[UHH staff members] expend some effort for the [Unit 150] but, because their efforts are less, we believe a special [lower rate] is warranted." (Allocation Policy at UHH63820.)[4]  The discounting of Unit 150's contributions has a significant impact on

---

[3]      This 33.3% weighting works in the following manner: say Unit 150 contributes 60% of the total contributions received by UHH in a given year; under the terms of the Allocation Policy (without a discount) UHH will draw from Unit 150's funds to pay for 60% of the shared administrative expenses.  But with the 33.3% percent weighting, UHH treats Unit 150 as having contributed only 20% (60% divided by three) of the total contributions to the fund, and allocations 20% instead of 60% of the administrative costs to Unit 150.  Importantly, this results in every other Plan Unit paying more in administrative funds: without the discount, only 40% of the administrative expenses were distributed among the funds of other Units; after the discount, 80% of the administrative expenses are paid by the other Units.

[4]      UHH's policy documents have not been consistent on this justification.  A 1994 document summarizing UHH's allocation policy, for example, explains that the Las Vegas Unit's contributions to the fund are weighted at 33.3% because "these Funds contribute such a[] disproportionate amount and should not be allocated such a high percentage expenses." (1994 Administrative Expense Memorandum [78-20] at UHH045785.)  In 2009, UHH's Executive

the administrative expense borne by other Plan Units, as Unit 150 is by far the largest unit in the fund—in fiscal year 2022–23, Unit 150's contributions to the fund were roughly equivalent to the contributions of all other Units put together. (*See* UHH 2022–23 Dashboard at UHH040201–02 (comparing Unit 150 contributions and expenses to "All Non-Culinary Plans," i.e. all other units).) Indeed, the claims in this action arise from the effects of this discounting: because Unit 150's administrative expense burden is greatly reduced, every other unit (including Units 178 and 278) must pick up the slack and pay an amount of administrative expenses disproportionate to their relative size (in terms of contributions) in the fund.

The basic methodology of shared expense allocation appears to have remained consistent since 1988: shared administrative expenses (namely executive and accounting staff expenses) are divided amongst the Plan Units according to the contributions from each Unit, and the Las Vegas (150) Plan Unit's contributions are weighted at a third. (*See* 2021 Allocation Report [78-24] at UHH045363.) An analysis performed on UHH's financial dashboards—annual reports showing the contributions and administrative expenses allocated to each Plan Unit—since 2016 show that the methodology results in assessing Unit 150 between $529.36 and $805.84 per participant in administrative expenses. (O'Connell Decl. [78-2] ¶¶ 55–56; *see also* Pl.'s Expenses Analysis [78-38] at PTF07494–95.) Over the same period, Units 178 and 278 (treated as one entity in UHH's dashboards) have been assessed between $1,014.82 and $2,152.80 per participant in administrative expenses. (*Id*.)

**B.    Defendant's Alleged Breaches**

Named Plaintiffs claim that Defendant breached its fiduciary duties of loyalty and prudence by failing "to ensure that plan expenses are allocated among participants in a manner reasonably related to the services furnished to individual participants." (*See* Am. Compl. ¶ 182.) In short, Plaintiffs allege that, as a result of two unjustified decisions, UHH charged the participants of Units

---

Committee described the reasons behind UHH's allocation methodology as "lost in the mists of time." (November 19, 2019 UHH Executive Committee Minutes [78-7] at UHH046017.)

178 and 278 administrative expenses in excess of the value of the benefits they received. (*See generally id.* ¶¶ 180–93.)

First, Plaintiffs claim that Defendant's internal allocation of administrative expenses between Plan Units was not reasonably related to the value of services, resulting in fully-insured Units like 178 and 278 paying more in administrative expenses (per participant) than the partially-insured Unit 150 despite receiving a lower standard of healthcare benefits. (*Id.* ¶ 185.) Between fiscal years 2016 and 2023, Units 178 and 278 paid at least 80% (and as much as 100%) more in administrative expenses per participant than Unit 150. (*See* O'Donnell Decl. ¶¶ 56–57.)

Second, UHH's cost-allocation method aside, Plaintiffs also allege that UHH took on exorbitant fund-wide administrative costs when compared to reasonably analogous multiemployer healthcare funds. (*See* Am. Compl. ¶¶ 187–93.) Using data available from the Department of Labor,[5] Plaintiffs compared UHH's total administrative expenses with the reported expenses of other self-insured and partially self-insured healthcare funds having at least 20,000 participants between April 2016 and 2023 (the most recent data available). (*See* O'Donnell Decl. ¶ 62–73.) From this comparison, Plaintiffs assert that UHH took on $72,836,445.10 more in administrative expenses than the average, comparable self-insured plan, and $235,845,102.96 more in administrative expenses than the average partially self-insured plan. (*Id.* ¶¶ 74–75.) Combined with Defendant's disproportionate allocation of administrative expenses among Plan Units, Plaintiffs claim that they were assessed an unreasonably large slice of an unreasonably large pie.

---

[5]     ERISA requires that ERISA-covered health and welfare plans file an annual report with the Department of Labor and Internal Revenue Service. 29 U.S.C. § 1021. The Department of Labor's regulations further require that plans with more than 100 participants satisfy this reporting requirement through Form 5500, which requires that a plan administer provide information on the total number of active participants at the beginning and end of fiscal year, the types of benefits provided by the plan, the plan's yearly administrative expenses, the plan's assets, and much more. 29 C.F.R. § 2520.103-1; (*see generally* Am. Compl. ¶¶ 137–39.) The Department of Labor then compiles the forms and makes them searchable on its website. *See* DOL Form 5500 Search. https://www.efast.dol.gov/5500Search/ (last accessed January 30, 2025.)

Plaintiffs further allege that Defendant's breach of its fiduciary duties resulted in lost wages and benefits on the part of plan participants. Specifically, Plaintiffs allege that because Units 178 and 278 were charged for exorbitant expenses, the target contribution rates for Unit 178 and 278 employers were inflated to subsidize expenses properly attributable to Unit 150 and Defendant's overspending. (*See* Am. Compl. ¶¶ 197–98.) Had the target contribution rate been reasonably related to the healthcare benefits received by Unit 178 and 278 participants, Plaintiffs claim, the dollars spent on administrative expenses could have been spent (either by the employer in a published-rate allocation, or by the union in a bucket allocation) towards wages or other benefits. (*Id*. ¶ 8); *see also Acosta*, 2023 WL 2744556, at *3–4 (finding that Plaintiffs had standing to bring ERISA claim by tying Defendant's alleged breach to lost wages).

### C.     The Named Plaintiffs

The five named plaintiffs in this action are current or former participants of Units 178 and 278 who allege they were subject to exorbitant administrative expenses described above. Relevant to the court's determination of Named Plaintiffs' suitability as representatives of the proposed class is their precise relationship to the fund and their participation in the litigation of their claims so far.

