UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE LUIS ACOSTA, *et al.,*   )
            )
    **Plaintiffs,**    )
            )
    **v.**       )  No.  1:22 C 01458
            )
**BOARD OF TRUSTEES OF UNITE HERE** )  Judge Rebecca R. Pallmeyer
**HEALTH,** *et al.,*    )
            )
    **Defendants.**   )

**MEMORANDUM OPINION AND ORDER**

The Board of Trustees of Unite Here Health ("UHH" or "the Fund") is a Taft-Hartley, national multi-employer employee benefit plan that provides benefits for workers in the retail, hospitality, and service industries.  Plaintiffs in this class action are participants in two of the Plan Units of which UHH is comprised, referred to here as Plan Units 178 and 278.  Plaintiffs allege that UHH breached its fiduciary duties under the Employee Retirement Income Security Act ("ERISA") by allocating costs incurred by the Fund in a way that is unfair to Plan Units 178 and 278, and by incurring excessive amounts of administrative expenses.

The facts are complex:  As noted, UHH is comprised of individual Plan Units, which provide benefits for employees working for various employers in different regions around the country. Plan Units 178 and 278, in which Plaintiffs are participants, serve the Los Angeles and Long Beach/Orange County, California areas.  Plaintiffs bring two claims for breach of fiduciary duty. First, they challenge UHH's policy for allocating administrative expenses, specifically the allocation of costs based on each Plan Unit's relative contribution rate to the Fund, and a discount that UHH has granted to Plan Units based in Las Vegas, Nevada.  Second, Plaintiffs assert that UHH incurs an excessive amount of administrative expenses.  Plaintiffs seek an award of restitution, disgorgement of profits, and an order enjoining Defendants' allegedly improper policies.  They also ask the court to award plan assets that are attributable to their contributions

to another benefits plan—the "Santa Monica Plan," which has no connection to UHH, and in which many of the class members are now participants. Defendants move for summary judgment on all claims [257] and to exclude the Plaintiffs' expert [260], Mr. Alex Zeid. Plaintiffs also move for partial summary judgment on Count One [262]. As explained in this opinion, the court concludes that even after ample discovery, Plaintiffs have not demonstrated that Defendants' administration of the Plans caused them harm. Defendants' motion for summary judgment is therefore granted, Plaintiffs' cross motion for summary judgment is denied, and the *Daubert* motion to strike the testimony of Mr. Zeid is stricken as moot.

## **BACKGROUND**

### I.      **Factual Background[1]**

#### A.      **UHH Background**

UNITE HERE HEALTH ("UHH," "the Fund," or "the Plan") is a national multi-employer health and welfare benefit plan, as defined in ERISA, § 3(1), 29 U.S.C. § 1002(1). (DSOF [259] ¶¶ 1, 4.) The majority of UHH participants are members of UNITE HERE, a labor union representing workers in the hotel, gaming, food service, and related industries. (DSOF [259] ¶ 1.) The welfare benefits that UHH provides are funded by contributions from employees and from participant employers. (PSOF [264] ¶ 2.) Each signatory employer is required to make regular contributions to UHH, and in return, the employees receive benefits from UHH. (PSOF [264] ¶ 2.)

---

[1]      The facts set forth here are presented in the parties' statements of fact pursuant to this court's Local Rule 56.1. UHH's Local Rule 56.1 Statement of Material Facts [259] is cited here as "DSOF [259] ¶ ___." Plaintiffs' Response to Defendants' Local Rule 56.1 Statement [269] is cited here as "Pls.' Resp. to DSOF [269] ¶ ___." In opposition to UHH's motion for summary judgment, Plaintiffs also filed an Additional Statement of Facts [270] cited here as "PSAF [270] ¶ ___." UHH's response to Plaintiffs' Additional Statement of Facts [285] is cited here as "Def.'s Resp. to PSAF [285] ¶ ___."

Plaintiffs, who have filed a cross-motion for partial summary judgment, have also submitted their own Local Rule 56.1 Statement of Material Facts [264] which is cited here as "s [264] ¶ ___." UHH's Response to Plaintiffs' Statement of Fact [274] is cited here as "Def.'s Resp. to PSOF [274] ¶ ___." ___." In opposition to Plaintiffs' motion for summary judgment, UHH also filed an Additional Statement of Facts [279] cited here as "DSAF [279] ¶ ___." Plaintiffs' response to UHH's Additional Statement of Facts [281] is cited here as "Pls.' Resp. to DSAF [281] ¶ ___."

Employer contribution rates are negotiated in collective bargaining between each local union and employer, and documented in collective bargaining agreements ("CBAs") (DSOF [259] ¶¶ 11, 12), and are subject to approval by UHH.  (Pls.' Resp. to DSOF [269] ¶ 17.)  UHH is managed by its participating labor unions and employers, who have equal representation on the Board of Trustees, the Defendants in this case and fiduciaries of the Plan.  (DSOF [259] ¶ 2; PSOF [264] ¶ 1.)

UHH is comprised of twenty Plan Units.  (DSOF [259] ¶ 8.)  Each Plan Unit provides benefits to employees in a certain region of the country, or to a specific group of employers or participants.  (*Id.*)  Each Plan Unit, however, is considered part of the Fund as a whole, rather than a separate employee benefit fund or plan.  (*Id.*)  Each Plan Unit can offer multiple benefit options or a single set of benefits to its participants.  (DSOF [259] ¶ 9.)[2]

Plaintiffs in this class action are persons who participate or have participated in two Plan Units—Plan Units 178 and 278—at any point from March 21, 2016 through the present.  (Order on Class Cert. [224] at 33.)  Many, but not all, of these individuals are also members of the UNITE HERE union Local 11 ("Local 11").  (Pls.' Resp. to DSOF [269] ¶ 13.)  Plan Units 178 and 278 provide benefits for workers in Los Angeles, California and the Long Beach/Orange County, California area, respectively.  (DSOF [259] ¶ 13.)  Plan Units 178 and 278 were created after two once-separate funds—the Los Angeles Hotel-Restaurant Employer-Union Welfare Fund (the "Los Angeles Fund") and the UNITE HERE Long Beach and Orange County Health Benefit Fund (the "Long Beach Fund")—merged into UHH in March 2012 and July 2012 respectively.  (DSOF [259] ¶ 14.)  Plan Unit 278 no longer exists; it closed on January 31, 2025, years after this litigation was filed.  (PSOF [264] ¶ 3.)

---

[2]     Neither party suggests that the availability of these options has any effect on administrative allocations or contribution rates.