#### 1.     Named Plaintiffs' Relation to Fund

Plaintiff Acosta has been a bartender for the Manhattan Beach Wesdrift Hotel since 1987 and was a participant in UHH Plan Unit 178 from approximately 2012 to 2022. (Am. Compl. ¶ 12.) Plaintiff Garcia works as a Senior Lead Steward for Westin Bonaventure Hotel & Suites in Los Angeles, California, and was a participant in UHH between 2012 and November 1, 2020. (*Id*. ¶ 13.) Since November 1, 2020, he has received benefits through a multiemployer plan called the Santa Monica UNITE HERE Health Benefit Trust Fund (hereinafter "Santa Monica Fund"). (*Id*.) Plaintiff Sanchez works as a banquet server for Aramark Sports, LLC, a position she has held since 1986, and was a participant in UHH Plan Unit 278 from approximately 2012 to 2022. (*Id*. ¶ 14.) Plaintiff Shevlin has been employed by Walt Disney Parks and Resorts since 1988,

currently working as a Food and Beverage Concierge. (*Id*. ¶ 15.) She was a participant in UHH Plan Unit 278 from at least 2012 until October 1, 2021; thereafter, she received benefits through the Santa Monica Fund. (*Id*.) Plaintiff Buenrostro has been employed by the Los Angeles Convention Center since 2000, where she currently works as a banquet server. (*Id*. ¶ 16.) She has been a participant in Plan Unit 178 from at least 2012 to present. (*Id*.) All named Plaintiffs reside in and around Los Angeles or Orange County, California,[6] and all are represented by UNITE HERE Local 11 ("Local 11") in collective bargaining with their respective employers. (*See id*. ¶¶ 12–16.)

### 2. Plaintiffs' Participation in the Litigation

Each of the Named Plaintiffs has responded to UHH's interrogatories and requests for documents, and each claims to understand the responsibilities of serving as class representatives, including reviewing documents and monitoring the case. (*See* Acosta Decl. [78-57] ¶ 9, Buenrostro Decl. [78-58] ¶ 11, Garcia Decl. [78-59] ¶ 10, Sanchez Decl. [78-60] ¶ 10, Shevlin Decl. [78-61] ¶ 10. Their deposition testimony was less confident, however. (*See* Acosta Dep. Tr. [82-2], Buenrostro Dep. Tr. [82-3], Garcia Dep. Tr. [82-4], Sanchez Dep. Tr. [82-5], Shevlin Dep. Tr. [82-6].) Acosta, for example, testified that he did not know what a class representative is, did not understand the responsibilities of serving as a class representative, and had not been monitoring the litigation. (Acosta Dep Tr. at 104:7–105:1.) Buenrostro, similarly, did not know what a class representative meant, and was unaware that she was representing others in the litigation. (*See* Buenrostro Dep. Tr. at 135:15–136:12.) Garcia was aware of his role as a class representative (Garcia Dep. Tr. at 64:5–14), but did not recall reviewing any documents (including the original and amended complaints) and was unaware of any pending motions. (*See id*. at 59:16–60:3; 63:12–15.) Sanchez testified that her role as class

---

[6] This case finds itself in this court by way of the UHH Trust Agreement, which requires litigation against the Board to be filed in the Northern District of Illinois. (UHH Trust Agreement [78-5] at UHH046766.)

representative meant that she "represent[s] herself," adding that she has obligations to other class members to "be[] here" and "[s]ay[] the truth," and has not monitored the litigation. (Sanchez Dep. at 117:6–15.) Shevlin's testimony was more satisfying; she demonstrated an understanding of the role of class representative in her deposition, and affirmed that she had reviewed the amended complaint. (*See* Shevlin Dep. Tr. at 112:1–9; 118:6-22.) The Named Plaintiffs all did demonstrate general knowledge of the claims at issue, reasonably describing the claims as involving unfair cost allocation between UHH Plan Units. (*See* Acosta Dep. Tr. at 61:20–62:1 ("My understanding is that Local 11 pays much more than other locals, and we get less benefits."); Buenrostro Dep. Tr. at 136:13–20; Garcia Dep. Tr. at 119:4–19; Sanchez Dep. Tr. at 100:11–22; Pls.' Excerpts of Shevlin Dep. Tr. [90-7] at 92:20–93:9.)

## II.    Procedural History

Plaintiffs filed their original complaint [1] on March 21, 2022, and, following Judge Leinenweber's partial grant [31] of Defendant's first motion to dismiss [19], filed a first amended complaint [46] on October 3, 2023. Defendant's motion to dismiss that amended complaint [49], was denied [120].

On April 16, 2024, Plaintiffs moved for class certification [76]. They define the proposed class as including "[a]ll current and former participants in UNITE HERE Health Plan Unit 178 or Plan Unit 278, who are or were participants in such Plan Units at any point from March 21, 2016, through the date of judgment in this action." (Pls.' Mot [76] at 2.) The motion is now fully briefed.

## **LEGAL STANDARDS**

"To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) requires a showing of numerosity, commonality, typicality, and adequacy of representation. *Id*. Rule 23(b) describes three "types" of actions that are appropriate for class certification: where prosecution of separate actions by individual class members would create a risk of inconsistent adjudications (b)(1)(A)) or dispose of the interests of other class members (b)(1)(B)); where the party opposing the class has acted on grounds that apply generally to the class, and the relief sought is purely injunctive (b)(2)); and where the court finds that common questions of law or fact predominate over questions affecting individual class members (b)(3)). *See* FED. R. CIV. P. 23(b).

"Plaintiffs bear the burden of demonstrating that they meet Rule 23's certification requirements by a preponderance of the evidence." *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 895 (7th Cir. 2024). In evaluating Plaintiff's motion, the court need not assume the truth of Plaintiff's assertions and is free to "receive evidence and resolve factual disputes as necessary to decide whether certification is appropriate." *Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, 322 F.R.D. 458, 463 (N.D. Ill. 2017) (citing *Messner*, 669 F.3d at 811). "A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." *Jacks*, 118 F.4th at 895 (quoting *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015)). As the Seventh Circuit recently reaffirmed in *Jacks*, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. (quoting *Bell*, 800 F.3d at 376).

## DISCUSSION

I.    **Rule 23(a) Requirements**

A.    **Numerosity**

A class may only be certified under Rule 23(a)(1) if "the class is so numerous that joinder of all members is impracticable."  FED. R. CIV. P. 23(a)(1).  "[A] forty-member class is often regarded as sufficient to meet the numerosity requirement."  *Anderson v. Weinert Enters., Inc*., 986 F.3d 773, 777 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020)).