UHH has two administrative offices, one in Las Vegas, Nevada and another in Aurora, Illinois. (Pls.' Resp. to Def.'s SOMF [269] ¶ 55.) The Las Vegas office serves Plan Units based in Las Vegas and Alaska, as well as a unit referred to as the "Hospitality Plan Unit" (the "Las Vegas-administered Plan Units"). (Pls.' Resp. to Def.'s SOMF [269] ¶ 55.) The Aurora office serves all UHH Plan Units other than those administered by Las Vegas. (*Id.*) The two Plan Units at issue in this case, Plan Units 178 and 278, have both been administered by Aurora.

### B. Overall Budget Monitoring

The Board of Trustees manages the Fund under a single budget, which covers all Plan Units. (DSOF [259] ¶ 5.) Consequently, contributions from employers, or trust funds established for similar purposes, are "pooled to support all benefit programs." (*Id.* ¶ 7.) As explained below, however, the Trustees track the surpluses and deficits of individual Plan Units through internal monitoring systems. (Pls.' Resp. to DSOF [269] ¶ 5.) The Fund-wide budget is governed by various policies, referred to here as the Reserve Policy, the Vendor Bid Policy, and the Salary Administration Policy. The Reserve Policy, implemented by the Board of Trustees, sets the minimum level of reserves that UHH must have on hand. (DSOF [259] ¶¶ 26–27.) The Vendor Bid Policy, adopted in 2006 and updated in 2023, requires UHH staff and trustees to engage in a "market competitiveness" analysis of certain contracts every three to five years and to monitor the quality of vendor services and expenses. (*Id.* ¶¶ 35–42.) The Salary Administration Policy sets guidelines for determining UHH staff salaries; UHH "regularly" employs a compensation consultant to review staff compensation and ensure that it is appropriate. (*Id.* ¶¶ 44–46.) Defendants do not say how often such reviews are conducted, but they assert generally that in each such review, the consultant determined that UHH staff and executive salaries were reasonable, but sometimes recommended increases consistent with market rates. (*Id.* ¶ 46.)

Recall that UHH also sets target contribution rates that it expects employers to make. (Pls.' Resp. to DSOF [269] ¶ 119.) UHH sometimes approves contribution rates that are lower than the target rate (including, on occasion, at the request of Local 11), but it also reserves the

4

right to terminate employers who do not pay target rates. (*Id.* ¶¶ 121–23, 127.) UHH thus maintains some control over the contribution rate that employers negotiate with their employees, although the extent of this control is disputed by the parties. In setting target contribution rates, UHH underwriting staff make future projections based on expected health care costs, numbers of participants, projected numbers of work hours, and the necessary reserves that must be maintained. (*Id.* ¶¶ 115–117.) In order to determine the amount of necessary reserves, UHH must estimate future administrative expenses (*id.* ¶ 117), that is, the expense of managing the funds rather than the cost of providing welfare benefits to participants. (PSOF [264] ¶ 5.)

This internal calculation of administrative expenses is what is at issue in this case. Plaintiffs have two complaints. First, Plaintiffs claim that UHH unfairly allocates its administrative expenses among Plan Units. As a result, higher reserves are maintained for some Plan Units, leading UHH to set higher contribution rates for those Plan Units and causing employees in those Plan Units to pay more than they should. Second, Plaintiffs target UHH's management of its administrative expenses, arguing that UHH violates its duty of prudence by incurring administrative expenses that are too high. Defendants argue that the evidence does not support either of these claimed harms.

### C. Overall Administrative Expenses

UHH divides administrative expenses into three categories: "Departmental," "Overhead," and "Professional." (DSOF [259] ¶ 53.) Departmental expenses include UHH staff salaries and employment costs, like travel and training, while Professional expenses cover payments to the Trustees and lawyers. (*Id.* ¶¶ 54, 61.) Overhead expenses include rent, employee benefits, payroll taxes, and supplies. (*Id.* ¶ 58.) Administrative expenses in total account for about 8% of UHH's overall budget, with the remaining 92% available to pay employee benefits. (*Id.* ¶ 31.)

Plaintiffs challenge UHH's administrative expenses as excessive, based on the analysis of their expert, Alex Zeid. Mr. Zeid is an actuary, specifically, an Associate of the Society of Actuaries and a Member of the American Academy of Actuaries, who has consulted on issues in

the life and health insurance space.  (Zeid Rep. [261-2] at 2.)  Mr. Zeid has been self-employed since 1985, and he currently works as an Appointed Actuary and Illustration Actuary, which "includes premium determination, valuations, due diligence, pricing, underwriting, policy drafting and filing, and other life insurance company matters."  (*Id*. at 1-2.)  His experience with Taft-Hartley funds, however, is limited: when asked about this in his deposition, he testified that he had provided services to Amalgamated Clothing and Textile Workers, but he could not say with confidence that this was a Taft-Hartley plan.  (Def.'s Ex. 14 [261-2] at 169–67, Zeid Dep. at 37:1–38:24.)

Mr. Zeid "compared UHH's administrative costs with the administrative costs of other multiemployer plans."  (PSAF [270] ¶ 26.)  He found that "of the 20 multiemployer health plans with the most participants, no plan spent as much as UHH as a percentage of contributions." (*Id.*) Importantly, Zeid compared administrative expenses using Form 5500 data,[3] looking at the overall administrative expenses for "every health plan in the country that submitted Form 5500s for the years he analyzed."  (*Id.* ¶ 21.)  Self-funded health and welfare plans are required to file Form 5500 with the Department of Labor.  (Zeid Apr. 9, 2025 Supp. Rep., Def.'s Ex. 5 [261-2] at 103); Zeid limited his examination to forms submitted by plans with certain characteristics that make them similar to UHH in asset size, contributions, and number of lives.  Specifically, he looked at plans that cover more than 50,000 participants, and have assets exceeding $10 million for health plans coded 4A—that is, health plans other than dental and vision plans.  (PSAF [270] ¶ 22; Zeid Rep. [261-2] at 11.)   Zeid excluded consideration of certain filings that "distorted the analysis," like those plans that had "little or no contributions."[4]  (*Id.*)  Based on that analysis, Zeid concluded

---

[3]      A Form 5500 is an Internal Revenue Service ("IRS") form that an employer maintaining an ERISA plan must file "to report information on the qualification of the plan, its financial condition, investments and the operations of the plan." http://irs.gov/retirement-plans/form-5500-corner (last visited Mar. 31, 2026).

[4]      Plaintiffs have not explained (nor is it clear to the court) how a plan covering 50,000 lives could function with "little or no contributions," but it is reasonable to conclude that filings made by such a fund would be outliers.

that during the class period, UHH incurred the largest amount of administrative expenses per participant, as well as per contributions. (PSAF [270] ¶ 22.) Only one plan in 2020 exceeded UHH's administrative expense per participant. (*Id.*)

Defendants' expert Stephanie Patrick, a senior consulting actuary with nearly 20 years of experience in the health and group benefits consulting field, criticized this analysis on the basis that Form 5500 data does not "capture all the nuances and complexities of a plan's operations." (*Id.* ¶ 31; Patrick Rep., Def.'s Ex. 130 [259-7] at 309, 320.) According to Mr. Zeid, however, such data is still useful because, he contends, "the administrative requirements of all health plans are essentially the same and consist primarily of 'claims adjudication, claims reimbursement, enrollment, policyholder/participant services, billing, collection and cost-savings initiatives.' " (PSAF [270] ¶ 31.)