Here, Plaintiffs propose a class of all individuals who were or are participants of Unit 178 and 278 at any time between March 16, 2016, and the conclusion of this action.  They assert that the putative class consists of at least 7,513 individuals.  (Pls.' Mem. at 8–9.)  Plaintiffs arrive at this number by looking to UHH's financial dashboards between 2016 and 2023, which detail the number of participants in Units 178 and 278 for each relevant year.  (*See* O'Donnell Decl. ¶ 51.)  Those dashboards show that the number of Unit 178 and 278 (combined) participants peaked (within the 2016–2023 period) at the end of the 2019–20 fiscal year (March 2020) with 7,513 participants.  (*See* UHH 2019-20 Dashboard [78-15] at UHH040147.)  It is reasonable to conclude, based on this data, that the proposed class will include at least as many individuals as were Unit 178 and 278 plan participants in March 2020, or 7,513 individuals.  This meets Rule 23(a)(1)'s numerosity requirement, and Defendant does not argue otherwise.

B.    **Commonality**

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  "A court need find only a single common question of law or fact, but it needs to identify more than the fact that everyone suffered as a result of a violation of the same provision of law."  *Orr*, 953 F.3d at 498 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  The "key to commonality" is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id*. at 498–99 (quoting *Wal-Mart*, 564 U.S. at 350).  "Where the same conduct or practice by the same defendant gives rise to the

same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc*., 764 F.3d 750, 756 (7th Cir. 2014).

Plaintiffs assert that there are a number of questions common to the class, including: (1) whether Defendant breached its fiduciary duties in granting a discount to Unit 150 for administrative fees, tending to increase the share of administrative expenses allocated to Plaintiffs' Units; (2) whether Defendant breached its fiduciary duties by adopting a policy of allocating administrative expenses based on contributions; (3) whether UHH's allocation policies *in fact* resulted Units 178 and 278's bearing a disproportionate share of the financial burden of paying administrative expenses; and (4) whether UHH's overall administrative expenses where unreasonably high, constituting a breach of Defendant's fiduciary duties.  (Pls.' Mem. at 10.)

Defendant counters that such questions are not common to all class members, as "UHH determines each employer's recommended contribution rate through a complex process that estimates administrative expenses as a percentage of the cost of health benefits."  (Opp. [84] at 3.)  Defendant argues that "determining whether UHH charged too much in administrative expenses will require analysis of the UHH underwriters' projected benefit costs for each year for numerous separate employers or employer groups." (*Id*.)  But Defendant confuses "whether" with "how much."  It is true that, in absolute terms, the amount of projected administrative expenses assigned to each employer is a function of the cost of the benefits, calculated at the employer category level.  *See supra* pp. 4–5.  But the administrative expense factor, which functionally determines how much administrative expense is allocated to each employer, is not set at the employer category level; it is set at the Unit level with no distinction between Unit 178 and Unit 278.  *See id*.  Whether the shared administrative expense factor set for Units 178 and 278 between March 2016 and present was inflated due to unfair allocation or exorbitant spending is a question common to all members of the purported class.

Moreover, as Plaintiffs observe, "commonality is quite likely to be satisfied" for fiduciary breach claims brought under ERISA § 502(a)(2).  (Pls.' Mem. at 9 (quoting *In re Schering Plough*

*Corp. ERISA Litig.*, 589 F.3d 585, 599 n. 11 (3d Cir. 2009).)  This is because § 502(a)(2) claims challenge the Defendant's actions in managing the plan, which generally consist of standardized conduct with respect to the various plan members.  *See, e.g.*, *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 349 (N.D. Ill. 2007) (finding commonality where "defendants' actions and decisions pertaining to the Plan amount to a common course of conduct vis-à-vis the putative class").  This case is no exception;[7] Plaintiffs' claims arise from Defendant's conduct in managing the fund in ways that affect all class members similarly.   Plaintiffs claim that UHH shifted administrative costs from Unit 150 to other Units and took on more administrative costs than other multiemployer health insurance plans, as reported by the Department of Labor.  Whether this conduct was reasonably justified or constituted a breach of Defendant's fiduciary duty are questions that are necessary to resolving each class member's potential claim and does not turn on individual facts or circumstances.

## C.    Typicality

Rule 23(a)(3) requires that "claims or defenses of the representative parties are typical of the claims or defenses of the class."  FED. R. CIV. P. 23(a)(3).  "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."  *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998).   "[T]he requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large," and "some factual variations may not defeat typicality."  *Oshana v. Coca–Cola Co.*, 472

---

[7]    Defendant suggests that the general rule finding commonality in ERISA cases does not apply here because Plaintiffs' claims are not typical ERISA claims: in addition to seeking injunctive relief on behalf of the fund, Plaintiffs seek monetary relief *from* the fund instead of *for* the fund.  (Opp. at 2.)  It is true that the nature of restitution sought by Plaintiffs is not the typical § 502(a)(2) claim—indeed, the kinds of monetary compensation they seek (individualized and out of the fund) are only available under § 502(a)(3), not § 502(a)(2).  *See Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 880 (7th Cir. 2013).  But the general logic of the ERISA cases cited by Plaintiff applies just as easily to § 502(a)(3) claims; regardless of the relief sought, each class member's claims turn on the propriety of Defendant's course of conduct in making decisions for the plan as a whole.

F.3d 506, 514 (7th Cir. 2006) (quotations omitted). While the inquiry is similar to the commonality

inquiry under Rule 23(a)(2), "the commonality inquiry focuses on what characteristics are shared

among the whole class while the typicality inquiry focuses on the desired attributes of the class

representative." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 606 (7th Cir. 2021). "[T]he

typicality requirement is liberally construed." *Dennis v. Greatland Home Health Servs., Inc.*, 591

F. Supp. 3d 320, 328 (N.D. Ill. 2022).

Plaintiffs argue that their claims are typical of the putative class because they arise from

the same actions taken by UHH in projecting and allocating administrative expenses. (Pls.' Mem.

at 10–11.) They note that "Defendant's allocation policy does not distinguish between participants

within Plan Units 178 and 278 in any way," thus "[i]f the allocation scheme is unlawful, it follows

that it had a common effect on all participants in the Plan Units." (*Id.*)

Defendant does not contest that claims of the Named Plaintiffs arise from the same

conduct that gives rise to all claims in the putative class. Instead, Defendant raises a scattershot

of arguments against typicality, none of which are persuasive. First, the Board argues that

because of the "complex examination of numerous projections used to estimate target rates for

individual employers of categories of employers," Plaintiffs cannot show that "the claim of a UHH

participant who works for one employer is typical of the claim of a participant who works for a

different employer." (Opp. at 5–6.) But Defendant overstates the complexity of UHH's projection

of administrative expenses. As discussed above, while UHH's process for arriving at a target

contribution rate for each employer is "complex" in an arithmetic sense, it treats administrative

expenses simply: there is one factor used across all employers in Units 178 and 278. Claims

brought by the Named Plaintiffs are typical of those of all Unit 178 and 278 participants.