UHH also submitted the report of David Evangelista, a rebuttal expert. Evangelista, a Certified Public Accountant with almost forty years of experience servicing multiemployer employee benefit plans, was retained to opine on the reasonableness and oversight of UHH's allocation policy and administrative expenses, and to rebut Zeid's expert findings. (Evangelista Rep., Def.'s Ex. 129 [259-7] at 168, 177.) Evangelista, like Patrick, took issue with Zeid's use of Form 5500 data to compare overall administrative expenses because "[b]y resorting to straight comparison administrative expense numbers across funds, [Zeid] falsely assumes that health and welfare funds offer similar administrative services across the board." (*Id.* at 208.)

### D. Allocation of Administrative Expenses

In addition to the claim that UHH incurs excessive administrative expenses, Plaintiffs challenge the allocation of those expenses among UHH Plan Units. Some of UHH's administrative expenses, such as "information technology, legal, human resources, finance, underwriting, payroll audit, and health policy services," are spent on the Fund as a whole, while others, such as professional expenses, are spent on services for a specific Plan Unit or geographic region. (PSOF [264] ¶¶ 8, 10 (undisputed in relevant part); DSOF [259] ¶¶ 56, 59–

7

60, 62–64.) UHH does not allocate administrative expenses based directly on the percentage of administrative services each Plan Unit uses, however. Not all Plan units rely on UHH for all of their administrative services. As a result, UHH allocates its administrative expenses by approximating how much it costs UHH to provide services to each Plan Unit. UHH attempts to capture this approximation by allocating administrative expenses across Plan Units according to an "Administrative Expense Allocation Policy" (PSOF [264] ¶ 6)[5], described in some detail below.

### 1. Contribution-based Allocation

Under the Administrative Expense Allocation Policy, the cost of administrative services that are shared among the entire Fund is generally allocated to each Plan Unit according to its percentage contribution to the Fund. In other words, to calculate the administrative expense allocation for a certain Plan Unit, that Plan Unit's administrative expense allocation is divided by its total contributions to the Fund. (DSOF [259] ¶ 78.) But administrative expenses are allocated slightly differently depending on whether they are categorized as Departmental, Professional, or Overhead.

Departmental expenses that are spent on the entire Plan (also known as "shared services") are allocated among Plan Units based on each Plan Unit's relative contribution to the fund. (DSAF [275] ¶ 24.) But there are two other categories of Departmental expenses: (1) departmental expenses for servicing only the Las Vegas-administered Plan Units, and (2) departmental expenses for servicing only the Aurora Plan Units. (DSOF [259] ¶ 56.) Las Vegas departmental expenses are allocated among Las Vegas-administered Plan Units, and Aurora departmental expenses are allocated among Aurora Plan Units, according to each Plan Unit's relative contribution. (*Id.*) For example, staff that serve only Las Vegas would only have their salaries allocated across Las Vegas-administered Plan Units, and the same for Aurora-specific

---

[5]        This policy was adopted in 1988 and subsequently modified in 2007 and 2002. (Pls.' SOMF [264] ¶ 6.)

8

staff, but staff that perform shared services have their salaries allocated among all Plan Units. (PSOF [264] ¶ 11.)

Overhead expenses that serve all employees and offices are first allocated among departments according to each department's salary expenditures. (DSOF [259] ¶ 59.) Overhead expenses that serve a specific geographic location (i.e., rent for offices serving one Plan Unit) are allocated to the departments in that location. (*Id.* ¶ 60.) Once expenses are allocated to a department, that department's overhead expenses are then allocated among Plan Units according to each Plan Unit's relative contribution rate. (*Id.* ¶ 59.)

Professional expenses that are spent on services provided to all Plan Units are also allocated across Plan Units according to their relative contribution to the Fund. (*Id.* ¶ 62.) But professional fees directly incurred by the Las Vegas-administered Plan Units are only borne by the Las Vegas Plan Units. (*Id.* ¶ 63.) The Aurora Plan Units are likewise allocated professional fees incurred by the Aurora Department, which are allocated among Aurora Plan Units depending on their percentage of contribution. (*Id.* ¶ 64.)

UHH contends these contribution-based allocations are reasonable, but acknowledges that contributions are not a perfect proxy for determining allocations. For example, Trustee Donna DeCaprio testified that administrative costs for each Plan Unit are incurred even on those occasions when a Plan Unit is delinquent in making its contributions. (Pls.' Ex. 202 [264-67] at 9–10, DeCaprio Dep.at 30:14–31:7.) If not perfect, allocations based on contributions are nevertheless a reasonable proxy, UHH maintains.

Trustees who were deposed in this case endorse that conclusion, sometimes without a clear reason beyond history. When asked why allocation was based on contributions, Trustee George Greene testified in his deposition that "[t]he fund staff, the outside consultants, and the trustees over the years, . . . have looked at our options, and we have looked at other options periodically and made the determination that this is the fairest way." (Def.'s Ex. 20 [259-2] at 710, Greene Dep. at 85:11–23.) He continued, "It's not exact, but it's the best option selected by the

9

fund." (*Id.* at 710–711, 85:23–86:1.) Greene was not on the Board in 1988 when the policy was first adopted, however, and he was unaware of other options that had been considered. (*Id.* at 711, 86:2–17.) He also testified that contribution rates "were not tied directly to any expense." (Pls.' Ex. 205 [264-70] at 24–25, Greene Dep. at 84:3–85:9.) Trustee James Louis Claus similarly testified that "[t]here may be other bases, but this [allocation method] has been established," and was reviewed and approved by outside auditors "[w]hen it was initially set up." (Def.'s Ex. 33 [259-3] at 208–209, Claus Dep. at 72:17–73:8.) When asked whether the contribution amounts affected the costs of administration, however, Trustee Claus responded, "I don't believe so." (Pls.' Ex. 204 [264-69] at 6, Claus Dep. at 23:14–18.)

Trustee Ades testified that while it may not be perfect, contribution-based allocation appeared to be a reasonable way to determine how to measure and allocate costs. (Def.'s Ex. 38 [259-3] at 284–85, Ades Dep. at 121:19–122:16.) That said, he did not know whether Plan Units that pay more contributions into the Fund actually cost more to administer. (Def.'s Ex. 38 [259-3] at 286, Ades Dep. at 123:17–23.) Trustee DeCaprio testified that she did not know why contributions were picked as the allocation method, just that the "method has been in place for quite a long time." (Pls.' Ex. 202 [264-67] at 23, DeCaprio Dep. at 100:5–20.)