Defendant also challenges typicality on the basis that four of the five Named Plaintiffs are

former participants in UHH who do not share an interest in pursuing the prospective relief available

to current participants (*Id.* at 6.) But Defendant cites no authority for the position that each Named

Plaintiff must be eligible for the identical relief due to all other members of a putative class. On

16

the contrary, courts routinely certify class actions for prospective relief in ERISA cases where a named plaintiff is a former participant in the plan at issue. *See, e.g., Brieger v. Tellabs*, Inc., 245 F.R.D. at 350 (finding typicality of named plaintiffs including former participants for injunctive relief); *George v. Kraft Foods Glob., Inc.*, 251 F.R.D. 338, 345–46 (N.D. Ill. 2008) (same); *Smith v. Aon Corp.*, 238 F.R.D. 609, 615–16 (N.D. Ill. 2006) (finding former plan participants have standing to pursue prospective relief on behalf of class). What matters for typicality is that Named Plaintiffs base their claims in the same conduct as the putative class, on the same theory of breach of fiduciary duties that represents the claims of the class. *See Keele*, 149 F.3d at 595.[8]

Next, Defendants argue that Named Plaintiffs' claims are not typical because they "seek to raid the UHH fund . . . which would *harm* those class members who still receive health benefits through UHH." (Opp. at 6.) As discussed below, the court is sensitive to this concern, but believes it relates to the adequacy of the Named Plaintiffs, not the typicality of their substantive claims.[9] Defendant then argues that Plaintiffs ignore the distinction between class members who are subject allocations and those subject to published-rate allocations, suggesting that a class member subject one form of allocation agreement is not typical of class member who is subject to another. (*Id.* at 7.) But whether a class member is allocated exorbitant administrative costs

---

[8]  Though Defendant raises this argument only with respect to typicality, the fit between the relief sought by the named plaintiff and the relief available to the class is really a question of adequacy under Rule 23(a)(3). The court recognizes that in *Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) (a case not cited by Defendant), the Seventh Circuit affirmed the district court's ruling that a plaintiff who lacked standing to seek prospective relief was not an adequate class representative under Rule 23(a)(4) to represent a class seeking an injunction. 546 F.3d at 799. But in that case, the named individual barred from pursuing prospective relief was the *only* named plaintiff in the case. Here, there is at least one Named Plaintiff (Buenrostro) who is a current participant, eligible for prospective relief. *Cf. Bhattacharya v. Capgemini N.A., Inc.*, 324 F.R.D. 353, 364 (N.D. Ill. 2018) (in an ERISA case, court found former employees inadequate to represent a class seeking prospective relief and refused to "certify [an injunctive relief subclass] *unless and until a new named plaintiff who is a current employee* . . . is added to the case." 324 F.R.D. at 364 (emphasis added).

[9]  *Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011), the case that Defendant cites as authority for this argument, also discusses a named plaintiff's requested relief harming other class members as a problem for adequacy under Rule 23(a)(4), not typicality. *See* 633 F.3d at 586–87.

through a published rate or by bucket allocations, their substantive claim under ERISA does not change—the claim still turns on the propriety of UHH's administrative spending and cost allocation standard across the class. Finally, Defendants argue that "[t]he claim of a UHH participant working for one employer is not typical of the claim [of] a UHH participant working for a separate employer" because the contribution made by an employer depends on the bargaining agreement between employer and employee union. (*Id.*) Not so. UHH treats all employers within Units 178 and 278 equally in projecting administrative costs as a factor of their cost of benefits; as Defendant's actions are typical across the putative class, so are the claims.

### D. Adequacy of Representation

Adequacy of representation requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "[A]dequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993).

Named Plaintiffs argue that they are adequate to represent the class because they "suffered the same injury as those of the class" and thus have a "strong interest in establishing Defendant's liability and determining whether Defendant violated ERISA." (Pls.' Mem. at 11–12.) Plaintiffs' counsel has also submitted declarations attesting to their experience in class action and ERISA litigation. (*See generally* Weiner Decl. [78-39]; Yokich Decl. [78-40].)

Defendant disputes that the Named Plaintiffs and their counsel are adequate under Rule 23(a)(4). Specifically, Defendant charges that former participants seeking to move money out of UHH present claims that conflict with those class members who are still receiving benefits through the fund, that Plaintiffs' counsel's representation of Local 11 presents a conflict of interest in pursuing claims for current UHH participants, and that the Named Plaintiffs lack the requisite

knowledge and involvement in the litigation to adequately protect the interests of absent class members. (*See* Opp. at 9-11.)

### 1. Antagonistic Claims Between Former and Current Participants

Defendant's first argument against adequacy concerns the relief sought by the Named Plaintiffs. As Defendant observes, Plaintiffs seek to "transfer plan assets attributable to contributions on behalf of Named Plaintiffs and class members to a health plan that currently provides their benefits." (*Id*. at 8; *see* Am. Compl at 54.) This requested relief, according to Defendant, is antagonistic to the class members who are still receiving benefits through UHH and have an interest in the "continued solvency" of the fund. (Opp. at 8.)

As a preliminary point, a transfer of funds out of UHH and into a different health plan would indeed advantage only those class members who are no longer receiving benefits through UHH. Should Plaintiffs succeed in proving their entitlement to monetary compensation from Defendant, current-participant class members will have to be compensated in some other way. Named Plaintiff's prayer for relief does not inhibit this court's "broad discretion to determine the appropriate remedy for a breach of fiduciary duty" under ERISA. *See Mintjal v. Prof. Benefit Tr*., No. 08-CV-5681, 2018 WL 11353294, at *8 (N.D. Ill. Apr. 23, 2018) (citing *Donovan v. Est. of Fitzsimmons*, 778 F.2d 298, 302 (7th Cir. 1985)).

As for the claim that the interests of former class members in moving funds out of UHH is antagonistic to the interest of current participants, Defendant fails to demonstrate a genuine conflict of interest between class members. Defendant properly articulates the interests of current participants of the fund: their interest is in the *solvency* of the fund, not the level of surplus or numerical value of assets. Even if the court were to assume that Plaintiffs' high estimate of monetary harm of $19,446,307.83 is correct, and further assume that this full amount must be transferred out of the fund, the amount recovered by Plaintiffs would still be dwarfed by UHH's

$1.26 billion in total assets, as reported to the Department of Labor.[10]  UHH's solvency does not appear to be at risk even in the event of a fantastical recovery for the Plaintiffs.  Absent such risk, there is no identifiable risk of harm to the current UHH participants, and no conflict for the purposes of Rule 23(a)(4).  *Cf. Spano*, F.3d at 586–87 (no adequacy of representation where "some members will actually be harmed by that relief" sought by named plaintiffs); *see Neil v. Zell,* 275 F.R.D. 256, 265 (N.D. Ill. 2011) ("[T]he conflicting economic interest necessary to render a representative inadequate must be of the type that, if that plaintiff succeeds, would result in identifiable harm to some member of the class.").  Moreover, as Plaintiffs rightly observe, it is not clear which—if any—forms of remedy Plaintiffs will be entitled to recover, in the event they prevail in this case.[11]  Should the circumstances of UHH's solvency change, or the nature of the action later give rise to conflicts between class members, the court can create subclasses or require separate representation to address the new-found conflict.  *Howard*, 989 F.3d at 610 ("If and when [potential conflicts] become real, the district court can certify subclasses with separate representation of each.").