### 2. The Las Vegas Discount

As detailed, UHH allocates administrative expenses based roughly on each Plan Unit's contribution. UHH's administrative expense policy, however, often calls for "weighting" in calculating the proportion of each Plan Unit's contribution rates for the purposes of determining their allocations. (DSOF [259] ¶ 66.) These "weights" are effectively discounts that account for what UHH describes as the "unique circumstances" of each Plan Unit. (*Id.*) For example, for Plan Units 178 and 278, which provide health care benefits by way of health maintenance organizations ("HMOs"), UHH uses only 75% of their proportional contribution amounts (i.e., a 25 percent discount) to allocate administrative expenses because, UHH asserts, HMO plans are less costly to administer. (DSOF [259] ¶ 67.) Another Plan Unit, the "Food Service Plan Unit" receives

an 8% discount, which accounts for the percentage of its contributions that go towards its less-expensive HMO benefits.  (DSOF [259] ¶ 68.)[6]

A central focus of Plaintiffs' concern is another discount, one accorded to the Las Vegas-administered Plan Units.  Those Plan Units are allocated 100% of their direct expenses, and pay shared Professional expenses based on their proportional contribution rate, without any weighting.  (DSOF [259] ¶¶ 69–70.)  In other words, they receive no discount on shared Professional expenses.  But the Las Vegas Plan Units do receive a significant discount on their allocated amount of shared Departmental and Overhead expenses.  For those expenses, Las Vegas-administered Plan Units' contribution rates are weighted at 1/3 of their full contribution allocation, meaning that the Las Vegas Plan Units enjoy a 66% discount on their contribution rates for these shared Departmental and Overhead expenses.[7]  (DSOF [259] ¶ 71.)  UHH justifies this discount on the basis that the Las Vegas-administered Plan Units perform (and independently bear the cost of) substantial administrative work that otherwise would be provided through the Plan's shared services.  (*Id.* ¶ 72.)  For example, the Las Vegas-administered Plan Units employ Zenith American Solutions, a third-party administrator which provides contribution and accounting, eligibility and enrollment, and claims processing services.  In addition, Las Vegas Plan Units staff perform work that is provided to other Plan Units by UHH shared services.  (*Id.*; PSOF [264] ¶¶ 21, 23.) Thus, according to Defendants, the discount accounts for the fact that Las Vegas-administered units bear independent costs that other Plan Units do not, and other Plan Units benefit from shared services that Las Vegas Plan Units do not use.[8]

---

[6] The parties do not explain why the HMO-based discount is just 8% for the Food Service Plan Unit, but the greater discount (25%) for Plan Units 178 and 278 appears to benefit Plaintiffs.

[7] Actually 66.67%, as Plaintiffs point out, but this is immaterial except for damages purposes.  (Pls.' Resp. to DSOF [269] ¶ 71.)

[8] The Trustees likewise testified in their depositions that the discount applies because of the extra costs that Las Vegas bears independently.  Trustee Greene testified that the discount was applied "[b]ecause the [third-party administrator] takes away a lot of the work

Plaintiffs dispute that this is a reasonable justification for the discount. Plaintiffs contend that the work performed by Zenith would not otherwise be paid for as part of "shared services." (Pls.' Resp. to DSOF [269] ¶ 72.) Zenith is contracted to provide member services, contribution and accounting, eligibility and enrollment, and claims processing. Those services are performed in-house at UHH by UHH's member services department; the CAER department (acronym for "contribution and accounting, and eligibility and enrollment"); and the claims processing department. (Pls.' Resp. to DSOF [269] ¶ 72.) But Plaintiffs contend the fact that UHH provides these services in-house does not justify the discount because these in-house services are provided only to the Aurora Plan Units, and the costs for those services are allocated only to the Aurora Plan Units. Indeed, UHH admits that these UHH departments are not considered shared services at UHH. (Def.'s Resp. to PSOF [274] ¶¶ 18–25.) Plaintiffs point out, further, that Zenith does not provide Las Vegas with any IT, legal, HR, finance, underwriting, payroll audit, or health policy services. UHH provides those services to all Plan Units, and all Plan Units pay for them by way of the allocations for shared services. Thus, Plaintiffs contend, Las Vegas should not receive a discount from its shared services allocation because (as Defendants acknowledge), Las Vegas enjoys the full benefits of shared services while it only pays for a substantially discounted portion of them. (Pls.' Resp. to DSOF [269] ¶ 72; Def.'s Resp. to PSOF [274] ¶ 10, 98–103.)

Plaintiffs argue, further, that even if the services Zenith performs would otherwise be considered shared services, the 66% discount is an arbitrary reduction rather than an accurate reflection of the work that Zenith performs. (Pls.' Resp. to DSOF [269] ¶ 72.) Indeed, there is no clear explanation in the record of how the 66% discount figure was chosen. When asked why the Las Vegas Plan Units were granted a discount of 2/3 rather than some other number, Trustee Ades testified that he would have to "speculate," but that the number has historically been

---

required by the fund staff." (Pls.' Ex. 205 [264-70] at 7–8, Green Dep. at 30:23–31:4.) Trustee Ades similarly explained that the discount applied because "they have a third-party administrator that does a lot," specifically, "work that otherwise would be performed . . . in-house." (Def.'s Ex. 38 [259-3] at 287, Ades Dep., at 124:4–18.)

12

determined to be a reasonable deduction, "and the board and those who have looked at it," including the restructuring committee, "have not found any reason to change that." (Def.'s Ex. 38 [259-3] at 287–289, Ades Dep. at 124:24–126:3.) Trustee DeCaprio also was unable to say whether the Las Vegas Plan Units use just 1/3 of the amount of shared services that other Plan Units use, nor does she know how that number was determined. (Pls.' Ex. 202 [264-67] at 12, DeCaprio Dep. at 33:6–14.) Trustee Greene also testified that he did not know why the number was chosen. (Pls.' Ex. 205 [264-70] at 29, Greene Dep. at 89:10–23.)