### 2.    Plaintiffs' Counsel's Conflict of Interest

Defendant's argument that Plaintiffs' counsel has a conflict of interest because of their concurrent or past representation of Local 11 fails for similar reasons.  The argument goes that

---

[10]    This information is publicly available from UHH's Form 5500 for the year 2023, available on the Department of Labor website. *See* DOL Form 5500 Search. https://www.efast.dol.gov/5500Search/ (accessed on Jan. 22, 2025). The same form shows Net Assets of $ 890,708,294, Total Contributions of $ 1,319,888,286, and Net Income of $ 167,501,644.  UHH also reported a total surplus of $ 66,194,379 for fiscal year 2022–23 in its dashboard.  (UHH 2022–23 Dashboard at UHH040198.)

[11]    The court observes that in ruling on Defendant's first motion to dismiss, Judge Leinenweber's opinion did not resolve the question of whether the monetary compensation sought by Plaintiffs' (now amended) complaint qualifies as the kind of "equitable remedy" sanctioned by ERISA § 502(a)(3).  (*See* Def.'s Mem. in Support of First Mot. to Dismiss; Pls.' Opp. to First Mot. to Dismiss.)  The parties do not raise this question again in moving and opposing class certification, but the court will ultimately be required to address it.  That the question is unresolved does not preclude class certification, however, because any argument that money compensation is not available in this case applies class-wide.

Local 11 has a "substantial interest in the Santa Monica Fund,"[12] creating a conflict between Local 11 and class members who do not currently receive benefits through the Santa Monica Fund, which extends to counsel that represents (or has represented) both Local 11 and the members of the proposed class.  (*See* Opp. at 10–11.)[13]  But, for now, this conflict is purely hypothetical—any interest that Local 11 has in diverting funds to the Santa Monica Fund becomes relevant only when and if Plaintiffs are found to be entitled to monetary compensation.  Until that point, even if the court accepts unsubstantiated (*see* Reply [91] at 15) claims of Local 11's interest in the Santa Monica Fund, Local 11 has a shared interest in ascertaining Defendant's ERISA liability.  By certifying this action for only the issues of liability and injunctive relief, but not monetary damages (as the court ultimately decides to do), Defendant's alleged conflict between Local 11 and current UHH plan members will not materialize.

### 3. "Figurehead" Plaintiffs

Defendant's final and most forceful argument against adequacy is that the Named Plaintiffs have demonstrated insufficient knowledge and involvement in this litigation.  (Opp. at 9–12.)  They cite to portions of Plaintiffs' deposition testimony that suggest poor understanding of certain terms like "class representative" and a lack of awareness of pending motions or case documents.  *See supra* pp. 9–10.  These admissions, Defendant argues, show that Named Plaintiffs are mere "figurehead plaintiffs" who have shifted their duties to class counsel.  (Opp. at 8 (citing *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 254 F. Supp. 3d 1007, 1023 (N.D. Ill. 2017).)

---

[12]  Citing to a web-page listing the Santa Monica Fund Board of Trustees (the link provided by Defendant no longer appears to work), Defendant notes that the co-President of Local 11 (Kurt Peterson), a former president of Local 11 (Thomas Walsh, also a member of the UHH Board), and the Local 11 Organizing Director (Austin Lynch) all sit on the Santa Monica Fund's Board.  (*See* Def.'s Opp'n at 11 n. 5.)

[13]  Though the parties have not offered details, the court infers that a past falling-out between Local 11 and UHH led to Local 11's receiving benefits from the Santa Monica fund rather than from UHH, and that Plaintiff's counsel represented Local 11 in that dispute.  Without more detail, the court declines to find a significant conflict of interest in these circumstances.

Rule 23(a)(4) requires that a class representative be "sufficiently interested in the outcome to ensure vigorous advocacy." *Wahl v. Midland Credit Mgt., Inc*, 243 F.R.D. 291, 298 (N.D. Ill. 2007). To that end, "[c]ourts have repeatedly emphasized the importance of class representatives having reviewed court papers prior to filing, answering interrogatories (obviously in a truthful way), conferring with attorneys about the prosecution of the action, and understanding the facts of the case." *Pruitt v. Pers. Staffing Grp., LLC*, No. 16-CV-5079, 2020 WL 3050330, at *4 (N.D. Ill. June 8, 2020). But it is important not to overstate the burden placed on the class representative. "Realistically, functionally, practically," federal courts know from experience that "it is counsel for the class representative and not the named parties, who direct and manage these actions." *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (quoting *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 n. 9 (3d Cir.1973)). Rule 23 thus places a "modest burden" on named plaintiffs "to demonstrate [a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery." *Zollicoffer v. Gold Stand. Baking, Inc.*, 335 F.R.D. 126, 160 (N.D. Ill. 2020) (quoting *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 394 (N.D. Ill. 2006)) (cleaned up). The burden in establishing that the class representative meets this standard is "not difficult." *Murray v. New Cingular Wireless Svc.*, Inc., 232 F.R.D. 295, 300 (N.D. Ill. 2005).

Plaintiffs' showing in this case was modest at best. In their depositions, Named Plaintiffs, who attested in their declarations to understanding the term "class representatives," were unable to provide a suitable definition in their deposition testimony. And when asked at their depositions about relevant documents, they could not recall having reviewed them. But this testimony, while disappointing, does not necessarily disqualify them as adequate class representatives. In *T.S. v. Twentieth Cent. Fox TV*, 548 F. Supp. 3d 749 (N.D. Ill. 2021), for example, the court found that proposed class representatives who could not recall viewing an amended complaint or their own interrogatory responses were nonetheless adequate because the court was "confident that counsel understands the need to continue updating [named plaintiffs] about the litigation." 548 F.

22

Supp. 3d at 802–03, *rev'd and remanded on other grounds T. S. v. Cnty. of Cook, Illinois*, 67 F.4th 884 (7th Cir. 2023).  In *In re Ocean Bank*, No. 06 C 3515, 2007 WL 1063042 (N.D. Ill. Apr. 9, 2007), the court found that a named plaintiff who was unable to define the term "class representative" was nonetheless adequate because "[w]hether or not [plaintiff] can define his duties as class representative, he has demonstrated the ability to fulfill them" by "participat[ing] in discovery by sitting for a deposition."  2007 WL 1063042, at *5.