### 3. Impacts of Allocation Policy

Importantly, the Administrative Expense Allocation Formula described above is used *only* for "internal accounting purposes." (DSOF [259] ¶ 48.) It does not actually reflect what is charged to Plaintiff Plan Units. Instead, as Defendants have explained, the Formula is used by the finance department for internal monitoring of the health of the fund as a whole. The formula provides additional data concerning costs at the Plan-Unit level. (*Id.* ¶ 49.) But this formula (and the allocated expenses it produces) is used internally and is not audited. (*Id.* ¶¶ 49, 51.) Plaintiffs have produced no evidence that it influences the fund's overall budget, which is prepared on a fund-wide level. UHH maintains monthly dashboards to monitor expense allocation according to the Formula. The dashboards break out each individual Plan Unit's contributions and allocated administrative expenses for UHH staff and the Board of Trustees to review. (*Id.* ¶¶ 49–52.) Because these dashboards are merely a "snapshot" of information, the Dashboard's surplus and deficit numbers do not "roll over into the following year." (*Id.* ¶ 52.) These dashboards were shared with the Board of Trustees starting in 2015. (*Id.* ¶ 104.)

Target contribution rates are set, however, by the underwriting department with the goal of maintaining six months of reserves to ensure Plan Unit self-sufficiency. (*Id.* ¶¶ 115–118; PSOF [264] ¶¶ 131–133.) The underwriting department *does* factor in projected administrative costs to set these contribution rates, but it does so using a different formula than the allocation formula described above. (Simon Decl. [259-2] at 566.) As the parties agree, Local 11 (the Union

13

representing Plan Units 178 and 278) was directing certain employers to over-contribute to UHH because of expected increases in minimum wage. This overcontribution meant that "projecting administrative expenses based on contributions would disadvantage Plan Units 178 and 278." (Pls.' Resp. to DSOF [269] ¶ 133.) For that reason, UHH has made an adjustment in its rate setting process in response: for Plan Units 178 and 278 alone, "UHH estimates future administrative expenses as a percentage of the cost of health benefits," *not* by contributions. (Pls.' Resp. to DSOF [269] ¶ 133.) UHH's chief underwriter Rob Simon confirmed that this formula is separate and apart from the allocation policy described in detail above. (Pls.' Ex. 91A [264-32] at 11–12, Simon Dep. at 48:14–49:15.)

All of this means, Defendants contend, that UHH's allocation policy is irrelevant to how it sets target contribution rates for the Plaintiffs in this case, and thus, they cannot prove that the policy caused them harm. Plaintiffs counter that "it is necessarily the case that the contribution rates must be high enough to account for the allocated administrative expenses." (Pls.' Resp. to DSOF [269] ¶ 134.) For the reasons explained below, however, the court concludes that Plaintiffs have failed to sufficiently prove the allocation formula they challenge is related to any harm for which they seek redress.

## II.     Procedural History

Plaintiffs bring two claims under ERISA §§ 502(a)(2), 502(a)(3), and 409; 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109, for breaches of fiduciary duty. As noted, Plaintiffs claim that the Board of Trustees breached these fiduciary duties in two ways: (1) through its Administrative Expense Allocation Policy—specifically, tying allocation to relative contribution rates, and applying the 66% discount to the Las Vegas-administered Plan Units' allocated Overhead and Departmental Expenses—(Count I), and (2) by incurring excessive and unreasonable total administration expenses (Count II).

In terms of remedies, should these violations be proven, Plaintiffs seek (1) restitution of their "lost income and other compensation caused by the Defendants' breaches of their fiduciary

14

duties," as well as disgorgement of Defendants' profits; (2) an injunction prohibiting UHH from accruing excessive administrative fees, from allocating expenses based on percentage of contributions without regard to the number of participants in each plan unit, and from applying a 66% discount to the Las Vegas Plan Unit; and (3) a court order transferring "plan assets attributable to contributions on behalf of Named Plaintiffs and Class Members to a health plan that currently provides their benefits," i.e., the Santa Monica Fund. (First Am. Complaint [46] at 52–54, ¶ 8; Pls. Resp. to DSOF [269] ¶ 153.)

Plaintiffs filed their original complaint [1] on March 21, 2022, and, following Judge Leinenweber's partial grant [31] of Defendants' first motion to dismiss [19], filed a First Amended Complaint ("FAC") [46] on October 3, 2023. This court denied Defendants' motion to dismiss [49] Plaintiffs' first amended complaint [120]. On April 16, 2024, Plaintiffs moved for class certification [76]. This court certified the following issues for class resolution pursuant to FED. R. CIV. P. 23(c)(4):

- 1. Whether Defendant had a policy of allocating administrative expenses among Plan Units based on the amount of each Plan Unit's incoming contributions, and whether such policy was a breach of Defendant's fiduciary duties under ERISA, 29 U.S.C. ch. 18.
- 2. Whether Defendant had a policy of discounting contributions from Las Vegas Unit 150 by 66% in allocating administrative expenses, and whether such policy was a breach of Defendant's fiduciary duties under ERISA, 29 U.S.C. ch. 18.
- 3. Whether Defendant took on administrative costs that were significantly greater than those of similar health benefit plan, and whether such conduct was a breach of Defendant's fiduciary duties under ERISA, 29 U.S.C. ch. 18.
- 4. Whether members of the class are entitled to injunctive relief.

(Order Clarifying Class Cert. [248] at 4.)

On August 27, 2025, Defendants moved for summary judgment on all claims [257] and to exclude the opinions of Plaintiffs' expert, Mr. Alex Zeid [260]. Plaintiffs also moved for partial summary judgment on Count I, which alleges that Defendants breached their fiduciary duties by adopting and failing to review an unreasonable allocation policy for administrative expenses [262].

15

For the reasons stated, the court grants Defendants' motion for summary judgment, denies Plaintiffs' motion, and strikes the motion to exclude the expert testimony of Alex Zeid as moot.

## LEGAL STANDARD

Summary judgment is appropriate if "'there is no genuine dispute as to any material fact,' and the moving party 'is entitled to judgment as a matter of law.'" *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026) (quoting FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, the court construes "the facts in the light most favorable" to the non-moving party and draws "all reasonable inferences in its favor." *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025). It does not "weigh evidence or make credibility determinations." *Johnson*, 164 F.4th at 1079.

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings. *Anderson*, 477 U.S. at 256–57 (1986). Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## DISCUSSION

Under ERISA, plan administrators owe a fiduciary duty of loyalty and prudence to the plan participants and their beneficiaries in their administration of the plan. "These duties are 'the highest known to the law.'" *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 943 (7th Cir. 2024) (citation omitted). Under the duty of loyalty, a

16

fiduciary must act for "the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Under the duty of prudence, the fiduciary must act "with the care, skill, prudence, and diligence" of a "prudent man acting in a like capacity and familiar with such matters." 29 U.S.C. § 1104(a)(1)(B); *Appvion*, 99 F.4th at 943. This is known as "the prudent man standard of care." 29 U.S.C. § 1104(a).

A plaintiff bringing a claim for breach of fiduciary duty must prove "'(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579 (7th Cir. 2022) (quoting *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 678 (7th Cir. 2016)). There is no dispute that the Defendant Trustees are plan fiduciaries. Defendants do, however, argue that they did not breach any duty, and even if they did, Plaintiffs have failed to produce evidence showing that any breach caused them harm.