Named Plaintiffs here have similarly demonstrated their adequacy.  They have testified at depositions, maintained communication with counsel, and responded to discovery requests throughout the nearly three years of litigation.  (*See* Weiner Decl. ¶ 10.)  Moreover, in the same depositions that Defendant cites, each Named Plaintiff demonstrated a clear understanding of what this case is about, *see supra* p. 10, explaining how their claims arose from the allocation of administrative expenses and unfair treatment between different Plan Units.  While the court expects Plaintiffs' counsel, in the future, to more thoroughly apprise the Named Plaintiffs of their specific responsibilities and pending motions, the court is satisfied for now that the Named Plaintiffs have "[a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery" sufficient to meet the requirements of Rule 23(a)(4).  *See Zollicoffer,* 335 F.R.D. at 160.

## II.      Rule 23(b) Requirements

Having found the Rule 23(a) requirements satisfied, the court turns to the question of whether this action fits under the types of actions described in Rule 23(b).  Plaintiffs argue that certification is warranted under either Rule 23(b)(1) or 23(b)(3).  (Pls.' Mem. at 12–13.)  The practical difference between the 23(b) subsections is that 23(b)(1) does not require that absent class members be given "the best notice that is practicable under the circumstances" and the opportunity to opt-out of the class, while 23(b)(3) does.  FED. R. CIV. P. 23(c)(2).  "A court should endeavor to select the most appropriate subsection, not just the first linguistically applicable one in the list."  *Jefferson v. Ingersoll Int'l Inc*., 195 F.3d 894, 898 (7th Cir. 1999).

### A.    23(b)(1)

Rule 23(b)(1) allows for certification when prosecuting separate actions would create a risk of either "(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." FED. R. CIV. P. 23(b)(1). As Plaintiffs note, ERISA § 502(a)(2) breach of fiduciary duty claims are commonly certified under Rule 23(b)(1) because "recovery for a breach of the fiduciary duty owed to an ERISA plan . . . will inure to the plan as a whole, and because defendant-fiduciaries are entitled to consistent rulings regarding operation of the plan." *Neil*, 275 F.R.D. at 267 (also collecting cases certifying ERISA breach of fiduciary duty claims under Rule 23(b)(1)). Indeed, such claims have been considered "paradigmatic examples" of claims that are appropriate for 23(b)(1) certification. *See In re Glob. Crossing Securities and ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) (quoting *Kolar v. Rite Aid Corp.*, No. Civ.A. 01–1229, 2003 WL 1257272, at *3 (E.D. Pa. March 11, 2003)).

Insofar as Plaintiffs seek injunctive relief under ERISA § 502(a)(2) preventing Defendant from taking on excessive administrative expenses and allocating expenses unevenly across plan units, Rule 23(b)(1)(A) appears to be a strong fit. Requiring each class member to individually adjudicate the propriety of UHH's administrative expense policies creates a significant risk that Defendant may be subject to inconsistent or conflicting judgments. *See Neil*, 275 F.R.D. at 268.

The court nevertheless hesitates to certify this action under 23(b)(1), however, because Plaintiffs also seek more individualized compensatory relief under ERISA § 502(a)(3).[14]    As explained in *Neil*, ERISA § 502(a)(2) claims are so often appropriate for 23(b)(1) certification

---

[14]    In their opposition to Defendant's first motion to dismiss, responding to the argument that the monetary relief sought is not available under ERISA, Plaintiffs confirmed that they seek restitution and a transfer of assets out of the fund as "appropriate equitable relief" under § 502(a)(3). (*See* Pls.' Opp. to First Mot. to Dismiss [24] at 21.)

because "in an ERISA action in which relief is being sought on behalf of the plan as a whole (as it is here), a plaintiff's victory would necessarily settle the issue for all other prospective plaintiffs." *Id*. at 267. All claims brought under § 502(a)(2)—which can only seek relief for "losses to the plan," *see* 29 U.S.C. § 1109—share the characteristic of seeking plan-wide relief and thus are particularly appropriate for class-wide resolution. *See, e.g.*, *Brieger*, 245 F.R.D. at 357 ("Plaintiffs bring their claims on behalf of the Plan as a whole to recover benefits owed under the Plan. Any recovery of lost benefits will go to the Plan . . . ."); *Smith*, 238 F.R.D. at 618 ("Monetary relief in a plan-wide action brought under ERISA section 502 is incidental, and flows from relief to the plan.")

But this rationale does not extend to claims brought under ERISA § 502(a)(3). "While section 502(a)(2) claims necessarily involve plan-wide relief, claims under section 502(a)(3) are not representative in nature." *Rogers v. Baxter Intern. Inc.*, No. 04 C 6476, 2006 WL 794734, at *11 (N.D. Ill. Mar. 22, 2006). The restitution and transfer of plan assets that Plaintiffs seek in this case (*see* Am. Compl. at 53–54), would not inure to "behalf of the plan as a whole," but instead to individual class members who lost wages because of Defendant's alleged breaches (because, they contend, dollars bargained for health benefits would otherwise have been available as wages). Indeed, as Defendant points out, these claims are effectively *against* the plan, seeking to draw funds out of UHH and into other health benefit plans. (*See* Opp. at 13.) Resolution of any one of these restitution claims will not subject Defendant to conflicting judgments or dispose of other class members' claims for monetary compensation—a court may readily find that one individual can demonstrate that their employer reduced wages to match UHH's inflated target contribution rates, while another cannot.

Nor can the monetary compensation sought by Plaintiffs be characterized as "incidental to the injunctive or declaratory relief." *Cf. Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 369 (7th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 360). Monetary relief is considered incidental—and thus does not necessitate heightened notice and opt-out measures—when "the award of monetary relief will just be a matter of . . . computing the employee's entitlement by

subtracting the benefit already credited it to him from the benefit to which the reformed plan document entitles him." *Id.* at 371. The circumstances here are different: the monetary award the Plaintiffs seek is not the amount they would collectively be due under a reformed plan; they want compensation for what they would have *earned*, had the administrative expenses charged to their employer been reasonable. As the court describes explains below, calculating these damages will necessarily be individualized, requiring evidence of specific collective bargaining agreements.

Plaintiffs' claims here are thus better understood as requests for individual monetary awards[15], thus properly analyzed under 23(b)(3). *See Rogers*, 2006 WL 784734, at *12 ("[I]f Rogers' section 502(a)(3) claims are to be certified at all, they should be certified under Rule 23(b)(3)."); *see also Piazza v. Ebsco Indus., Inc*., 273 F.3d 1341, 1353 n. 7 (11th Cir. 2001) (holding that Plaintiffs' § 502(a)(2) could only be certified under Rule 23(b)(1), but that separate suits for individual relief under § 502(a)(3) would be properly certified under Rule 23(b)(3)). After all, "individualized monetary claims belong in Rule 23(b)(3)." *Wal-Mart*, 564 U.S. at 362.