Courts look to the common law of trusts in evaluating an ERISA fiduciary's actions. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) (ERISA fiduciary's duty is informed by common law of trusts). Under trust law, a fiduciary not only has a duty to make prudent decisions, but to continually monitor its decisions and revise imprudent ones. *Id.* at 529 (this "continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."). Consequently, "a fiduciary's failure to exercise his or her discretion—i.e., . . . under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care." *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 796 (7th Cir. 2011).

"Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) (citation omitted). Further, "[w]hether an ERISA fiduciary has acted prudently requires consideration of both the substantive

17

reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision." *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014).

## I.      Count I: Unfair Allocation of Administrative Expenses

Both Plaintiffs and UHH seek summary judgment on Count I—Plaintiffs' claim that UHH and its Board of Trustees breached their fiduciary duty in adopting an Administrative Allocation Policy that tied allocation of costs to relative contribution rates, and applied a two-thirds discount to certain costs allocated to the Las Vegas Plan Units.

"Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012). "Even though the parties may agree that no genuine dispute of material fact exists, the Court can deny all motions if the parties do not establish their rights to judgment as a matter of law." *Tokio Marine Specialty Ins. Co. v. Altom Transp., Inc.*, 618 F. Supp. 3d 791, 795 (N.D. Ill. 2022), *aff'd,* No. 23-1443, 2024 WL 808059 (7th Cir. Feb. 27, 2024).

As explained here, the court concludes that Plaintiffs have what may be meritorious criticisms of UHH's overall allocation policy, but they have not shown how that policy caused them actual harm, nor have they established that the policy UHH employs to calculate the contribution rates for their Plan Units is not a reasonable one.

### A.      The contribution-based allocation

The court begins with Plaintiffs' objections to UHH's policy of allocating certain shared administrative expenses according to a Plan Unit's relative contribution rate. Plaintiffs contend that policy is unreasonable, because contribution rates do not rationally relate to UHH's actual cost of administering its Plan Units. Consequently, Plaintiffs argue, Plan Units 178 and 278 end up subsidizing other Plan Units by paying more than their fair share of administrative expenses. Instead, in Plaintiffs' view, the UHH should utilize an allocation method based on numbers of participants in each Plan Unit, a method that their expert, Mr. Zeid, contends would be a better

18

proxy for administrative costs. Plaintiffs also claim that even if the allocation method that UHH has used is not substantively unreasonable, UHH's failure, for 25 years, to exercise any discretion in assessing this method by itself constitutes a breach of fiduciary duty.

The parties have spilled much ink on the question of whether UHH's contribution-based allocation approach is reasonable, a question that may turn on relatively complicated accounting decisions. The court concludes it need not decide the issue, however, because Plaintiffs have not demonstrated that the allocation approach they challenge actually caused the harm for which they seek redress. It is undisputed that this approach is *not* used by UHH to determine the target contribution rates for Plaintiff Plan Units. (DSOF [259] ¶ 133; Pls.' Resp. to DSOF [269] ¶ 133.) This means Plaintiffs have not been subject to excessive contribution rates as a result of this approach and have not suggested how, otherwise, they have been harmed. Without a showing of harm, Plaintiffs have not established this essential element of their claim of breach of fiduciary duty claim under ERISA. *See George*, 2011 WL 5118815, at *9 ("[B]oth loss and a causal connection between that loss and defendant's breach are necessary elements of an ERISA claim for damages under 29 U.S.C. § 1109(a).")

Plaintiffs acknowledge that in fact, UHH sets contribution rates for Plan Units 178 and 278 using a percentage-of-benefits approach—not a percentage-of-contributions approach. They acknowledge, further, that this practice is adopted to ensure that Plan Units 178 and 278 were not overcharged relative to the actual cost of administering their plans. (*See* Pls.' Mot. [263] at 24; Pls.' Resp. to DSOF [269] ¶ 133.) But Plaintiffs nevertheless insist that UHH's allocation approach must have an impact on the contribution rates set for their Plan Units because the general allocation approach is used for internal accounting purposes, and "it is necessarily the case that the calculated contribution rates must be high enough to account for the allocated administrative expenses." (Pls.' Resp. to DSOF [269] ¶ 134.) Because, according to Plaintiffs, Trustees use the general allocation approach in determining whether a Plan Unit (including Plaintiff Plan Units) is self-sufficient, and because "the Trustees 'may take necessary action' to

19

'return such Plan Unit to self-sufficiency,' " it follows that the general allocation approach informed decisions about Plaintiff Plan Units contribution rates. (*Id.*)

The court does not find Plaintiffs' contention that "it must have happened" satisfactory for purposes of summary judgment. In short, beyond conjecture and speculation, Plaintiffs have failed to point to any evidence regarding how UHH's general allocation approach, or the Las Vegas discount, actually increased the contributions that Plaintiffs are required to pay. Plaintiffs have not demonstrated, for example, that on any particular occasion, even once, Trustees or UHH staff—after assessing the financial health of their Plan Units via reference to the allocated administrative expenses, and finding those Plan Units would run a deficit—increased contribution rates for Plaintiff Plan Units to ensure that their Plans remained in the black. Nor have they demonstrated that the administrative expenses used by UHH's underwriting department to set target rates closely mirrored the administrative expense allocation developed by the finance department. Quite the opposite: Plaintiffs have repeatedly acknowledged that the formula used to calculate their target contribution rates is different than the allocation formula they challenge. (Pls.' Resp. to DSOF [269] ¶ 134, Pls.' Resp to DSAF [281] ¶ 64.). Instead, Plaintiffs baldly argue that "the exact formula by which UHH determined how much to overcharge [Plaintiff Plan Units] is irrelevant." (Pls. Reply [280] at 2.) But the formula for determining contribution rates is *profoundly* relevant when Plaintiffs challenge that formula as unreasonable or unfair. Plaintiffs have engaged in several months of discovery, but have yet to add meat to the bones of their causation theory, sufficient to create a genuine dispute of material fact. *Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

In reaching its conclusion, the court acknowledges that Defendants have done a poor job of explaining their apparent failure to review this allocation approach on a regular basis, or

20

justifying the discount applied to administrative expenses allocated to the Las Vegas Plan Units. The evidence suggests that Defendants did not review the Las Vegas discount policy for at least 25 years. (Pls.' Opp'n [268] at 20–21, 42.) Defendants point to several dates where they claim the Trustees reviewed the policy, but the evidence they present does not suggest that any review between 2000 and 2021 was sufficiently detailed to make their decision to keep the Las Vegas discount a reasoned one. For example, in 2002, meeting minutes reflect that UHH's CFO merely "addressed a Trustee inquiry about the 'allocation of administrative expenses'," which was the extent of the discussion regarding the discount. (Def.'s Resp. to PSOF [274] ¶ 55.) In 2007, when UHH's pension fund merged with other pension plans, meeting minutes from the Board of Trustees' meeting show that Trustees did not discuss the Las Vegas discount, despite this being a circumstance where review of the allocation policy would have been warranted. (PSOF [264] ¶ 56.) In 2009, Trustees apparently asked UHH executive staff to prepare a report to the Trustees regarding the allocation of expenses between Las Vegas and Aurora, after UHH's CEO told trustees that "[t]he reasons why any particular item is allocated appear to be lost in the mists of time." But there is no evidence that such a report was provided or that the Trustees requested any follow up after their November 19, 2009 meeting. (Def. Resp. to PSOF [274] ¶¶ 57–58.) And "Defendants admit they have identified no records reflecting review of the allocation policy between December 3, 2014 and June 2, 2021." (*Id.* ¶ 69.)