Before turning to Rule 23(b)(3), the court briefly considers whether Plaintiffs' § 502(a)(2) claims could be separately certified under Rule 23(b)(1) under the "divided certification" framework described by the Seventh Circuit in *Jefferson v. Ingersoll Intern. Inc*., 195 F.3d 894 (7th Cir. 1999) *and Lemon v. Intl. Union of Operating Eng'rs, Loc. No. 139, AFL-CIO*, 216 F.3d 577 (7th Cir. 2000). As explained in those cases, where a putative class seeks both injunctive relief (generally certified under 23(b)(1) or 23(b)(2))[16] and monetary damages (appropriately

---

[15]   Indeed, Plaintiffs may obtain such monetary relief under ERISA only if they are correct in asserting that the restitution they seek qualifies as "make-whole damages," deemed equitable in nature by the Seventh Circuit. *See Kenseth*, 722 F.3d at 882.

[16]   The putative classes in *Lemon* and *Jefferson* technically sought certification only for their injunctive relief claims under Rule 23(b)(2), which provides for certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," FED. R. CIV. P. 23(b)(2), not Rule 23(b)(1). But given that the Seventh Circuit was

certified under 23(b)(3)), a district court need not certify the whole class under one or the other. Instead, the district court may "divide certification" by certifying a 23(b)(1) class for equitable relief *and* a separate, 23(b)(3) class for damages. *See Lemon*, 216 F.3d at 581–82 (citing *Jefferson*, 195 F.3d at 898–99). Neither party requests this solution, and it has several practical drawbacks. For one, "the Seventh Amendment has been interpreted to entitle a party in a divided-certification case to demand that the damages claims be tried first, to a jury," and thus divided certification is not optimal when "the issues underlying the declaratory and damages claims overlap[]," as they do here. *Johnson*, 702 F.3d at 371. Creating separate classes for equitable and monetary relief will also raise new Rule 23(a) questions as to whether the Named Plaintiffs are adequate to represent a class seeking *only* prospective relief. Considering this entire action under Rule 23(b)(3)—an approach also supported by *Jefferson* and *Lemon* (*see Lemon*, 216 F.3d at 581)— avoids such concerns.

### B.     23(b)(3)

Rule 23(b)(3) provides for certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Plaintiffs seeking to certify a (b)(3) class must meet two requirements: the predominance requirement and the superiority requirement.

#### 1.     Predominance

The predominance requirement is met when "common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (quotation omitted). A question is a "common question" when "the same evidence will suffice for each member to make a prima facie showing or the issue is

---

chiefly concerned with the difference in notice and opt-out requirements between (b)(2) and (b)(3) classes, *see Jefferson*, 195 F.3d at 897–98, the cases are relevant to the distinction between (b)(1) and (b)(3) classes as well.

susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotations omitted).

When determining whether common questions predominate in a particular action, the Seventh Circuit has directed district courts to "begin the class certification analysis by identifying the elements of the plaintiff's various claims." *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339 (7th Cir. 2023) (cleaned up) (quoting *Simpson v. Dart*, 23 F.4th 706, 713 (7th Cir. 2022)). Plaintiffs here bring breach of fiduciary duty claims under ERISA, requiring a showing "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quotations omitted).

Defendant does not dispute that it is UHH's designated fiduciary. (*See* Answer to Am. Compl. [36] ¶ 1.) As for the second element—whether Defendant breached fiduciary duties by taking on excessive administrative expenses and allocating disproportionately low administrative costs to Unit 150—the focus is solely on the Board's conduct; it is a purely common question. *See Allen*, 835 F.3d at 679 (holding that ERISA plaintiffs can prove breach of fiduciary duty claims by "compar[ing] whatever steps [fiduciary] actually took with the procedures that a prudent fiduciary would use"). Any evidence that one class member would submit to show that Defendant's actions were imprudent or unreasonable would be sufficient for any other class member to prove a breach of Defendant's fiduciary duty. Finally, as to the third element, Plaintiffs allege a class-wide harm that is similarly susceptible to class-wide proof. They claim that because they were paying excessive administrative expenses, Plan Units 178 and 278 were unable to use those funds to improve the benefit options available to the class members. (*See* Pls.' Mem. at 14.) Resolving whether UHH's expense allocation policies in fact reduced the standard of benefits for Plan Units 178 and 278 is another purely common question across the putative class members.

Defendant does not dispute that determining whether its conduct constituted a breach of fiduciary duties is a purely common question. Instead, Defendant focuses solely on the question of individualized damages; Defendant urges that, should this court reach the question of monetary compensation, the inquiry will be highly individualized and unsuitable for class-based resolution. As Defendant argues, administrative expenses projected for each Unit are based on a percentage of the cost of benefits by employer-category, and the degree of alleged overcharging depends on whether a particular employer agrees to a "bucket" or "published-rate" allocation. (Opp. at 4–5; *see also supra* p. 3.) Class members compensated (presently or in the past) from bucket allocations will need to show that every dollar (or a percentage of every dollar) the union contributed to the fund would otherwise have been paid in wages or employee benefits. Class members who are part of published rate allocations, on the other hand, would need to show that every dollar (or percentage of every dollar) contributed by their employer towards the fund would otherwise be paid in wages or benefits.[17] As Plaintiffs' submissions in response to Defendant's first motion to dismiss show, such evidence is generally found in the collective bargaining agreement between Local 11 and a specific employer. (*See* Pls.' Opp. to First Mot. to Dismiss at 15–17.) Therefore, resolution of whether (and how much) a particular class member is entitled to money compensation in addition to injunctive relief will require an individual inquiry into the terms of their employer's CBA. This suggests that predominance has an identifiable endpoint in this action—after a determination of whether Defendant breached its fiduciary duties, questions of monetary compensation will be more individualized.