Defendants cannot, however, be held liable for procedural imprudence alone. ERISA requires Plaintiffs to demonstrate that imprudent decision-making resulted in an objectively unreasonable decision that harmed them in some way. *Albert,* 47 F.4th at 583 (quoting *Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010)) ("[S]everal [district] courts have held that a failure to monitor claim is derivative in nature and must be premised [on] an underlying breach of fiduciary duty."). It is true that under ERISA, a fiduciary has a duty to "exercise his or her discretion—i.e., to balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done

21

so . . . ." *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 796 (7th Cir. 2011); *see also Munt v. WEC Energy Grp., Inc.*, 728 F. Supp. 3d 957, 969 (E.D. Wis. 2024) (explaining that while fiduciaries need not make a decision regarding every aspect of a plan at "regular or prescribed intervals," they may be liable "for failing entirely to do so, or for failing to do so for a long period of time"). But plaintiffs bringing claims under ERISA must still sufficiently prove causation to be entitled to a remedy. *Appvion*, 2025 WL 346736, at *4 ("ERISA plaintiffs must plead that there is some causal connection between their claim and the alleged losses." (citing *Brant v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982)). Because Plaintiffs here have failed to sufficiently demonstrate that the allocation approach and discount caused them harm, the court need not say more about this asserted breach of the UHH's Trustees fiduciary duty.

Defendants' motion for summary judgment is granted as to UHH's contribution-based allocation approach and the Las Vegas discount.

## II. Count II: Excessive Administrative Expenses

Plaintiffs have alleged that the Trustees breached their fiduciary duties in a second way, as well: by incurring "unreasonable administrative expenses compared to the level of benefits provided." (Am. Compl. [46] ¶ 6.) Plaintiffs' basis for this allegation is a comparison performed by their expert, Mr. Alex Zeid, of UHH's overall administrative costs to those incurred by comparable plans. UHH's costs were substantially higher—among the highest in the nation, according to Mr. Zeid. (Pls. Opp'n [268] at 24.) Defendants move for summary judgment on this claim, as well. They argue that the other plans to which Plaintiffs compare UHH are not comparable as a matter of law. The court agrees.[9]

Guidance on this issue can be found in *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022). There, affirming dismissal of an ERISA plaintiff's complaint, the Seventh Circuit outlined

---

[9] Defendants also argue that UHH's monitoring activities were reasonable as a matter of law; because summary judgment is granted on other grounds, the court need not consider this argument.

22

the standard for stating a claim regarding overall excessive expenses under ERISA.  The court observed that, while the determination of whether a plaintiff's complaint regarding excessive administrative expenses passes muster requires careful, " 'context-sensitive scrutiny of a complaint's allegations,' " it is not sufficient for plaintiffs to simply allege that fees were higher than average fees for other plans.  47 F.4th at 580 (citation omitted).  Rather, plaintiffs are required to "allege that recordkeeping fees were excessive *relative to the services rendered*."  *Id.* (quoting *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (cleaned up and emphasis added)).

Defendants raised a concern on this score when they filed their motion to dismiss Count II in October 2023 [49], asserting there that the allegations in Plaintiffs' complaint were based on improper average comparisons.  The court denied that motion [120], finding that Plaintiffs' distinction between fully-funded and self-insured plans was sufficiently distinct from a comparison of average administrative expenses to suffice at the pleading stage.  *Acosta v. Bd. Of Trustees of UNITE Here Health*, No. 22 C 1458, 2024 WL 3888862, *8 (N.D. Ill. Aug. 21, 2024).  But the court observed that discovery was ongoing, and that "this analysis may change as more information comes to light."  (*Id.*)  A comparison between other multiemployer plans listed in the complaint would "indeed end up being apples-to-oranges" if those other plans, for example, turned out to "offer varying portfolios of health-care benefits at vastly divergent price points."  (*Id.*)  In other words, for Plaintiffs to demonstrate sufficiently that the administrative costs they faced were actually excessive relative to the services they received, they would need to investigate whether the administrative services of other plans were comparable to the services rendered by UHH.  Plaintiffs have failed to do so.

Plaintiffs' claim regarding average administrative expenses relies almost exclusively on the opinion of their expert, Mr. Zeid.  In conducting his analysis of UHH's administrative costs, Mr. Zeid did not perform an analysis of the services rendered by UHH and its vendors compared to the services rendered in the comparator plans.  Rather, Mr. Zeid assumed, for the purposes of

23

his report, that "the administrative requirements of all health plans are essentially the same" consisting primarily of "claims adjudication, claims reimbursement, enrollment, policyholder/ participant service, billing, collection and cost-savings initiatives." (PSOF [270] ¶ 31.) According to Plaintiffs, Zeid's assumption means that "differences in services have no material impact on the expenses incurred by a plan," so "it is not necessary to show that the services provided to or available to other plans are the same as long as there are other metrics that provide for a meaningful comparison." (Pls.' Opp'n [268] at 31–32.)

Plaintiffs' argument fails for several reasons. First, as the Seventh Circuit established in *Albert*, it is legally insufficient to simply assume that all administrative expenses are the same between plans and then conduct a comparison of averages to support a claim regarding excessive costs. 47 F.4th at 580. This is precisely what Mr. Zeid has done in developing his opinion. Plaintiffs' reference to UHH's excessive costs as compared to a variety of different comparison sets is unavailing when their expert failed to do what the case law requires in any of the comparisons he offers—namely, to dig deeper regarding what specific administrative services were offered by UHH or the comparator plans. Mr. Zeid instead assumed relative uniformity of administrative costs among health plans, but offered no support for this assumption and admitted in his deposition that he did not look at the administrative services used by either UHH or comparator plans in developing his opinion. (Defs. Ex. 137 [259-7] at 572, Zeid Dep. at 203:16–21.) Nor did he identify any other evidentiary source for his assumption. (*See* Zeid Rebuttal Report to Evangelista, [261-2] at 71.)