Plaintiffs, for their part, admit that calculating damages will involve "individualized questions," but argue that "aggregate damages" can be resolved on a class-wide basis. (Reply at 2.) Specifically, they urge that aggregate damages can be approximated by taking the

---

[17] Note that even if a class member is unable make such a showing, Defendant could still be held liable for overcharging the class member's employer or union with an inflated target contribution rate, though that overcharging did not result in *monetary* harm to the class member.

difference between the administrative expenses they were actually allocated and the administrative expenses they *would* have been allocated, had they been assigned the same rate of expenses-per-participant as Unit 150. (*See id.*) This approach fails for two reasons. First, the discounted rate of administrative expenses allocated to Unit 150 is not the rate that Unit 178 and 278 "should have paid," under Plaintiffs' theory of recovery. Indeed, they contend that Defendant breached its duty by assigning a rate of administrative expenses to Unit 150 that was unjustifiably *low*, forcing other Plan Units to pick up the slack. (*See* Pls.' Mem. at 5 "[T]he Las Vegas Plan Unit is allocated only one-third of its fair share of these expenses.").) Presumably, a fair distribution would result in participants in all units bearing an equal burden—less costly for Units 178 and 278 but more costly for Unit 150. More fundamentally, what matters for calculating the monetary harm owed to the class members is the target employer contribution rate, not the actual allocation of costs at the end of the fiscal year. Employers (in published rate allocations) and unions (in bucket allocations) negotiate how much to pay into the fund based on the target rates set by the underwriters, not the actual allocation of administrative expenses at the end of the fiscal year. *See supra* p. 3. A proper calculation of what an individual class member is owed in restitution, therefore, involves comparing what their employer or union actually paid into the fund compared to what they *would* have paid, had the administrative expense factor been reasonable—Plaintiffs have not submitted a formula for how this harm can be readily aggregated.

The fact that individual questions will eventually predominate in this case, should it reach the point of calculating damages, need not defeat certification under Rule 23(b)(3) at this stage. Courts are well familiar with class actions "where the defendant's liability can be determined on a class-wide basis, but aggregate damages cannot be established and there is no common method for determining individual damages." *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015). And "[i]t has long been recognized that the need for individual damages determinations at this later stage of the litigation does not itself justify the denial of certification."

*Id*. (collecting cases).[18]  Rather, "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues." *Carnegie v. Household Intern., Inc*., 376 F.3d 656, 661 (7th Cir. 2004).  Indeed, "[a] district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individualized assessments."  *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010); *see also* FED. R. CIV. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").  Courts often address problems with individualized damage calculations by "bifurcat[ing[ the case into a liability phase and a damages phase."  *Mullins*, 795 F.3d at 671.  That approach is appropriate here, where common questions predominate over questions of liability but subside over questions of damages.  In these circumstances, "a class action limited to determining liability on a class-wide basis, with separate hearings to determine— if liability is established—the damages of individual class members, or homogeneous groups of

---

[18]     Defendant quotes *Thomas v. GEICO*, No. 20 C 04306, 2024 WL 1075151, at *6 (N.D. Ill. Mar. 12, 2024) for the assertion that "plaintiffs must show their damages model is capable of measurement on a class wide basis" for 23(b)(3) certification.  (Opp. at 14.)  The district court in *Thomas* based this conclusion on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  In that case, the Court held that certification was improper where plaintiffs' model for calculating class damages "failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised."  569 U.S. at 35–36.

The Seventh Circuit, however, has interpreted *Comcast* more narrowly than Defendant suggests.  In *Butler v. Sears, Roebuck and Co*., 727 F.3d 796 (7th Cir. 2013), the court explained that *Comcast* "holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges."  727 F.3d at 799. The Seventh Circuit clarified that *Comcast* does not bar class certification when "there is no possibility[] that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis."  *Id*. at 800.  In other words, *Comcast* does not require that a putative class be able to measure class-wide damages, so long as the class can show that any asserted damages flowed from the same class-wide injury.  Here, even if Plaintiffs cannot calculate class-wide damages, there is no doubt that the lost wages asserted by the class resulted from Defendant's challenged conduct.

class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed." *Butler*, 727 F.3d at 800.[19]

In light of this guidance from the Seventh Circuit, the court finds that the following issues in this action meet the predominance requirement and can be properly certified under Rule 23(b)(3): (1) whether Defendant took on exorbitant administrative expenses relative to the standard of care provided to participants, constituting a breach of its fiduciary duty; (2) whether Defendant weighted contributions from Unit 150 at 33% in allocating shared administrative costs, constituting a breach of its fiduciary duty; and (3) what, if any, injunctive relief is appropriate.

### 2.  Superiority

"The superiority inquiry requires courts to assess the fairness and efficiency of class adjudication 'with an eye toward other available methods.'"  *Quinn v. Specialized Loan Servicing, LLC*, 331 F.R.D. 126, 133 (N.D. Ill. 2019) (quoting *Mullins*, 795 F.3d at 664) (internal quotation omitted).  Rule 23(b)(3) explicitly mentions four factors relevant to superiority, including:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A–D).  For the issues that the court has previously determined are appropriate for class resolution (liability and injunctive relief), Plaintiffs have met their burden of showing that a class action is superior.  First, because the putative class challenges actions taken by Defendant that apply across the fund, the effect of the alleged breach is spread across the

---

[19]    In determining how the allocation of excessive administrative expenses damaged an individual class member, it may turn out that certain class members do not have claims to compensatory monetary relief—if, for example, their wages were set or determined before the UHH created the target contribution rate—but that can easily be accounted for after certification. *See Pella*, 606 F.3d at 394 ("While it is almost inevitable that a class will include some people who have not been injured by the defendant's conduct . . . this possibility does not preclude class certification."); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) ("If the court thought that no class can be certified until proof exists that every member has been harmed, it was wrong.")

fund, and no individual participant has a significant interest in pursuing these claims. Second, Plaintiffs' counsel has attested that there is no other lawsuit against UHH alleging the same violation of ERISA. (O'Donnell Decl. ¶ 76.) Third, this forum is a particularly desirable forum to manage litigation of these claims because UHH's Trust Agreement requires litigation in the Northern District of Illinois. (UHH Trust Agreement at UHH046766.) Finally, there are no reasons to think that this class will be hard to manage. In fact, the class is defined by Plan Units that share similar geography (Los Angeles, Orange County, Long Beach) in addition to current or former representation by Local 11. Defendant does not challenge superiority in its submissions.

## CONCLUSION

Plaintiffs' motion for class certification is granted [76, 78] as explained in this order. The court hereby certifies a class composed of all current and former participants in UNITE HERE Health Plan Unit 178 or Plan Unit 278, who are or were participants in such Plan Units at any point from March 21, 2016, through the date of judgment in this action. Under this court's authority under Federal Rule of Procedure 23(c)(4), the class is certified for the following issues:

1. Whether Defendant had a policy of discounting contributions from Las Vegas Unit 150 by 66% in allocating administrative expenses, and whether such policy was a breach of Defendant's fiduciary duties under ERISA, 29 U.S.C. ch. 18.

2. Whether Defendant took on administrative costs that were significantly greater than those of similar health benefit plan, and whether such conduct was a breach of Defendant's fiduciary duties under ERISA, 29 U.S.C. ch. 18.

3. Whether members of the class are entitled to injunctive relief.

The parties are directed to meet and confer to propose a form of class notice, *see* FED. R. CIV. P. 23(c)(2)(B), to be presented at a video status hearing on April 24, 2025 at 11:00 a.m.

ENTER:

Dated: March 31, 2025

_____
REBECCA R. PALLMEYER
United States District Judge

33