Finally, even assuming that Mr. Zeid's assumption is supported and accurate, Plaintiffs' suggestion—that "other metrics for meaningful comparison" can replace an analysis regarding the services rendered in comparator plans—was rejected in *Albert*. Indeed, the metrics offered by Plaintiffs, including "the assets of the plan, the amount of contributions received by the plan, and the number of participants in the plan" (Pls.' Opp'n [268] at 30–31), were precisely the ones that the Seventh Circuit found insufficient to state a claim. *Albert*, 47 F.4th at 579 (finding that

plaintiff failed to state a claim where comparator plans had "similar numbers of participants" and "total assets," but did not include information concerning the quality or type of recordkeeping services provided by comparator plans).

Plaintiffs cite to *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 185 (3d Cir. 2024), to support their argument that Zeid's comparison, which used administrative costs listed on various plans' Form 5500s, is sufficient to establish their claim. (Pls.' Opp'n [268] at 33–34.) In *Mator*, plaintiffs, a class of plan participants and beneficiaries, alleged that the plan's fiduciaries caused the plan to pay excessive record keeping fees. To support their allegation, plaintiffs ran a comparative analysis of Form 5500s for various comparable plans. In doing so, they assessed the recordkeeping fees for the defendant plan by comparing other plans with identical or similar "service codes," which are codes that outline the specific services that are rendered under the umbrella of recordkeeping. *Id.* at 185. The court concluded that it would be overly burdensome to require plaintiffs to identify "identical comparators," i.e., those with an exact match for service codes on their Form 5500s, at the motion to dismiss stage. *Id.* at 186 n.4 ("[I]t would be virtually impossible for a plaintiff to identify plans that buy precisely the same bundle of services as a defendant plan. That would make it more important for courts not to disregard every less-than-identical comparator.") Importantly, however, the court found the complaint sufficient because plaintiffs "provide[d] specific plan comparators, not just industry averages, and plausibly allege[d] that the services purchased were sufficiently similar to render the comparisons valid." *Id.* at 188. Unlike the information supporting plaintiffs' complaint in *Mator*, Zeid's report did not look beyond the overall administrative costs outlined in Form 5500s. (*See* Pls.' Opp'n [268] at 17.) Plaintiffs' reliance on *Mator* is therefore misplaced.

Because the comparison Plaintiffs use is insufficient as a matter of law, summary judgment in favor of Defendants is warranted on Count II. The court need not address Plaintiffs' claim for procedural breach of fiduciary duty on this issue. *See Cutrone v. Allstate Corp.*, No. 20 CV 6463, 2025 WL 306179, at *5 (N.D. Ill. Jan. 27, 2025).

25

### III.     A Note on Requested Remedies

One final observation:   If Plaintiffs could prove their claims here, there would be open questions regarding their requested remedies.   First, Plaintiffs' argument that they can recover lost wages is unsupported, as ERISA is limited to equitable relief.   Plaintiffs rely on *CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011) to argue that lost wages are an appropriate form of relief under ERISA.   *Amara* did seem to broaden the type of relief available under ERISA to monetary damages that looked more compensatory rather than equitable in nature, and many courts permitted such relief in its wake.   *Tapley v. Locs. 302 & 612 of the Int'l Union of Operating Eng'rs-Emps. Constr. Indus. Ret. Plan*, No. 3:10-CV-0033-HRH, 2014 WL 12616914, at *2 (D. Alaska July 11, 2014) (permitting recovery of lost wages in the wake of *Amara*); *cf. McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 (4th Cir. 2012) (permitting claim for life insurance proceeds lost as a result of defendant's breach).   The Supreme Court has since clarified, however, that such extension of the relief available under ERISA was inappropriate.   *See Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 148 n.3 (2016) (clarifying that *Amara*'s discussion of relief available under § 502(a)(3) was "not essential to resolving that case," and that the Court's interpretation of equitable relief in earlier cases limiting relief to recovery of "'particular funds or property in the defendant's possession . . . remains unchanged"); *see also Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 504 (4th Cir. 2023) (rejecting *McCravy*'s expansion in light of *Montanile*.)  Even had they proven their claims, Plaintiffs could not move forward to pursue a lost wages remedy.

That leaves their other forms of requested relief, including injunctive relief and an "order to transfer plan assets attributable on behalf of Named Plaintiffs and Class Members to a health plan that currently provides their benefits," i.e., the Santa Monica Fund. (Am. Compl. [46] at 53–54; Pls'. Resp. to DSOF [269] ¶ 153.)  As to injunctive relief, Plaintiffs must demonstrate that they are entitled to a permanent injunction by showing that "future harm [is] imminent rather than likely to occur at some undefined point down the road."   *Pa. Chiropractic Ass'n v. Blue Cross Blue*

26

*Shield Ass'n*, No. 09 C 5619, 2014 WL 4087221, at *5 (N.D. Ill. Aug. 19, 2014), *rev'd on other grounds sub nom*, *Pa. Chiropractic Ass'n v. Indep. Hosp. Indem. Plan, Inc.*, 802 F.3d 926 (7th Cir. 2015) (citation and internal quotation marks omitted).  Plaintiffs allege in their complaint that another health plan "currently provides their benefits." (Am. Compl. [46] at 54.)  It is therefore unclear whether Plaintiffs would have standing to request an injunction, as it appears that UHH no longer provides benefits to the named class members.

And in terms of Plaintiffs' request that the court order a transfer of funds attributable to their contributions to the Santa Monica Fund, the court is at a loss regarding the propriety of such a remedy; the Santa Monica Fund provides benefits to participants who are not members of the class and never received benefits from UHH.  (DSOF [259] ¶ 156, Pls.' Resp. to DSOF [269] ¶ 156; Def.'s Exh. 100 [259-5] at 223, Lynch Dep. at 53:3-8); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." (internal quotations omitted)).  At oral argument, the court pushed Plaintiffs to explain how their proposed remedy would be limited to benefit class members alone.  Plaintiffs' counsel responded by saying that he "suspect[ed] that [the Santa Monica Fund] would be willing and able to implement some type of reasonable limitation on the spending" of the transferred funds (Tr. of Oral Argument [293] at 58:5–8), but it remains unclear how such a limitation would operate.  Because Defendants are entitled to summary judgment on other grounds, however, the court need not attempt to weed through this confusion in more detail.

27

## CONCLUSION

For the reasons explained here, Defendants' motion for summary judgment [257] is granted. Plaintiffs' cross motion for summary judgment is denied [262]. The pending motion to exclude the testimony of Dr. Zeid [260] is stricken as moot. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiffs.

ENTER:

Dated:  March 31, 2026

_____
REBECCA R. PALLMEYER
United States District Judge

28